**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY
and SIERRA CLUB,

      Plaintiffs,

v.                               CIVIL ACTION NO: 3:20-470

AUSTIN CAPERTON, Secretary,
West Virginia Department of
Environmental Protection,

      Defendant.

## <u>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS</u>

For the following reasons, this Court should deny Defendant's meritless motion to dismiss.

### FACTUAL AND LEGAL BACKGROUND

On January 21, 1981, the Office of Surface Mining Reclamation and Enforcement ("OSM") conditionally approved West Virginia's State program pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1253. SMCRA requires that an approved state program, such as West Virginia's, have a bonding system that ensures the costs of reclamation are covered if a mine operator is unwilling or unable to complete reclamation. 30 U.S.C. § 1259; 30 C.F.R. § 800.14. The state may allow bonding requirements to be met either through a full-cost, site-specific bond, in which the full cost of reclamation is provided at the outset, or an "Alternative Bonding System" ("ABS"). An ABS allows the permittee to begin mining without securing a bond for total reclamation costs. 30 C.F.R. § 800.11. An ABS, however, must meet two requirements: 1) it must ensure there is an economic incentive for the permittee to complete reclamation; and, 2) it must be tailored so that "the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time." <u>Id</u>. § 800.11(e).

1

West Virginia operates an ABS through a combination of site-specific bonding and its Special Reclamation Fund. Compl., ¶ 23; see also W. Va. Code § 22-3-11. Pursuant to the West Virginia ABS, an operator posts an initial site-specific bond not to exceed $5,000 per acre. W.Va. Code § 22-3-11. Should the permittee fail to compete reclamation and should the reclamation costs at the mine exceed the penal bond amount, the WVDEP draws money from the Special Reclamation Fund to complete reclamation. Id. at § 22-3-119(g). The Special Reclamation Fund is funded through a fee on every ton of clean coal mined in West Virginia (currently 27.9 cents per ton). Compl., ¶ 27. Through this hybrid system, West Virginia maintains its ABS program so long as it retains "sufficient money to complete the reclamation plan for any areas which may be in default at any time." 30 C.F.R. § 800.11(e). West Virginia's ABS was approved by OSM on March 1, 1983. 60 Fed. Reg. 51,900 (1995).

On March 26, 2020, the West Virginia Department of Environmental Protection ("WVDEP") filed an emergency motion in the Circuit Court for Kanawha County, West Virginia, requesting that the court place ERP Environmental Fund, Inc. ("ERP"), into receivership, and that it appoint a special receiver to take immediate control of ERP's assets. Compl., ¶ 29. WVDEP's filings in that action show the agency's own assessment of ERP's financial state: insolvency. Id., ¶¶ 30–31. WVDEP further elaborated on the effect of that insolvency on the Special Reclamation Fund. Id. Specifically, the filings show that the ERP had ceased operations, laid off all its employees and had no source of cash or other assets available for reclamation at its mines. Id. WVDEP averred to the Kanawha County Circuit Court that ERP had over 100 permits for coal mines in West Virginia, had accrued hundreds of violations of its permits, and was subject to 41 orders to show cause why relevant permits should not be revoked. Id., ¶ 31. WVDEP further represented to the court that, although ERP had $115 million in bonds, the agency was unsure if it could rely on those bonds for reclamation. Id. The agency's description of the impact of the insolvency on the Special Reclamation Fund was dire. It specifically stated that taking over the reclamation obligations for ERP's permits would "overwhelm the fund

both financially and administratively." Id. WVDEP estimated ERP's permits would require $230 million in general reclamation costs and an additional hundreds of millions of dollars to treat selenium-related water quality issues. Id. According to a recent accounting of the Special Reclamation Fund's finances, there are only $174 million available for both land and water reclamation in the fund. Id., ¶¶ 28, 31.

On March 27, 2020, the Kanawha County Circuit Court issued a temporary restraining order ("TRO") granting the WVDEP's motion and appointing Doss Special Receiver, LLC as special receiver for ERP's receivership estate. In a declaration submitted to this Court in another proceeding, the Special Receiver stated that "[t]he cash currently available to the Receivership is insufficient to resume the earth-work component (grading, seeding, revegetating) of reclamation remaining to be completed at ERP's permits while also simultaneously bringing all NPDES permitted outlets into compliance with effluent limits." Compl., ¶ 35. Despite the estimated "hundreds of millions of dollars" in liabilities at ERP's sites, the Special Receivership was initially funded with only one million dollars. Id., ¶ 36.

Although ERPs' insolvency alone is enough to "overwhelm" the Special Reclamation Fund, it is not the only company in a financially precarious position. Murray Energy and its subsidiaries, which operate more than 20 mines in West Virginia are currently in bankruptcy. Id., ¶ 41. Revelation Energy and its affiliate companies are in bankruptcy. Id., ¶ 42. Southeastern Land, LLC, is financially stressed and currently subject to litigation by WVDEP at over forty mine sites. Id., ¶ 43.

To maintain its administration of SMCRA, the WVDEP is required to "implement, administer, enforce, and maintain [its program] in accordance with [SMCRA], this chapter, and the provisions of the approved State program." 30 C.F.R. § 733.11. Among WVDEP's obligations is a nondiscretionary duty to promptly notify OSM "in writing of any significant events or proposed changes which affect the implementation, administration, or enforcement of the approved state program." 30 C.F.R. §

3

732.17(b). Notification is specifically required when there are "[s]ignificant changes in funding or budgeting relative to the approved program." 30 C.F.R. § 732.17(b)(6). OSM has specifically noted in other contexts that "the failure of a large mining company could be a very significant event." 67 Fed. Reg. 37610, 37623 (May 29, 2002).

On May 8, 2020, Plaintiffs gave notice of their intent to sue based on those facts and WVDEP's failure to perform its nondiscretionary duty under 30 C.F.R. § 732.17(b). On July 8, 2020 (the 61st day after the notice of intent to sue was sent), the WVDEP sent a letter to OSM specifically denying that any significant event had occurred which affected the implementation, administration, or enforcement of the State program. Compl., ¶ 45. Instead, it informed OSM that its actions related to ERP's permits had "positively affected the State's [ABS] program." Id.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(1) of the Fed. R. of Civ. P. may be either an attack made on the fact of the complaint or upon the truth of the underlying allegations. Beck v. McDonald, 848 F3.d. 262, 270 (4th Cir. 20187). In the case of a facial attack, as here, the court is required to accept all of the complaint's factual allegations as true, "and the plaintiff, in effect, is afforded the same procedural protection as he would under a 12(b)(6) construction." Adams v. Bain, 697 F.2d. 1213, 1219 (4th Cir. 1982). Pursuant to Rule 12(b)(6), the court must construe factual allegations in the light most favorable to the plaintiff. Lambeth v. Bd. of Comm'rs of Davidson County, 407 F.3d 266, 268 (4th Cir.2005)).

## ARGUMENT

## I.   WVDEP Did Not Provide Requisite Notice to OSM of the Effects of ERP's Insolvency

In his Memorandum in Support of Its Motion to Dismiss, Defendant maintains that WVDEP did provide, and Plaintiffs pled, that WVDEP provided notice to OSM. He further argues that such an allegation in the Complaint is alone sufficient grounds for dismissal of this action. Such an argument

4

grossly misconstrues the facts alleged and the actual letter that WVDEP sent to OSM. Defendant cannot rewrite the Complaint to fit his own legal theories for dismissal. "[T]he plaintiff is the master of the complaint." Ohio Valley Envt'l Coal. v. Apogee Coal Co., LLC., 531 F. Supp. 2d 747, 755 (S.D. W.Va. 2008).

As stated in the Complaint, and described above, the WVDEP sent a letter to OSM specifically stating that no significant events had occurred which affected the implementation, administration, and enforcement of the bonding program in West Virginia. Compl.,. ¶ 45. In addition, the letter described WVDEP's actions on ERP's permits as positively affecting the state program. Id. The argument that a letter denying that any significant event had occurred is adequate notification of a significant event is simply perverse. WVDEP's July 8, 2020 letter therefore does not and cannot satisfy the agency's obligations under § 732.17(b).

Although Defendant repeatedly argues that this case involves WVDEP's discretion over what to tell OSM, no discretion is involved. The agency has admitted that its ABS is not sufficient to handle the current insolvency of ERP. Compl., ¶¶ 30–31. That admission shows that WVDEP's duty was triggered pursuant to 30 C.F.R. § 732.17(b) to notify OSM of a significant change in financial condition of the ABS, and that duty is nondiscretionary. It does not matter that the agency has been unable or unwilling to cash in ERP's bonds at its defunct mines. That bond money ($115 million) cannot fill the huge financial gap in the ABS, which currently has only $174 million and cannot cover the current and future costs of reclaiming all of ERP's mines ($230 million) and treating all of their wastewater (additional hundreds of millions). SMCRA requires WVDEP to ensure the ABS has "sufficient money to complete the reclamation plan for any areas which may be default at any time." 30 C.F.R. § 800.11(e) (emphasis added). The words "at any time" are not limited to current forfeitures but require West Virginia to "ensure that sufficient money will be available to complete land and water reclamation on all existing and future bond forfeiture sites." 67 Fed. Reg. 37610, 37613 (emphasis added). ERP's

insolvency is a significant event which threatens the "implementation administration, or enforcement of the program" (i.e. the state's ability to run the program in a way which complies with SMCRA), so notice to OSM is required. 30 C.F.R. § 732.17(b). WVDEP's letter to OSM is insufficient on its face to satisfy WVDEP's duty.

Moreover, the regulation at issue does not provide room for agency discretion. 30 C.F.R. § 732.17(b). The plain language provides:

> The State regulatory authority shall promptly notify the Director, in writing of any significant events or proposed changes which affect the implementation, administration, or enforcement of the approved State program. At a minimum notification shall be required for—. . . (6) Significant changes in funding or budgeting relative to the approved program.

Id. The duty to notify is denoted by the word shall, which is mandatory and is a typical way to describe a nondiscretionary duty. Kingdomware Technologies, Inc. v. U.S., ____ U.S. ____, 136 S.Ct. 1969, 1977 (2016); see also Sierra Club v. U.S. Army Corps of Eng'rs, 909 F.3d 635, 645 (4th Cir. 2018) ("'Shall' is an unambiguously mandatory term[.]") WVDEP's duty is triggered by the occurrence of a "significant event" (rather than the agency's assessment or determination of a situation.) The Court cannot defer to the agency and must determine whether a significant action has occurred based on the evidence presented. See e.g., Ohio Valley Envt'l Coal. v. Pruitt, 893 F.3d 225, 229–31 (4th Cir. 2018) (recognizing the "constructive submission doctrine" in which a court may find that an agency's mandatory duty is triggered by the prolonged failure to submit necessary documents.").

## II.     **Plaintiffs Are Not Bound to the Decision of the** Norton **Court by Res Judicata**

Defendant's res judicata argument is meritless. As the Fourth Circuit has explained, the doctrine of res judicata bars claims where there is 1) a final judgment on the merits in a prior suit; 2) an identity of the cause of action in both the earlier and the later suit; and 3) an identity of parties or their privies in the two suits. SAS Institute, Inc. v. World Programming Limited, 874 F.3d 370, 378 (4th Cir. 2017). Under the principles established by the Fourth Circuit, res judicata does not apply to

the claim in this action because the second and third elements are not satisfied. First and foremost, the claim at issue in this case does not share an identity of cause of action with any of those resolved by the court in <u>West Virginia Highlands Conservancy v. Norton</u>, 147 F. Supp. 2d 474 (S.D. W.Va. 2001). Second, although one of the Plaintiff organizations participated in the <u>Norton</u> case, two did not. Accordingly, there is no privity between the participant in the former case and the other two Plaintiffs in this action.

A. <u>The Claim at Issue in this Case Did Not Arise out of the Same Transactions as those in Norton</u>.

Only by making the broadest possible characterization of Plaintiffs' allegations (a suit claiming mismanagement of the West Virginia Special Reclamation Fund) can Defendant argue that the claim here is "identical" to those brought by the West Virginia Highlands Conservancy in <u>Norton</u>. It is well-settled in this circuit, however, that courts must take a "transactional" approach when assessing whether causes of action are identical for purposes of <u>res judicata</u>. <u>SAS Institute</u>, 874 F.3d at 378–79; <u>see also</u> <u>Clodfelter v. Republic of Sudan</u>, 720 F.3d 199, 210 (4th Cir. 2013). Under that approach, the relevant inquiry is "whether the claim presented in the new litigation arises out of the same transaction or series of transactions as the claim resolved by the prior judgment and whether the claims could have been brought in the earlier action." <u>SAS Institute</u>, 874 F.3d at 378–79 (quoting <u>Laurel Sand & Gravel Inc. v. Wilson</u>, 519 F.3d 156, 162 (4th Cir. 2008); internal quotation marks omitted).

Defendant's attempts to argue for an identity of claims (and its argument for <u>res judicata</u> as a whole) fail because it ignores that transactional approach. "The fact that two suits involve challenges to very similar courses of conduct does not matter; a prior judgment cannot be given the effect of extinguishing claims which did not even then exist." <u>Ohio Valley Envt'l Coal. v. Aracoma Coal Co</u>. 556 F.3d 177, 211 (4th Cir. 2009) (quoting <u>Lawlor v. Nat'l Screen Serv. Corp.</u>, 349 U.S. 311, 328 (1955)). In this action, Plaintiffs' claim is based on events that occurred in 2020. As described in the Complaint, this action is based largely upon statements made by the WVDEP itself in an action to

place ERP into a Special Receivership, which described the company's insolvency and the Special Reclamation Fund's inability to deal with such insolvency. Compl., ¶¶ 30–31. Moreover, the Complaint describes the current status of other companies either in bankruptcy (Murray Energy and Revelation Energy) or at imminent risk of insolvency (Southeastern Land). The series of "transactions" that gave rise to this action did not exist at the time the <u>Norton</u> decision was reached in May 2001. Consequently, <u>res judicata</u> does not preclude Plaintiffs' claim.

Defendant relies heavily on <u>Nash County Bd. of Ed. v. Biltmore Co.</u>, 640 F.2d 484 (4th Cir. 1981) ("<u>Nash</u>"), to argue that this Court should take an expansive view of the identity-of-claims prong of <u>res judicata</u>. The <u>Nash</u> decision does not compel the result Defendant seeks, nor is it contrary to the current "transactional" approach in the Fourth Circuit. The <u>Nash</u> decision applied <u>res judicata</u> to bar a later suit precisely because it was based on the exact same transaction as the earlier case:

> Both suits deal with the same subject-matter, i. e., the purchase of fluid milk and milk products solely by the various school districts of North Carolina. They involve no other purchases. The two suits allege the same wrongful act, the same illegal price-fixing conspiracy, the same operative facts in support of such conspiracy. . . . In both cases, the evidence will be identical and the damages recoverable and the relief available the same.

<u>Id</u>. at 486.[1]

Plaintiffs' claim in this case is based upon recent facts and actions that had not yet occurred at the time of the decision of the <u>Norton</u> court. For that reason, the claim cannot be extinguished by <u>res judicata</u>.

    B.  <u>The Sierra Club and Ohio Valley Environmental Coalition Are Not in Privity with the West Virginia Highlands Conservancy</u>

---

[1] **The** U.S. Supreme Court has recently cast doubt on whether claims brought under different laws can be barred by <u>res judicata</u>. In <u>Whole Woman's Health v. Hellerstedt,</u> the Supreme Court clarified that "[i]t has never suggested that challenges to two different statutory provisions that serve two different functions must be brought in a single suit. And lower courts normally treat challenges to distinct regulatory requirements as 'separate claims,' even when they are part of one overarching '[g]overnment regulatory scheme.'" ___ U.S. ___, 136 S.Ct. 2292, 2308 (2016) (modification original).

Defendant argues that Sierra Club and the Ohio Valley Environmental Coalition ("OVEC") should be considered in privity with the West Virginia Highlands Conservancy because their interests are aligned. Def.'s Mem. in Supp. of Mot. to Dismiss at 11–12. That alignment of interests, however, is not sufficient for parties to be considered "in privity" with one another. There are three recognized categories of non-parties who may be considered "in privity" with a party to a prior action: "1) a non-party who controls the original action; 2) a successor-in-interest to a prior party; and 3) a nonparty whose interests are adequately represented by a party to the original action." Martin v. American Bancorporation Retirement Plan, 407 F.3d 643, 651 (4th Cir. 2005). Defendant does not contend that Sierra Club or OVEC controlled the original action or are successors-in-interest to the West Virginia Highlands Conservancy. Instead, Defendant relies on the last category, known as "virtual representation." See id. (noting that the third category of "adequate representation" is also known as "virtual representation.")

Virtual representation requires more than a mere alignment of interests. It is narrowly defined in the Fourth Circuit. Id. (citing Klugh v. U.S., 818 F.2d 294, 300 (4th Cir. 1987). The doctrine does not apply "where the parties to the first suit are not accountable to the nonparties who file a subsequent suit." Id. "In addition, a party acting as virtual representative for a non-party must do so with at least the tacit approval of the court." Id. This "tacit approval" requirement is only met where "there is a disclosed relationship in which the party is accorded the authority to appear as a party on behalf of others." Id. The Fourth Circuit approach to privity for virtual representation is narrower than that applied in other circuits and has been described by other circuit courts of appeal as applying only in "very limited, technical situations." Id. (citing Tyus v. Shoemehl, 93 F.3d 449 (8th Cir. 1996)).

Defendant cannot show that the West Virginia Highlands Conservancy was accountable to the Sierra Club or the Ohio Valley Environmental Coalition for its litigation in the Norton proceeding (because it was not). Nor can Defendant point to a "disclosed" relationship in which the West Virginia

Highlands Conservancy was given authority to appear in the <u>Norton</u> case on behalf of the Sierra Club

or the Ohio Valley Environmental Coalition (because there was none). For those simple reasons, the

Sierra Club and the Ohio Valley Environmental Coalition cannot be considered "in privity" with the

West Virginia Highlands Conservancy for purposes of <u>res judicata</u>. Such lack of privity provides an

independent basis for allowing two of the three Plaintiffs to proceed in this action.[2]

III.   <u>The Eleventh Amendment Does Not Deprive the Court of Jurisdiction Over Plaintiffs'
       Claim in this Action</u>.

In arguing that the Eleventh Amendment bars Plaintiffs' claim, Defendant relies almost

entirely on <u>Bragg v. West Virginia Highlands Conservancy</u>, 248 F.3d 275 (4th Cir. 2001), and <u>Norton</u>.

<u>Bragg</u> serves as the landmark decision on Eleventh Amendment restrictions to citizen-suits under

SMCRA; but it recognized that the amendment applies only to a certain category of actions under the

statute. 248 F.3d at 295. Specifically, it held only that the Eleventh Amendment prohibits claims

brought against a state officer to enforce minimum national standards. <u>Id.</u> The Court explained,

> when a State's program has been approved by the Secretary of the Interior, we can
> look only to the State law on matters involving the enforcement of minimum national
> standards; <u>whereas, on matters relating to the good standing of a State program,
> SMCRA remains directly applicable</u>.

<u>Id.</u> (emphasis added). The Court went on to explain that, although SMCRA's federal provisions related

---

[2] Defendant posits an argument as to the separate principle of collateral estoppel in a footnote. *See* Def.'s Mem in Supp of. Mot to Dismiss at 9 n. 10. To succeed in barring a claim under the doctrine of collateral estoppel, the proponent bears the burden of showing, 1) an identity of issues or facts with the prior action; 2) actual resolution of the common issue or fact; 3) the critical nature of the issue or fact in the prior judgment; 4) the finality and validity of the prior proceeding; and 5) that the party to be foreclosed had a full and fair opportunity to litigate the prior issue. <u>In re Microsoft Anti-Trust Litig.</u>, 355, F.3d 322, 326 (4th Cir. 2004). The collateral estoppel argument fails for the same reasons as Defendant's argument on <u>res judicata</u>. Here the issues at hand are based on factual circumstances that did not exist at the time of the <u>Norton</u> decision. Moreover, two of the Plaintiffs in this action did not have a full and fair opportunity to litigate the issue in the prior suit because they were not parties to it. <u>See Martin v. American Bancorporation</u> 407 F.3d 643, 654 n. 18 (4th Cir. 2005) (recognizing that nonparties to a prior suit cannot ordinarily be bound by collateral estoppel and that appellants at issue could not be barred because they were neither parties to the prior suit or their privies.).

to national minimum standards "drop out" when a state gains primacy, those related to OSM's oversight duties remain in place and are enforceable. Id. ("This is not to say of course that all SMCRA's provisions 'drop out.' The Act's structural provisions creating the facility through which the State can attain and lose its primacy status remain directly operative." (Emphasis in original.)). And as for Norton, that case simply does not address the distinction between provisions which are meant to enforce national minimum standards and those specific to OSM's oversight role. See generally Norton, 147 F. Supp. 2d 474.

The distinction recognized by Bragg was given effect by the Third Circuit in Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310 (3d Cir. 2002). In that case, the plaintiffs raised eight counts against James M. Seif, the Secretary of the Pennsylvania Department of Environmental Protection, alleging violations of SMCRA. Id. at 313–14. Six of those counts were dismissed because they violated Pennsylvania's Eleventh Amendment immunity. Id. at 330. Two counts, however, were allowed to proceed. Id. at 330–32.

Both of the surviving counts in Hess involved the failure of the Secretary to submit specific information to OSM. Id. The court explained, "[t]hese counts in essence allege that Pennsylvania, via Seif, has not complied with certain specific federal oversight requirements, requirements that have no counterpart in state law. Accordingly, these counts may go forward against Seif under the Ex parte Young exception. . . ." Id. at 331.

As further justification for its decision, the Hess court noted that the text of 30 U.S.C. § 1270(a)(2) would not make sense if there was not a way for citizens to bring suit under SMCRA against a state once that state had achieved primacy. Id. This is consistent with basic statutory interpretation principles that a statute must be interpreted "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions . . . inconsistent, meaningless, or superfluous." Anderson v. Hancock, 820 F.3d 670, 674 (4th Cir. 2016).

11

This Court has also recognized the distinction acknowledged in <u>Bragg</u> and, therefore, has allowed actions involving SMCRA's notification provisions to proceed. In September 2001, a few months after <u>Bragg</u> was decided, this Court held: "the federal regulation requiring submission to and approval by the federal agency of any change in the State program's regulations is part and parcel of the 'carefully designed balance' between state and federal authorities and advances 'the federal interest in preserving this statutory design.'" <u>Ohio River Valley Envt'l Coal. v. Callaghan</u>, No. 3:00-cv-58, slip. op. at 6 (S.D. W.Va. Sept. 21, 2001) (Doc. No. 181) (J. Chambers). The Fourth Circuit refused to disturb the opinion on appeal. <u>See</u> <u>Ohio River Valley Envt'l Coal. v. Timmermeyer</u>, 66 Fed. Appx. 468 (4th Cir. 2003) (quoting <u>Bragg</u> for the proposition that "SMCRA's structural provisions creating the facility through which the State can attain and lose its primacy status remain directly operative"). The case ultimately resulted in a settlement between the plaintiffs and the state agency. Civil Action No. 3:00-cv-58, Doc. No. 287.

Plaintiffs' claim in this case—that Defendant has failed to provide notification to OSM of a change in program status—falls under the same regulatory sections as the claims allowed to proceed by this Court in <u>Callaghan</u> and by the Third Circuit in <u>Hess</u>: 30 C.F.R. § 732.17. Notice is part of the federal oversight program for which there is no counterpart in West Virginia law. It promotes the carefully designed balance between state and federal authority under SMCRA. Accordingly, the requirements in 30 C.F.R. § 732.17 do not "drop out" under <u>Bragg</u>. Rather, they remain in place and are enforceable. Under the <u>Ex Parte Young</u> doctrine, this Court has jurisdiction to compel Defendant to comply with federal law. For those reasons, the Eleventh Amendment does not serve as a bar to Plaintiffs' claim.

IV.    <u>Plaintiffs Have Properly Alleged Standing to Pursue Their Claim</u>

SMCRA's citizen suit provision authorizes the filing of an action by "any person having an interest which is or may be adversely affected." 30 U.S.C. §1270(a). Such language indicates Congress's

intent to confer standing to the limits of the U.S. Constitution. <u>Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 16 (1981); <u>PIRG v. Powell Duffryn Terminals</u>, 913 F.2d 64, 70 n.3 (3d Cir. 1990). To have constitutional standing, a plaintiff must suffer an actual or threatened injury-in-fact that is fairly traceable to the challenged action by the defendant and is likely to be redressed by a favorable decision. <u>Friends of the Earth v. Laidlaw Environmental Services</u>, 528 U.S. 167, 180–81 (2000). An organization has standing to sue in representation of its members when 1) at least one of its members would have standing to sue in his or her own right, 2) the organization's purpose is germane to the interests it seeks to protect, and 3) there is no need for the direct participation of the individual members in the action. <u>Friends of the Earth, Inc. v. Gaston Copper Recycling</u>, 204 F.3d 149, 155 (4th Cir. 2000).

Defendant argues that Plaintiffs' injuries are "speculative" because it is uncertain that the WVDEP will ever institute forfeiture proceedings against mine operators. Such an argument misses the point. Plaintiffs' injuries currently exist and are traceable to WVDEP's failure to provide a required statutory notice and its financial inability to adequately reclaim abandoned mine sites, including those which ERP has abandoned. <u>See</u> Compl., ¶ 11. It is the lack of reclamation, not the act of forfeiture, which is the source of Plaintiffs' injury. <u>See</u> 67 Fed. Reg. 37610, 37613 (clarifying that the requirement for WVDEP to have "sufficient money to complete the reclamation plan for any area which may be in default at any time" requires that there is sufficient money to reclaim "all existing and future bond forfeiture sites.") Those injuries would be redressed through a West Virginia SMCRA program amendment as a result of the processes in 30 C.F.R. § 732.17.

It does not matter that the WVDEP's act of placing ERP's assets into receivership has allowed the company to avoid filing for bankruptcy, or that WVDEP has so far failed to act to forfeit ERP's

13

permits[3]. The failure of reclamation at these mines is causing harm that is occurring now. Plaintiffs have alleged sufficient facts to show ERP has abandoned its reclamation obligations. Compl., ¶ 30. ("ERP has laid off all of its employees, has ceased operations, and has no source of cash or other assets available for reclamation and water treatment at its mines."). They have alleged sufficient facts to show that significant reclamation obligations are outstanding. Id., ¶ 31.d ("In the month prior to WVDEP's motion for receivership, WVDEP issued roughly forty orders to show cause relating to unabated cessation orders related to dozens of outstanding and unabated violations [of] ERP's permits and surface mining and water pollution control laws."); see also, id., ¶ 31.e ("ERP's insolvency has left many mining sites unmanned, unsecured, unmaintained, and in various stages of land and water disturbance and incomplete reclamation").

WVDEP's own statements to the Circuit Court of Kanawha County show that there is simply not enough money available to remediate these sites. The agency itself represented that it was unsure it would be able to collect the proceeds of the bonds posted for ERP's mines. Compl., ¶31.i. It also acknowledged that using Special Reclamation Fund money to reclaim the sites would "overwhelm the fund both financially and administratively" and that reclamation therefore could not be completed as required by SMCRA. Id. Moreover, WVDEP cannot claim that its establishment of a receivership somehow nullifies or excuses its failure to reclaim those sites. The Special Receiver stated plainly, in filings to this Court that "[t]he cash currently available to the Receivership is insufficient to resume the earth-work component (grading, seeding, revegetation) of reclamation remaining to be completed at ERP's permits while also simultaneously bringing all NPDES outlets into compliance with effluent limits. Id., ¶ 33. The failure to adequately fund reclamation at ERP's sites and elsewhere is the source

---

[3] Contrary to its argument, Defendant notes in his brief that bond forfeitures have begun, as the WVDEP revoked four permits at the Martinka mine. Def.'s Mem. in Supp. of Mot. to Dismiss at n. 7.

of Plaintiffs' injuries and the continued underfunding could be remedied if WVDEP provided the requisite notice to OSM.

1. Plaintiffs have Suffered Actual and Current Injuries[4]

To establish injury-in-fact, "a plaintiff need only show that he [or she] used the affected area and that he [or she] is an individual for whom the aesthetic and recreational values of the area [are] lessened by the defendant's activity." Piney Run Preservation Ass'n v. County Com'rs of Caroll County, MD, 268 F.3d 255, 263 (4th Cir. 2001) (internal quotation marks omitted; modification in original.) Plaintiffs have alleged actual and current injuries to their members, Vivian Stockman, Cindy Rank, and Ronda Harper as the result of unreclaimed mine sites. Compl., ¶ 11. Plaintiffs' members visit, live near, drive by and/or fly over areas of the State and observe the adverse impacts left by WVDEP's failure to reclaim abandoned mine sites. Id. Observable impacts from the failure of reclamation affect their recreational, aesthetic, environmental and property interests. Id. Specific to ERP's mines, Plaintiffs have members who live downstream and refrain from using streams or restrict their usage of streams as a result of excessive discharges of selenium. Id. Those are actual injuries, which are presently occurring and are sufficient to demonstrate injury-in-fact.[5]

The decisions in Montana Environmental Information Center v. Stone-Manning, 766 F.2d 1184 (9th Cir. 1994) ("MEIC"), and Clapper v. Amnesty Intern, 568 U.S. 398 (2013)—upon which

---

[4] Because Plaintiffs' members suffer from current injuries they do not rely on the "relaxed" standards of immediacy recognized for standing in cases where there is a procedural violation of a statute by a government agency. However, in such cases, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." Center of Biological Diversity v. E.P.A. 861 F.3d 174, 182–83 (internal citations omitted).

[5] The Court has previously found Plaintiffs to have standing through their members below ERP's mines, which were formerly owned by Hobet Mining LLC, and Apogee Coal Company. See Ohio Valley Envt'l Coal. v. Apogee, 2008 WL 11318044 (S.D. W.Va. May 2, 2008); Ohio Valley Envt'l Coal. v. Hobet, 702 F. Supp. 2d 644 (S.D. W.Va. 2010).

the Defendant relies for its "speculative injury" argument—are easily distinguishable. In MEIC, plaintiffs challenged the future action of the Director of the Montana Department of Environmental Quality, arguing that pattern and practice showed she would violate nondiscretionary duties under SMCRA by granting a mining permit. Id. at 1187. That illegal grant of a deficient application, the plaintiffs alleged, would cause injuries to the plaintiffs' members at the yet unpermitted mine site. Id. at 1189. The case was dismissed because the plaintiffs had failed to include allegations in their complaint to establish a substantial likelihood that the permit would be granted. Id. Similarly, Clapper involved allegations of future injury based on future wiretaps under the Foreign Intelligence Surveillance Act of 1978. 568 U.S. at 401–02.[6]

In contrast to MIEC and Clapper, the Plaintiffs' members in this case are suffering current injury from currently unreclaimed mine sites. Defendant has already engaged in illegal conduct (failing to notify OSM of the budget deficiency in the West Virginia ABS) and Plaintiffs' members are suffering current injury that are directly related to the WVDEP's budget deficiency and its attendant failure to assume ERP's reclamation obligations.

2.  Plaintiffs' Injuries are Fairly Traceable to Defendant's Conduct

Defendant's traceability argument is again premised on its misapprehension that Plaintiffs must "presume" that there has been a significant change in the budgeting of the West Virginia ABS. Plaintiffs are presuming nothing: WVDEP stated in its own legal filings that ERP's insolvency would "overwhelm" the Special Reclamation Fund. Moreover, WVDEP's appointed Special Receiver has stated that he lacks the resources to fulfill the reclamation requirements under SMCRA. Compl., ¶¶

---

[6] Plaintiffs in Clapper advanced an alternative theory of standing arguing that they had suffered current injury because they had incurred costs to protect themselves from surveillance by illegal wire-taps. 568 U.S. at 402. The Court held that the plaintiffs could not manufacture standing by self-inflicting injury based on a hypothetical future harm. Id. This theory too is distinguishable, as Plaintiffs' harms in this case result from currently unreclaimed mining operations that are diminishing their property, recreational, and aesthetic interests. Compl., ¶ 11.

31, 33.

The only citation Defendant provides in its argument on traceability is to the U.S. Supreme Court decision in Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992). The Lujan decision, however, recognized that when a plaintiff's claims are based upon the violation of a procedural requirements of a statute, it does not have to allege with certainty that following the procedure will result in an agency action favoring plaintiffs:

> Thus, under our case law, one living adjacent to the site of proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

Id. at n. 7.[7] The Lujan footnote is consistent with later pronouncements on the "causation" or "traceability" requirements of standing in a case like the one at bar. In a case alleging a procedural deficiency in an agency action, plaintiffs need not show that an agency would have reached a different result but for the procedural error or that an agency will actually exercise its discretion in any particular fashion in the future. WildEarth Guardians v. Jewell, 783 F.3d 298, 306 (D.C. Cir. 2013); Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 443–44 (D.C. Cir. 1998). Instead, the procedural step must merely be connected to the substantive result. WildEarth Guardians, 783 F.3d at 306 (quoting Massachusetts v. EPA, 549 U.S. 497, 518 (2007); see also Center for Biological Diversity v. E.P.A. 861 F.3d 174, 183 (D.C. Cir. 2017) (applying these principles to a standing inquiry on claims of a procedural deficiency under the Endangered Species Act.)

Here, there is a connection between the missing procedural step (WVDEP's failure to notify OSM) and the substantive result (i.e., the impact of unreclaimed mines on Plaintiffs' members'

---

[7] The Lujan example differs from those in MEIC and Clapper. In the Lujan hypothetical the illegal action had already occurred (the failure to conduct an environmental impact statement). In MEIC and Clapper both the injuries and the act which would give rise to them were yet to occur. See supra at 16.

aesthetic, recreational, and property interests.) WVDEP's notification of change in financial status would trigger OSM's oversight of the agency's administration of the program. 30 C.F.R. § 732.17(c) (Upon receipt of such a notification from the state "the Director [of OSM] shall determine whether a State program amendment is required . . . ."). That would involve a determination by OSM of whether the West Virginia program is meeting all of SMCRA's requirements. 30 C.F.R. § 732.17(e) ("State program amendments may be required when . . . [c]onditions or events indicate that the approved State program no longer meets the requirements of this Act or this chapter."). As described above, those requirements include the mandate that West Virginia's ABS have sufficient money available to reclaim all mines which may be forfeited "at any time." 30 C.F.R. § 800.11(e). Plaintiffs' injuries, as alleged in the Complaint, directly stem from WVDEP's failure to reclaim mine sites due to lack of funding. Compl., ¶ 11. Plaintiffs thus satisfy the causation or traceability requirement of standing.[8]

3.  Plaintiffs Are Not Required to Show that OSM will Make a Favorable Decision

Defendant argues that Plaintiffs' real grievance is with OSM, and further that Plaintiffs cannot succeed in showing redressability for their injuries because they cannot show OSM will act in Plaintiffs' favor. Again, this argument rests on a mischaracterization of the facts pled. WVDEP has not notified OSM that WVDEP's bond program lacks sufficient funds to reclaim land and abate water pollution at mine sites of the insolvent ERP and other companies that are under financial duress. Compl., ¶ 45. Instead, WVDEP has told OSM that there have been no significant changes in the implementation, administration, and enforcement of its state program, and that recent actions related to ERP's permits have "positively affected the State's program." Id. Without the requisite notice by WVDEP, OSM has

---

[8] At the end of its section on traceability Defendant notes that "Plaintiffs have a different vehicle for obtaining federal oversight of the State's budget program under 30 C.F.R. § 733.12(a)(2)." Defendant does not explain this bald assertion. However, if Defendant means to imply that such alternate remedial scheme somehow undermines Plaintiffs' right to judicial review of a nondiscretionary duty under 30 C.F.R. § 732.17, that contention was flatly rejected by the Third Circuit in Hess. 297 F.3d at 331–32.

no duty to review the program to determine whether a program amendment is required. See 30 C.F.R. § 732.17(c).

Moreover, Plaintiffs are under no obligation to show OSM will make the determination they seek. The redressability requirement is relaxed when Plaintiffs allege a procedural injury. WildEarth Guardians, 738 F.3d at 371 ("If the BLM is required to adequately consider each environmental concern it could change its mind about authorizing the lease offering."); see also Animal Legal Defense Fund, 154 F.3d at 443–44. Here, the requisite notice by WVDEP will trigger a duty by OSM to review the West Virginia ABS and could result in a required program amendment that will adequately fund reclamation at sites causing harm to Plaintiffs' members. Nothing more is required.

V.    Plaintiffs' Claim Is Ripe for Review

In its final argument for dismissal, Defendant points to the doctrine of ripeness, stating that "Plaintiff's claim and alleged injuries are entirely premised on events that have not and may not occur." Mem. in Supp. of Mot. to Dismiss at 20. Although Defendant cites the correct legal standard for the doctrine, the argument fails because it is based on a mischaracterization of facts alleged in the Complaint.

It is correct that "in reviewing a ripeness claim, [the court] consider[s] (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Deal v. Mercer Cty. Bd. of Ed. 911 F.3d 183, 190–91 (4th Cir. 2018). Here, both prongs favor allowing this action to proceed. First, this case is fit for review. Plaintiffs' claim is based upon the agency's own assessment of its ABS program made in March of this year. Compl., ¶¶ 30–31. It is supported by facts related to recent statements of a special receiver who is administering over 100 defunct permits, and the extraordinarily precarious financial conditions of other major coal companies in the state. Id., ¶¶ 34–35 (statements of the special receiver); id., ¶¶ 41–44 (allegations relating to other companies). More importantly, Plaintiffs' members' injuries are presently occurring. Id., ¶ 11. If factual questions exist,

they pertain to the <u>current</u> state of the bond program, <u>current</u> communications with OSM, and the <u>current</u> state of Plaintiffs' injuries.

The hardship test also weighs in Plaintiffs' favor. Plaintiffs' members are currently suffering from the WVDEP's inaction. The only relief required of Defendant is to stand by its assessment of the West Virginia bond program and make an adequate notification to OSM. On balance, any hardship to WVDEP is minimal, especially when compared to Plaintiffs' very real and presently occurring injuries.

## Conclusion

For these reasons, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss.

Respectfully submitted,

/s/ J. Michael Becher
J. Michael Becher (WV Bar No. 10588)
Derek Teaney (WV Bar No. 10223)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org
dteaney@appalmad.org

Counsel for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY
and SIERRA CLUB,

       Plaintiffs,

v.                                    CIVIL ACTION NO: 3:20-470

AUSTIN CAPERTON, Secretary,
West Virginia Department of
Environmental Protection,

       Defendant.


**CERTIFICATE OF SERVICE**

       I, J. Michael Becher, hereby certify that on August 26, 2020, I served the foregoing Plaintiffs' Response to Defendant's Motion to Dismiss through the Court's CM/ECF System, which will provide service and notification to the following:

Benjamin L. Bailey                    Kevin Wallace Barrett
BAILEY & GLASSER                 BAILEY & GLASSER
209 Capitol Street                     209 Capitol Street
Charleston, WV 25301-1386       Charleston, WV 25301
304/345-6555                       304-345-6555
Email: bbailey@baileyglasser.com   Email: kbarrett@baileyglasser.com


Maigreade Bridget Burrus
BAILEY & GLASSER
209 Capitol Street
Charleston, WV 25301-1386
304-345-6555
Email: mburrus@baileyglasser.com      /s/ J. Michael Becher