## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |  |
|---|---|---|
| **OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA HIGHLANDS CONSERVANCY, and SIERRA CLUB,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 3:20-cv-00470** |
| **AUSTIN CAPERTON, Secretary, West Virginia Department of Environmental Protection,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

## REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Plaintiffs' response, while sweeping in its discussion of the implementation, administration, and enforcement of West Virginia's federally-approved State surface mining program under the West Virginia Surface Coal Mining and Reclamation Act, gives little ink to the most important element of their claim:  DEP's failure to notify OSM.  To succeed on their claim that DEP violated 30 C.F.R. § 732.17(b), Plaintiffs must plead that DEP failed to give notice to OSM.  But, the Plaintiffs' Complaint acknowledges, DEP did, in fact, send a notice to OSM.[1]  The Plaintiffs just disagree with its contents and DEP's determination in connection therewith.[2]  Shying away from this fatal admission, Plaintiffs are left to attack, *on the substance of it*, DEP's discretionary determination that the ERP receivership (and other "events" the Plaintiffs cite) did not give rise to a significant change in the budgeting and funding of the

---

[1] *See* Compl. [Doc 1] at ¶ 45.
[2] *See id.*

State's bonding program.

Those undeniable facts, premised upon the allegations in the Plaintiffs' Complaint, knock the props entirely out from under this action.  They demonstrate that the Plaintiffs attack a discretionary determination of DEP, not a nondiscretionary act as the federal law requires to maintain a citizens' suit.  They demonstrate that the Plaintiffs' attack centers on their own issues with the State's bonding program, such that sovereign immunity bars their suit.  And they demonstrate that the Plaintiff-citizens have, in reality, already had their chance in court on those issues and lost, such that res judicata (and collateral estoppel) bar this action before it ever gets to the merits.

If this Court were to deny DEP's motion to dismiss and further determine that this action is the proper subject of a citizens' suit (something DEP denies based upon facts it would adduce outside of the Complaint), it would be left to conduct a trial to determine for itself whether or not the ERP receivership and other alleged insolvencies gave rise to a significant change in the funding and budgeting of the State program, contrary to DEP's own determination.  In addition to involving a federal court in the State bonding program at an unprecedented level of granularity, such a trial would necessarily involve the proverbial "battle of the experts," with DEP proffering its own expert testimony and the Plaintiffs left to adduce testimony of their own hired expert.  That scenario only highlights the fact that the Plaintiffs attack the substance of the State's bonding program, DEP's administration thereof, and DEP's discretionary determinations relating thereto.

In attacking the State's bonding program, the Plaintiffs admit they rely "largely" upon an affidavit filed in the ERP receivership.[3]  In doing so, the Plaintiffs take substantial liberties with

---

[3] *See* Resp. at *7–8.  The Plaintiffs mistakenly refer to the affidavit as a declaration.

the contents of the affidavit (as well as in the description of subsequent events in the receivership) to make their case here.  Viewing the affidavit in its proper context (and in full), however, demonstrates that the "statements" the Plaintiffs pull from the affidavit are incomplete in both substance and content.  The Plaintiffs have manipulated the factual assertions contained within the affidavit to "fit" the necessary predicates of Section 732.17(b).  Absent that, there exists no basis to claim that a significant change affecting the State bonding program has occurred.

To enable the Court fully to assess the Plaintiffs' Complaint, DEP attaches hereto as Exhibits A and B true and correct copies of the complete affidavit and the notice (without its referenced enclosures) incorporated into the Complaint.[4]

The Plaintiffs' allegations affirmatively misstate at least two details in the affidavit that are key to the Plaintiffs' claim herein.  The Plaintiffs allege in their Complaint that DEP estimated ERP's reclamation work at $230 million and stated that the bonds backing that work total $115 million, thus leaving the State's bonding program underfunded.[5]  Neither allegation accurately reflects the statements in the affidavit.  The affidavit explicitly grounds the reclamation estimate *at the time of Patriot Coal's bankruptcy case in 2015*;[6] it is not and was not an estimate of the current amount of reclamation work required to be done at ERP's sites.  And the Plaintiffs ignore the fact that Patriot posted an additional $12.5 million cash bond to back

---

[4] "In evaluating a motion to dismiss, [a court] may consider documents that are attached to or submitted with the complaint, … and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"  *Buck v. Hampton Township Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed.2004)).

[5] *See* Compl. at ¶ 31(f) & (h); *see also* Resp. at *5.

[6] *See* Ex. A at ¶ 25.  The Plaintiffs also ignore the fact that a separate coal company agreed to provide $7 million worth of reclamation at the former Patriot mine sites, thus reducing ERP's reclamation costs by a similar amount. *See* Ex. A at ¶ 35.b.

ERP's obligations.[7]  Those discrepancies undercut the Plaintiffs' back-of-the-envelope analysis of the alleged shortfall caused by the ERP receivership that forms the sole basis of their Complaint, particularly inasmuch as the Plaintiffs use a reclamation estimate that, at best, is *five years out of date* and understate the amount of the bonds.[8]

More importantly, however, the Plaintiffs also fail to note that the affidavit, immediately after referencing the concerns the Plaintiffs cite in their Complaint, adds that "[f]aced with those prospects, DEP . . . began exploring alternatives for security the reclamation and remediation of the ERP mining sites"[9] and ultimately sought and obtained the appointment of a receiver to that end.[10]  Thus, as the affidavit makes clear and the Plaintiffs fully ignore, DEP took affirmative steps to *avoid* the potential issues the Plaintiffs now latch onto as facts in existence.  Given DEP's actions to address those issues, the statements in the affidavit cannot be considered "admissions" as to the insufficiency of the State's bonding program.

Even leaving aside the Plaintiffs' misleading use of the affidavit, the Plaintiffs simply cannot overcome the fact that, despite all the statements they pull out of context from the affidavit, DEP subsequently determined in its notice to OSM that the current situation, including the existence of the ERP receivership and other supposed "events" the Plaintiffs reel off, simply does not give rise to a significant change in the budgeting or funding of the State's program.[11]  It is that subsequent discretionary determination, made in light of the very statements the Plaintiffs now cite again in their Complaint, that the Plaintiffs now seek to attack on the merits in this suit.

---

[7] *See* Ex. A at ¶ 35.a.
[8] *See* Resp. at *5 ("That bond money ($115 million) cannot fill the huge financial gap in the ABS, which currently has only $174 million and cannot cover the current and future costs of reclaiming all of ERP's mines ($230 million) and treating all of their wastewater (additional hundreds of millions).").
[9] *See* Ex. A at ¶ 65, *et seq.*
[10] *See Ward v. ERP Envtl Fund, Inc.*, Civil Action No. 20-C-282 (Cir. Ct., Kanawha County).  If this action were to proceed, DEP would adduce facts demonstrating that the receiver has, in fact, substantially reduced ERP's bonded reclamation obligations through, among other actions, transferring ERP permits to other operators.
[11] *See* Ex. B.

As set out in DEP's initial brief in support of its motion to dismiss and as discussed in more detail below, agency determinations to act pursuant to the directives of a statute are often immune from judicial oversight.  Indeed, courts have interpreted statutes that otherwise appear to be "non-discretionary" as "discretionary" when the agency in question must exercise a substantial amount of discretion in carrying out the statutory provision.  DEP submits that Section 732.17(b) falls within that class of statutory provisions requiring the substantial discretion of the relevant State regulatory agency and contemplates its discretionary assessment of whether significant events have occurred that would impact the administration, implementation, or enforcement of that State's program, including changes in funding or budgeting.

Seemingly recognizing the infirmity of their own position in light of the notice DEP sent to OSM, the Plaintiffs make a clumsy attempt to claim injury from, alternatively, ERP's and DEP's supposed failure to reclaim mine sites in West Virginia.[12]  ERP, which continues to operate its mine sites under the special receiver, is not a party to this action and this Court obviously cannot redress any injuries it has caused the Plaintiffs herein.  As for DEP, the Plaintiffs have not alleged, and simply cannot allege, that the bankruptcy or insolvency of any coal company (including, now, Murray Energy on which the Plaintiffs rely)[13] has led or will inexorably lead to DEP's failure to reclaim a single mine site much less the entire set of permits each allegedly bankrupt or insolvent company holds.  Their Complaint does not even allege the revocation and forfeiture of a single permit coming out of any bankruptcy or insolvency, an

---

[12] *See* Resp. at *13-14.

[13] *See* Comp. at ¶¶ 41, 44 & 52.  The United States Bankruptcy Court for the Southern District of Ohio just confirmed Murray Energy's Chapter 11 reorganization plan on August 31, 2020.  Pursuant to the confirmation order, Murray Energy will emerge from bankruptcy continuing to operate all its permitted sites in West Virginia (and the other states in which it operates).  *See* Confirmation Order, *In re Murray Energy Holdings, Inc.*, Case No. 19-56885 (Bankr. S.D. Ohio, Aug. 31, 2020) [Doc 2135].

allegation essential to establishing DEP's obligation to reclaim in the first place.[14] DEP noted

the conjectural hurdles the Plaintiffs skipped over in their Complaint and the insufficiency of the

Plaintiffs' allegations in that regard in its initial brief.[15] They have said nothing in their response

to contradict that conclusion. Their Complaint stands on rank speculation and conjecture based

upon their own imaginings. As a result, the Plaintiffs have alleged no concrete, particularized,

actual or imminent injury upon which to base their standing to sue, their putative claims lack any

sense of ripeness, and any justiciable controversy.

The Plaintiffs' Complaint fails at the pleading stage and should be dismissed.

## ARGUMENT

The Plaintiffs' Response fails to establish any basis for denying DEP's motion to dismiss.

### A. The Plaintiffs' Complaint fails to establish a nondiscretionary duty to notify OSM of the occurrence of a significant event affecting the State program.

The entire basis of the Plaintiffs' cause of action in this case is that, given DEP's

statements in an affidavit filed in its state court receivership case against ERP, DEP was under a

nondiscretionary duty to notify OSM of a significant event that affects the implementation,

administration, or enforcement of its approved State program. That contention is based upon

affirmative misstatements and misconstructions of the affidavit and a misunderstanding of the

nature of DEP's obligations under 30 C.F.R. § 732.17(b).

#### 1. The affidavit in the ERP case does not say and cannot be construed as saying that DEP acknowledged the insufficiency of the State bonding program.

Any fair and complete reading of the affidavit simply does not say or even imply that the

State's bonding program will be unable to meet the State's obligations. Save for the statements

---

[14] The Plaintiffs pick up on DEP's disclosure of the revocation of four ERP permits to now suggest, without any evidence or discussion, that the revocation and forfeiture of seemingly all of ERP's permits has begun. *See* Resp. at *14, n.3.
[15] *See, e.g.,* Mem. at **16-18.

that the Plaintiffs misstate concerning the extent of ERP's reclamation obligations and the bonds backing them, DEP acknowledges the concerns it expressed in the affidavit as to the potential impact of revoking and forfeiting all 100-plus ERP permits on the Special Reclamation Fund and calling $115 million in bonds at more or less the same time on the surety and DEP's recoveries thereon. *See* Ex. A at ¶¶ 62–65.  But the affidavit makes clear that (a) DEP would have to revoke and forfeit all the bonds *only if* "ERP remain[ed] in widespread default of its obligations under its permits as it [was then]" (Ex. A at ¶ 62) and (b) "the actual reclamation and remediation of the ERP Mining sites could be *delayed*" if those concerns came to pass (Ex. A at ¶ 64).  Nowhere does DEP state or imply in that affidavit or otherwise that even the *en masse* revocation, forfeiture, and transfer of all 100-plus ERP permits, if they actually happened, would necessarily lead to the insolvency of the State's bonding program.  Moreover, after noting its concerns regarding the immediate, wholesale revocation, forfeiture, and transfer of ERP's permits, the affidavit continues by stating that, "[f]aced with those prospects, DEP and [the surety bond issuer] began exploring alternatives for securing the reclamation and remediation of the ERP mining sites."  Ex. A at ¶ 65.  The affidavit continues by noting that the surety bond issuer had agreed to "fund a special receiver charged with overseeing ERP's operations, assets, and affairs . . . and determine whether it is possible to develop a plan for maintaining its permits, reclaiming and remediating ERP's mining sites and obtaining bond release all in accordance with the surface mining and clean water laws applicable to its operations."  Ex. A at ¶ 70.  To implement that proposed program and thereby attempt to avoid the concerns DEP described in the affidavit, DEP commenced the receivership action and obtained the appointment of a special receiver which continues to this day to operate ERP with funding provided by the surety bond issuer.  *See Ward v. ERP Envtl Fund, Inc.*, Civil Action No. 20-C-282 (Cir. Ct., Kanawha

County, West Virginia).

The Plaintiffs' Complaint, in pulling selective statements out of context from the affidavit, grossly misstates the affidavit's substance.  It simply cannot be construed, as the Plaintiffs do in their Response, as an "admi[ssion] that [the State's bonding system] is not sufficient to handle the current insolvency of ERP."  Resp. at *5.  Nor can the affidavit be fairly read to contradict DEP's subsequent determination, as expressed in the notice it sent to OSM, *see* Ex. B at *2, that no significant event affecting the implementation, administration, or enforcement of the State's bonding program had occurred.

### 2. The Plaintiffs misstate DEP's discretion under Section 732.17(b).

The Plaintiffs latch onto the word "shall" in Section 732.17(b) as though it imposes upon DEP the obligation to send a notice of significant event and "does not provide room for agency discretion."  Resp. at *6.  Their position would lead to an absurd result *in this case*.  For what the Plaintiffs suggest is that DEP had an obligation to advise OSM of a significant change in the funding or budgeting relative to its program, *even though DEP explicitly determined and advised OSM that the cited event(s) did not give rise to a significant event affecting the implementation, administration, or enforcement of the State program*.  To get to that result, the Plaintiffs assert that "[t]he Court cannot defer to the agency and must determine [for itself] whether a significant action has occurred based on the evidence presented" by citizens groups, citing a case that simply does not stand for the proposition stated.[16]  *Id.*

As noted above, that reading of Section 732.17(b) would require the Court to convene a trial in which DEP and the Plaintiffs would be forced to adduce expert testimony to allow the

---

[16] Nowhere in its decision in *Ohio Valley Envtl. Coal. v. Pruitt*, 893 F.2d 225 (4th Cir. 2018), does the Court of Appeals ever suggest that a court cannot defer to agency action.  To the contrary, the Court of Appeals's decision, fairly read, stands for the proposition that the courts should defer to agency action when the agency is taking action.

Court to determine for itself that a significant change in the funding or budgeting relative to the State program did or did not occur. As DEP also pointed out in its initial brief, the Plaintiffs have an administrative remedy to address their concerns in that regard. *See* Mem at *19. The Plaintiffs do not deny the existence of that remedy, but instead insist on "judicial review of [an alleged] nondiscretionary duty under 30 C.F.R. § 732.17." Resp.at *18, n. 8. Contrary to the Plaintiffs' claim and even accepting the Plaintiffs' back-of-the-envelope analysis at face value, DEP cannot fairly be said to be under a nondiscretionary duty to notify OSM of a significant change in funding and budgeting.

Section 732.17(b), on its face, vests State regulatory authorities with seemingly unfettered discretion to determine whether a significant change in the funding or budgeting of its program has occurred. In fact, the "mandatory" act the Plaintiffs latch onto arises, if at all,[17] only after the State regulatory body has determined that "significant changes in funding or budgeting relative to the approved [State] program" have occurred. Section 732.17's regulatory history reinforces precisely that kind of intent to leave such matters to the State regulatory agencies. Therein, OSM approvingly cited Section 3(c) of Executive Order 13132 stating that "[w]ith respect to Federal statutes and regulations administered by the States, the national government *shall grant the States the maximum administrative discretion possible*. Intrusive Federal oversight of State administration is neither necessary or desirable." Revisions to the

---

[17] "Use of the word 'shall' generally indicates a mandatory intent u*nless a convincing argument to the contrary is made*." *Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir. 1977) (emphasis added). With respect to an agency's duty to enforce under a statute, the word "shall" has actually been viewed, at least in certain circumstances, as discretionary. *See Dubois v. Thomas*, 820 F.2d 943 (8th Cir. 1987) (holding that that Clean Water Act imposes only discretionary, rather than mandatory, duty on Environmental Protection Agency to investigate and make a finding where private citizen asserts violation and to take enforcement action upon finding of violation despite word "shall" in statute); *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977) (holding that Administrator of Environmental Protection Agency's duty under the Federal Water Pollution Control Act Amendments to issue the orders or to file suit is discretionary and not mandatory despite the word "shall" in statute); *Monongahela Power Co. v. Reilly*, 980 F.2d 272 (4th Cir. 1992) (finding the EPA administrator's reasonable interpretation of the statute was entitled to deference).

State Program Amendment Process, 70 Fed. Reg. 61194-01, 61203 (Oct. 20, 2005) (codified at

30 C.F.R. 732.17) (emphasis added).

The Plaintiffs' reliance on *Ohio Valley Environmental Coalition v. Pruitt*, 893 F.2d 225

(4th Cir. 2018) only serves to highlight the notion of the State's discretionary authority in that

regard.  This simply is not a case where the "constructive submission doctrine" discussed in

*Pruitt* has any application, for here the agency has acted and sent a notice in response to a

threatened citizens' suit.  *See* Ex. B.  In fact, the *Pruitt* decision supports the notion that the

courts should not interfere when the agency has taken discretionary action in furtherance of its

obligations under federal law and not simply failed to submit necessary documents.  *Id.* at 230–

31.

### B.  Plaintiffs fail to establish any bar to the application of the *res judicata* (or collateral estoppel) defense.

The Plaintiffs concede that *Norton*'s dismissal of their prior citizens' suit on the basis of

DEP's sovereign immunity constituted "a final judgment on the merits in a prior suit" with

respect to the first prong of the *res judicata* analysis.  Therefore, the analysis is limited to the

second and third prong of the *res judicata* test.

### 1.  The two suits do arise out of the same "transaction."

With respect to the second prong, the Plaintiffs do not take issue with DEP's reliance on

*Nash*'s "expansive view of the identity-of-claims prong," but instead argue only that this present

action did not arise out of the same "transaction" as the claims against DEP in *Norton*.  *See* Resp.

at **7-8.  The Plaintiffs' simplistic and superficial analysis of the "transactions" involved here

and in *Norton* belie the fact that the two suits actually do arise out of the same "transaction,"

namely the establishment of the State's alternative bonding program.

"The expression 'transaction' in the claim preclusion context 'connotes a natural

grouping or common nucleus of operative facts.'" *Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir. 1999).  Among the factors to be considered in deciding whether the facts of the current and prior claims "are so woven together" that they constitute a single claim "are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." *Id.*  That determination, obviously, is not so simple as reciting new statements or new facts that developed between the two suits, as the Plaintiffs now assert.  *See* Resp. at \*\*7–8.  Even cases the Plaintiffs cite stand for the proposition that *res judicata* is a "practical doctrine" that does not devolve into a "simple test to determine whether causes of action are identical."  *SAS Institute, Inc. v. World Programming Ltd*, 874 F.3d 370, 377 (4th Cir. 2017).

Actually examining the cases the Plaintiffs cite, there can be little doubt that subsequent claims challenging different permits on different grounds (*Ohio Valley Envtl Coal. v. Aracoma*, 556 F.3d 177 (4th Cir. 2009)), based on the separate (and different) laws of a different country (*SAS Institute*), and under statutes that did not exist at the time of the prior suit (*Clodfelter v. Republic of Sudan*, 720 F.3d 199 (4th Cir. 2013)) are not susceptible, at least easily, to the assertion of *res judicata*.  But that is not the case here.  The Plaintiffs here contend, just as they did in *Norton*, that the State's bonding program is insufficient to provide funding for reclamation DEP would have to do in the event that the State were forced to revoke permits and forfeit bonds *en masse*.  They cite to supposed "events" that have occurred since the first suit.  But none of those events, without much more yet to occur, constitute new "transactions" involving the parties to the suit.  Indeed, neither the alleged insolvencies on which the Plaintiffs rely nor the other large coal company bankruptcies of the past eight years have resulted in any permit revocations and bond forfeitures giving rise to DEP's obligation to reclaim, other than the four isolated

revocations and bond forfeitures DEP identified in its motion to dismiss.  Under these circumstances, the Plaintiffs have not alleged a single new or different "transaction" involving DEP out of which their new cause of action allegedly arises.  In fact, to the extent that the Plaintiff's claim in this action arises out of a "transaction" involving the parties to the litigation, it arises out of precisely the same transaction at issue in *Norton*, namely the State's establishment and funding of its alternative bonding program.

*Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156 (4th Cir. 2008), cited by the Plaintiffs in their Response, supports the notion that new facts or events, even those involving the parties to the two sets of litigation, do not necessarily lead to a new "transaction."  There, the plaintiff was part of a group that unsuccessfully challenged the constitutionality of a then-recently-enacted law that required mine operators to replace landowners' declining water supplies and compensate landowners for subsidence of the surface of the land resulting from their operations.  *Id.* at 160.  Eleven years later, the plaintiff brought a different constitutional challenge to an order issued under that law that required it to replace a specific well.  *Id.* Applying the "transactional" test enunciated in its earlier decision in *Pittston Co. v. United States*, 199 F.3d 694 (4th Cir. 1999), the Court of Appeals held that *res judicata* precluded the subsequent suit, concluding that the new procedural due process claim, even though based on a newly issued and specific order under the law, was "not sufficiently different from the substantive due process claim raised in [the prior suit]," *id.* at 162, and therefore barred.  The same applies here.  The Plaintiffs, at best, cite recent instances of specific coal company insolvencies that raise precisely the same kind of issues they raised in the earlier suit, namely the impact thereof on the solvency of the State's bonding program.  This new suit, based as it is on a supposed "as-applied challenge" of a law previously unsuccessfully challenged on its face,

12

involves the same nucleus of facts addressed in the prior complaint and, therefore, *res judicata* applies. *Id.*

### 2. The two suits involve the same party and its privities.

Although they frequently act jointly in citizens' suits in this Court,[18] the Plaintiff-citizens' groups claim that they lack privity with the plaintiff-citizens' group in *Norton*. That assertion, at best, ignores one critical fact—that Plaintiff West Virginia Highlands was the named plaintiff in *Norton* and, accordingly its claims are barred by *res judicata* without any reference to the privity analysis. But the Plaintiffs' contention also reflects an unduly narrow view of privity in the context of two citizens' suits.

Applying the two-part test enunciated in *Martin v. American Bancorporation Retirement Plan*, 407 F.3d 643 (4th Cir. 2005), DEP submits that the Sierra Club and Ohio Valley Environmental Coalition were adequately represented by the Conservancy, and thus privity is established. First, the Conservancy's interests in *Norton* and the Plaintiffs' interests here are identical. *See Martin*, 407 F.3d at 652. Second, the Conservancy actually did represent the interests of the Sierra Club and Ohio Valley Environmental Coalition (or more particularly their citizen members) with at least the tacit approval of the court. Indeed, the Conservancy represents the same *class* of individuals as represented by both the Sierra Club and Ohio Valley Environmental Coalition.

Adequate representation may be established where those present for the first judgment "are of the same class as those absent and that the litigation is so conducted as to insure the full and fair consideration of the common issue." *Hansberry v. Lee*, 311 U.S. 32, 43 (1940). The

---

[18] *See, e.g., Ohio Valley Envtl Coal. V. Hobet Mining, LLC*, Civil Action No. 3:15-cv-04101; *Ohio Valley Envtl Coal. v. ERP Envtl Fund, Inc.*, Civil Action No. 3:11-cv-00115; *Ohio Valley Envtl Coal. v. Hobet Mining, LLC*, Civil Action No. 3:09-01167; *Ohio Valley Envtl Coal. v. Apogee Coal Co.*, Civil Action Nos. 3:07-0413, 3:08-0088.

Plaintiffs are environmental groups representing their citizen members or "class" of individuals with similar interests.  Indeed, the Plaintiffs' representation is tantamount to a public interest representation as private attorneys general.  *See Middlesex Cnty Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 17 (1981).  In that vein, the groups themselves – as opposed to the individual members – are permitted to pursue litigation on behalf of their individual members to enforce state and federal environmental law.  As noted in DEP's motion to dismiss, *see* Mem. at *11; nn. 11 & 12, the Plaintiffs in this case frequently file cases on behalf of their members and pursue litigation in tandem and for the benefit of their members and the public.  To be sure, the groups' members have the same interest in the outcome of any given litigation, much like a class of persons in a class action, and their members (like those of a class action) are equally impacted by the outcome of a case, whether it be favorable or unfavorable to the interests of the groups' members.

With respect to *Norton*, the class of persons seeking relief were those persons claiming to have been adversely affected by the DEP's administration, implementation, and enforcement of its federally-approved State bonding program.  Here, the class of persons seeking relief are those persons claiming to be adversely affected by DEP's administration, implementation, and enforcement of that same federally-approved State bonding program.  Accordingly, the class of persons now represented by the Conservancy, Sierra Club, and Ohio Valley Environmental Coalition share the same interests as those class of persons represented by the Conservancy in *Norton*.  Moreover, while the Court nominally dismissed the Conservancy's claims in *Norton*, the Court in reality dismissed the claims of the Conservancy's *citizen members* and, thus, the claims of an entire class of individuals with the Court's "tacit approval."

*Martin* is, therefore, distinguishable from this case.  In *Martin*, the first case involved

14

one-off claims, *i.e.*, a declaratory judgment action filed by American Bancorporation to resolve the proper earnings formula with respect to one individual, Mr. McKain.  407 F.3d at 646–47. The second case involved a class action to resolve the proper earnings formula with respect to all the employee participants under the subject Plan.  *Id.* at 647.  The *Martin* Court ultimately determined that McKain was not accountable to the later class members and that the *McKain* court had not tacitly approved his representation of later class members.  The Court's decision, however, largely turned on the fact that McKain had not agreed to represent other employee participants of the plan because he himself did not prosecute a class action in the *McKain* case. *Id.* at 652 (noting that "during the substantive portions of the case, the entire focus of the court was on McKain as an individual participant and there was no disclosed relationship in which McKain was accorded authority to appear as a party on behalf of Appellants. Thus, there was no tacit approval.").

Here, we have a class of individual citizens whose rights were adjudicated in case one, and we have the same class present here in case two.  Plaintiffs represent in their pleadings here (and the pleadings in *Norton*) that they represent a class of individuals with shared interests and motivations to resolve their claims against the DEP.  Compl. at ¶¶ 9–11. The Court and all parties here (and in *Norton*) are on notice that the Plaintiffs, as environmental groups, are pursuing claims on behalf of a class of similarly situated persons.  Indeed, the Conservancy disclosed its relationship with its members in *Norton*,[19] and the Court entered judgment against the Conservancy with knowledge that the judgment would adversely affect the class of individuals represented by the Conservancy.  Given that the same class of individuals is present

---

[19] *See* Compl., *West Virginia Highlands Conservancy v. Babbitt*, Civil Action No. 2:00-1062 (S.D. W.Va. Nov. 14, 2000) [Doc 1] at ¶¶ 9-13.

here, privity under *Martin* has been established.[20]

**C. The cases on which the Plaintiffs rely to overcome State sovereign immunity have no application to this case.**

The Plaintiffs' sole challenge to the State's sovereign immunity claim is that the instant case involves challenges to the State's ongoing obligations under federal law that are similar to those involved in the Third Circuit's decision in *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310 (3d Cir. 2002) and this Court's decision in *Ohio River Valley Environmental Coalition, Inc. v. Callaghan*, Civil Action No. 3:00-0058 (S.D. W.Va., Sept. 21, 2001). The Plaintiffs' reliance on those cases is misplaced, as the two different statutory provisions involved in those cases do not reflect the same level of discretionary authority as the provision involved in this case.

In *Hess*, the plaintiffs launched an attack similar to the attacks the Plaintiffs launched in *Norton* and then again here. In six separate counts, the plaintiffs asserted various claims that challenged the sufficiency of Pennsylvania's reclamation bonding system and the Pennsylvania secretary's performance of alleged nondiscretionary duties relating thereto. Applying the same kind of analysis as in the Fourth Circuit's *Bragg* decision, the Court dismissed each of those counts on sovereign immunity grounds. 297 F.3d at 330. But the court permitted the plaintiffs to proceed with two counts that challenged the secretary's failure to submit information required under, among other provisions, 30 C.F.R. § 732.17. *Hess*, however, involved Section 732.17(f)(1), which provides:

> If the Director [of OSM] determines that a State program amendment is required, the State regulatory authority shall, within 60 days after notification of that

---

[20] In many respects, this case is analogous to those cases in which courts hold that *res judicata* bars subsequent private individuals' suits when the government previously asserted those claims. *See Southwest Airlines Co v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 98 (5th Cir. 1977) (and cases cited therein). In this case, the citizens' group effectively sought to stand in the place of the government as private attorneys general and their prior unsuccessful assertion of claims against DEP should bar subsequent citizens' group suits asserting the same claim.

> decision, submit to the Director either a proposed written amendment or a description of an amendment to be proposed that meets the requirements of the Act and this chapter, and a timetable for enactment which is consistent with established administrative or legislative procedures in the State.

As this provision makes clear, the triggering event for state regulatory authority action is OSM's determination that a state program amendment is required. Unlike Section 732.17(b), which is triggered only by a State regulatory agency's determination that a significant event affecting the State program has occurred, Section 732.17(f)(1) affords the State regulatory agency no discretion—if OSM has made the required determination, the State agency must submit the required amendment or a description thereof and a timetable for enactment within 60 days, something the Pennsylvania secretary allegedly had not done.

The specific regulatory provision at issue in this Court's decision in *Callaghan* similarly reflects an absence of State regulatory discretion. Section 732.17(g) provides:

> Whenever changes to laws or regulations that make up the approved State program are proposed by the State, the State shall immediately submit the proposed changes to the Director as an amendment. No such change to laws or regulations shall take effect for purposes of a State program until approved as an amendment.

Just as the provision at issue in *Hess*, the regulatory provision at issue in *Callaghan* afforded the state regulatory agency no discretion once the State had determined to change the laws or regulations that make up the approved State program. And the plaintiffs in that case alleged precisely that—that DEP had changed the State program without previously submitting the proposed change to OSM for approval. *See Callaghan*, at *2.

The facts in the instant case differ markedly from those in *Hess* and *Callaghan*. First and foremost, as noted above, DEP *did* deliver a notice to OSM. Secondly, DEP has not in this case made a decision that alters the funding or budgeting of the State's program. But equally importantly, especially in the absence of any State decision to alter the funding or budgeting of

its program, Section 732.17(b) affords DEP discretion that Sections 732.17(f) and (g) simply do not provide, the discretion to determine whether or not an event has occurred that constitutes a significant event affecting the implementation, administration, or enforcement of the State's program *before* the nondiscretionary duty to provide notice to OSM even arises.  Application of the same rule the Plaintiffs urge in this case would be functionally equivalent to permitting citizens to challenge OSM's determination of the need for a program amendment in the *Hess* case or the State's decision to change the State program in *Callaghan*, as opposed to challenging the States' respective submission obligations under Section 732.17 once those determinations had been made.

As the foregoing demonstrates, the Plaintiffs' reliance on *Hess* and *Callaghan* to avoid the application of sovereign immunity fail, and accordingly the Court should dismiss the Complaint on sovereign immunity grounds.

**D.  The Plaintiffs fail to establish the existence of a justiciable case or controversy.**

The Plaintiffs overlook the importance of the specific facts of this case to the standing and ripeness analysis in this case.  This is not a case where a plaintiff seeks to enforce permit conditions against a mine operator or challenge the agency's failure to enforce a permit.  Indeed, this case does not fall into the camp of cases where a plaintiff "need only show that he [or she] used the affected area and he [or she] is an individual for whom aesthetic and recreational values of the area [are] lessened by the defendant's activity."  *Ohio Valley Envtl Coal v. Hobet Mining, LLC*, 702 F. Supp. 2d 644, 650 (S.D. W.Va. 2010).

 The Plaintiffs cite *Hobet* and *Ohio Valley Envtl Coal v. Apogee Coal Co.*, Civil Action No. 3:07-0413, 2008 WL 11318044 (S.D. W.Va. May 2, 2008) for the general proposition above but ignore the distinctions between those cases and this one.  The Plaintiffs in those cases (which

are identical to the Plaintiffs here) sued mine operators for specific violations of the mine operators' mining permits.  Specifically, the Plaintiffs alleged that the mine operators violated the effluent limitations for selenium found in their permits.  The harm – the excess selenium discharged into nearby waterways – was fairly traceable to the Plaintiffs complained of injury – the Plaintiffs' inability to enjoy the river for fear of being injured by the excess selenium. Moreover, that injury tied to the defendant-coal companies' current activities, *i.e.*, the current discharge of selenium from the defendants' mines.  The Court in *Hobet* and *Apogee* was, therefore, well positioned to grant prospective relief to the Plaintiffs to address specific injuries directly linked to the coal companies' conduct.

Those kinds of injuries and connections simply do not exist here.  The Plaintiffs are pursuing claims against DEP solely as a regulatory agency writ large and not against coal companies operating mines like in *Hobet* or *Apogee*.  The Plaintiffs do not allege any particular injury relating to any particular permit or to any particular mining site.  Indeed, the Plaintiffs do not allege any specific injury that has actually occurred to date.  Nor do they connect any injuries to any particular unperformed obligation on the part of DEP to reclaim any particular mining site or any particular permit(s) that DEP is likely to have to reclaim.  It is plain from the face of Plaintiffs' claims that they are pursuing relief only from *future unspecified and as-yet speculative and hypothetical* injuries that may not ever occur.

Indeed, the Plaintiffs have pleaded no facts that support the conclusion that the insolvency of ERP or the potential insolvency of any other West Virginia coal mining operators has had *any* impact (let alone a "significant" impact), to date, on the State's bonding program.  It is not enough, in this case, for the Plaintiffs to broadly allege that they have observed environmental impacts resulting from DEP's alleged past failure to reclaim.  At a minimum, the

19

Plaintiffs must plead facts that support the plausible conclusion that DEP's actual reclamation efforts in the future will be adversely impacted by a significant change in funding to the State bonding program that has already occurred.  But the Plaintiffs' pleadings do not even draw a causal link between the alleged harm (the alleged significant change in the State bonding program) and the alleged injury (DEP's alleged failure to reclaim because of the change in the bonding program).  Instead, the Plaintiffs include only a generalized and wholly unspecific (and unsupported) claim they have been harmed by the DEP's failure to reclaim mine abandoned *since the enactment of SMCRA on August 3,1977.  See* Compl. at ¶ 11.  And, ultimately, the Plaintiffs are forced to admit that this action turns "largely upon statements made by WVDEP itself in an action to place ERP into a Special Receivership," as well as the alleged "current status of other companies in either bankruptcy or at imminent risk of insolvency," Response at 8, and the imagined effect those alleged insolvency proceedings will have on permit revocations, bond forfeitures, and eventually the funds available to the State to complete reclamation at some indeterminable date in the future.

The Plaintiffs have simply failed to allege any real injury and failed to connect any such injury to any conduct on DEP's part.  They lack standing.  Their claims are not ripe.  There simply is no case or controversy for this Court to hear and determine at this point in time.

### Conclusion

The Court should dismiss the Plaintiffs' Complaint.

Dated:  September 2, 2020                    /s/ Kevin W. Barrett
                                            Benjamin L. Bailey (WVSB #200)
                                            Kevin W. Barrett (WVSB #13569)
                                            Maggie B. Burrus (WVSB #12518)
                                            BAILEY & GLASSER LLP
                                            209 Capitol Street
                                            Charleston, West Virginia 25301
                                            Telephone: (304) 345-6555
                                            Facsimile: (304) 342-1110
                                            bbailey@baileyglasser.com
                                            kbarrett@baileyglasser.com
                                            mburrus@baileyglasser.com

                                            *Attorneys for the Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

|  |  |  |
|---|---|---|
| **OHIO VALLEY ENVIRONMENTAL COALITION, WEST VIRGINIA HIGHLANDS CONSERVANCY, and SIERRA CLUB,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 3:20-cv-00470** |
| **AUSTIN CAPERTON, Secretary, West Virginia Department of Environmental Protection,** | ) ) ) ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 2, 2020, I electronically filed the foregoing **REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT** with the Clerk of the Court using the CM/ECF system, which will send notice of the filing thereof to the attorneys for the Plaintiffs:

> J. Michael Becker
> Derek Teaney
> Appalachian Mountain Advocates
> P.O. Box 507
> Lewisburg, WV 24901

>       */s/ Kevin W. Barrett*
>       Kevin W. Barrett (WVSB #13569)