# EXHIBIT A

# PART 1 of 2

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

| | |
|---|---|
| **HAROLD D. WARD, Acting Director, Division of Mining and Reclamation, West Virginia Department of Environmental Protection,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) CIVIL ACTION NO. 20-C-282 |
| **ERP ENVIRONMENTAL FUND, INC.,** | ) ) ) |
| **Defendant.** | ) ) ) |

FILED
Cathy S. Gatson, Clerk
Kanawha *a copy*
MAR 26 2020

## AFFIDAVIT OF HAROLD D. WARD IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND TEMPORARY AND PRELIMINARY APPOINTMENT OF A SPECIAL RECEIVER

COUNTY OF KANAWHA          )
                                                ) ss:
STATE OF WEST VIRGINIA     )

HAROLD D. WARD, being duly sworn, deposes and says:

1.       I am the Director of the Division of Mining and Reclamation and Deputy Secretary of the West Virginia Department of Environmental Protection ("DEP").

2.       Unless otherwise stated herein, I have personal knowledge of the facts stated herein.

**ERP Permits, Violations, and DEP Orders**

3.       ERP Environmental Fund, Inc. ("ERP"), the Defendant herein, holds more than 100 DEP-issued permits to mine coal and conduct other activities at numerous mine sites in West Virginia.

4.       Upon information and belief, ERP also holds permits to mine coal in other States, including Kentucky, Illinois, and Tennessee.

1

5.      As of the date hereof, DEP has issued 160 notices of violations of various conditions associated with ERP's West Virginia mining permits, many of which have not yet been abated.

6.      In an attempt to address those unabated violations, DEP has issued 118 failure to abate cessation orders, none of which ERP has taken appropriate action to abate.

7.      In a further attempt to address those unabated violations, DEP has issued forty-one orders to show cause why the related permits should not be revoked.

8.      Despite DEP's administrative actions to enforce the West Virginia Surface Coal Mining and Reclamation and Water Pollution Control Act, ERP remains in violation of the same.

9.      In fact, ERP recently acknowledged and agreed that it is in material default of its obligations under its permits and its reclamation agreement with DEP and does not have any sources of cash or other assets available for the reclamation and water treatment required under its permits, the reclamation agreement, or applicable law.  A copy of the term sheet in which ERP acknowledges the same is attached hereto as Exhibit A.

10.     In addition, upon information and belief and in view of its lack of cash and other assets, ERP has, as of March 19, laid off all of its employees and ceased operating all together.

11.     Since the beginning of February, ERP had been performing only limited essential activities with emergency and limited outside funding to address imminent threats to the public health and safety at ERP's "Martinka" mine.

12.     In view of ERP's complete cessation operations, I would expect that ERP will continue to accrue violations and that the underlying causes of certain of its existing violations will materially worsen, particularly as spring approaches and precipitation increases the amount of water flowing onto and through ERP's mine sites.  ERP's mine sites stand in varying stages of

2

land disturbance and substantial land reclamation and water treatment obligations exist on those sites.

13.    Without immediate and decisive action to resume even the most basic permit and site maintenance, many of ERP's mine sites can be expected to begin to threaten imminent and identifiable harm to the environment and the public health and safety.

**ERP's Martinka Mine**

14.    Of particular concern to DEP is ERP's Tygart River Mine complex in Marion County that DEP commonly refers to as the "Martinka" mine.

15.    The Martinka mine has been closed for years, but requires constant remediation to prevent imminent harm to the public health and safety.

16.    Both surface and groundwater flows work to influence the volume of water that can inundate a mine void.  The water that flows into a mine void contains many natural elements, but when water accumulates in the voids, water can exhibit highly elevated levels of certain elements.  This is the case at Martkina and absent effective treatment the water can be extremely harmful to humans and the environment.

17.    A mine void has a natural "pool."  As water fills the mine, the potential for the mine to become fully inundated increases as does the potential, depending on the chemical characteristics exhibited by the coal seam and surrounding strata, for polluted discharges from the mine.  When this occurs, the mine has the potential to artesian or discharge through other uncontrolled points.

18.    To avoid artesianing or discharge through other unauthorized point sources, the pool level requires constant monitoring and maintenance of the pool elevation.  The pumped water requires treatment for contaminants before it discharges into tributaries of the Tygart

3

River. ERP has advised DEP that the costs associated with the pumping and treatment of water at Martinka has run nearly $900,000 annually.

19.     As ERP's operating cash flow has deteriorated and now dried up completely, it began to engage in only intermittent and sporadic pumping and treatment of the Martinka mine pool. In addition, ERP only sporadically performed normal and routine maintenance of the pumps. As a result, the Martinka mine pool has risen at rates as fast as one foot per week and has reached elevations that have come to within four to six feet of what DEP has determined to be critical pool elevation that would result in the uncontrolled artesianing of the mine water. These flows would bypass the designed capture and treatment system associated with the site. This would result in contaminated water discharging into the receiving stream that is the source of drinking water for thousands of West Virginians within a matter of weeks if not days.

20.     ERP has communicated to DEP that it does not have the resources to maintain the dewatering and treatment required at the Martinka operation.

21.     Given the exigent circumstances, DEP stepped in and agree to provide limited funds to repair and replace the pumps and continue to pump and treat water at the Martinka mine in the short-term, but ERP remains in desperate need for funds to continue to pump and treat water at the Martinka mine.

**ERP's Acquisition of the Permits**

22.     Except for one permit first issued to ERP in or about 2019, ERP acquired the permits it holds in connection with Patriot Coal Corporation's second Chapter 11 bankruptcy case in 2015.

4

23.     In connection with that case, Patriot proposed to sell its valuable mining assets in West Virginia to Blackhawk Mining, LLC, a well-known and established coal mining company that already operated several mines in West Virginia.

24.     Patriot initially proposed to close its other mining sites in West Virginia and transfer the mines and the associated permits to transfer a liquidating trust or other similar entity that would be obligated to reclaim and remediate the shuttered mine sites.

25.     At the time, DEP estimated that the costs of reclaiming and remediating Patriot's "abandoned" sites in excess of $230 million.

26.     In addition, DEP was aware of a federal consent order requiring Patriot to treat selenium-laced water at various of its mine sites in southern West Virginia with estimated treatment costs running, at that time, in the hundreds of millions of dollars.

27.     Inasmuch as Patriot proposed to "fund" the liquidating trust with only limited unliquidated and illiquid assets, DEP (and various agencies of the United States) opposed Patriot's proposed plan and embarked on extensive litigation to oppose bankruptcy court approval of the plan in the bankruptcy case.

28.     During that time, however, an individual named Tom Clarke and his affiliated entity, Virginia Conservation Legacy Fund ("VCLF"), appeared on the scene in the summer of 2015.

29.     Mr. Clarke and VCLF proposed to take transfer of Patriot's troubled mining sites and Patriot's proposed funding sources and complete the required reclamation and remediation.

30.     Patriot executives, even though they expressed skepticism of the proposal in a meeting with me, quickly latched onto Mr. Clarke's proposal and incorporated it into Patriot's bankruptcy plan.

5

31.     I met with Mr. Clarke several times over the summer and fall of 2015 and conducted and caused an investigation of Mr. Clarke and VCLF.

32.     During those meetings and investigation, I learned that Mr. Clarke and VCLF had no experience in the operation or reclamation and remediation of coal mines; instead, Mr. Clarke had been an executive of a nursing home business and VCLF had only recently acquired the Natural Bridge tourist attraction in Virginia, and Mr. Clarke's only "coal mining experience" appeared to involve an unpaid consulting assignment monitoring compliance issues for Southern Coal Company. *See, e.g.,* https://www.roanoke.com/news/local/jim-justice-gets-helping-hand-from-botetourt-conservationist/article_0993fee9-e083-54cb-a364-b09c72fedea7.html.

33.     Concerned about Mr. Clarke's lack of experience in the industry and the adequacy of the funding for his proposed acquisition, DEP continued to oppose Patriot's bankruptcy plan and the proposed transfer of Patriot's troubled mine sites to VCLF.

**Settlement Agreement with Patriot**

34.     In the end, however, and after extensive litigation and negotiations, DEP entered into a settlement agreement in the bankruptcy case with Patriot, VCLF, and Blackhawk.  A copy of the settlement agreement, dated as of October 27, 2015, is attached hereto as Exhibit B.

35.     Pursuant to the settlement agreement,

  a.  Patriot agreed to post an additional "pool bond" in West Virginia in the amount of $12.5 million to fund the reclamation and remediation of its former mine sites should VCLF fail to complete them (Ex. B at § 1);

  b.  Blackhawk agreed to provide $7 million worth of reclamation work on the West Virginia sites (Ex. B. at § 2); and

6

     c. VCLF agreed to fund and grant DEP security interests in various sources of cash and a "collateralized reclamation account" (Ex. B. at § 5)

36.     The bankruptcy court in Patriot's bankruptcy case approved Patriot's plan on October 9, 2015 and Patriot consummated its bankruptcy plan on October 26, 2015; in connection therewith, VCLF consummated its acquisition of Patriot permits, an acquisition ultimately by ERP as VCLF's recently organized subsidiary, the following day.

**Reclamation and Collateral Agreements with ERP**

37.     In furtherance of the settlement agreement, DEP entered into a detailed reclamation agreement and a collateral and deposit account control agreement (the "collateral agreement") with VCLF and ERP on February 17, 2016. Copies of the reclamation agreement and collateral agreement are attached hereto as Exhibits C and D, respectively.

38.     Pursuant to the collateral agreement, ERP and VCLF granted DEP a fully perfected security interest in and to substantially all its cash and cash flow, including

     a. The amount of any proceeds received by them upon phased bond releases in accordance with the settlement agreement;

     b. The net proceeds of the sale of any coal mined at any of the sites on which ERP holds a DEP-issued permit;

     c. Certain cash flow generated from the operation of another VCLF-acquired operating mine in northern West Virginia; and

     d. The proceeds of certain claim settlements.

39.     In furtherance thereof, the reclamation agreement established detailed parameters relating to the use of those funds, including the prioritizing of ERP's reclamation and remediation activities (Ex. C at § 3), a detailed budgeting and accounting process and the process

7

for the release of funds from the collateralized reclamation account (Ex. C at § 5), which was then and has remained under DEP's complete control.

**ERP's Management Issues**

40.     With no mining experience himself, upon ERP's acquisition of the Patriot permits and sites, Mr. Clarke hired a former Patriot mining engineer, Matt Cook, to oversee ERP's reclamation and remediation activities as ERP's president.

41.     Over the years, DEP has developed a good working relationship with Mr. Cook, and Mr. Cook has, in my opinion, generally performed well and as best has he could in accordance with the reclamation agreement, subject to the massive funding and other challenges he has faced as detailed below.

42.     But, upon information and belief, Mr. Cook is a mining engineer and does not have a financial or accounting background.

43.     Although DEP has occasionally had communications with others in Mr. Clarke's organization who appear to have some financial or accounting background, those individuals have appeared to me to play no consistent role in the financial or accounting affairs of ERP.

44.     And while Mr. Clarke appears to have some financial and accounting background and experience, Mr. Clarke has played virtually no role in ERP's relationship with DEP since ERP acquired the Patriot permits and sites.

45.     Instead, upon information and belief, Mr. Clarke embarked almost immediately after the Patriot transaction on an acquisition binge that seems to have diverted his and his management's attention from ERP's operations and management.

46.     DEP has direct knowledge of two of Mr. Clarke's first two acquisitions, the purchase of two coal mines from Cleveland Cliffs, including one in West Virginia known as the

8

Pinnacle Mine, and the purchase of assets out of the Walter Energy bankruptcy in Alabama that included the Maple-Eagle mine in West Virginia.

47.     But, upon information and belief, Mr. Clarke also almost immediately embarked on an entire series of unrelated acquisitions, including an iron ore mine in Minnesota, at least one steel mill, a coal mine in Canada, a gold mine in California, and many others.

48.     Since completing the acquisition of the Patriot permits and mines, Mr. Clarke also pursued other mining acquisitions—of Alpha Natural Resources in 2016, of the Oxford mine and then the Kemmerer mine out of Westmoreland Coal in 2019, and of Blackjewel's Wyoming mines in 2019.

49.     Over the years and as evidenced in ERP's regular budgeting and accounting under the reclamation agreement, ERP has suffered from variously insufficient, intermittent and sporadic funding.

50.     By the middle of 2018, ERP's sources of funding, other than the limited proceeds of intermittent coal sales generated by its mining of coal incidental to reclamation, had largely dried up and ERP requested that DEP permit it to access the $1 million in funds in the collateralized reclamation account that the parties had previously earmarked for water treatment to provide for ongoing reclamation at the former Patriot sites.

51.     DEP agreed to permit ERP access to those funds on the terms and subject to the conditions set forth in a binding term sheet dated as of October 11, 2018.  A copy of the term sheet is attached hereto as Exhibit E.

52.     Pursuant to the term sheet, ERP agreed to grant DEP liens in certain real and personal property and deposit the net proceeds of all asset sales into the collateralized reclamation account.  *See* Ex. E at §§ 3 & 4.

53.     ERP never did, however, sell assets as contemplated in the term sheet.

54.     Instead, upon information and belief and based upon documentation ERP provided to DEP's attorneys, ERP repeatedly encumbered some of those assets to secure other debts.

55.     DEP only recently learned and received documentation showing that an ERP-related entity that subsequently merged into ERP had granted two mortgages and a deed of trust in certain of its real property to secure promissory notes that entity, as well as Mr. Clarke and two other individual ERP insiders, issued to a law firm totaling $4.2 million; that deed of trust now allegedly encumbers real property owned by ERP.  Copies of the filed mortgages and deed of trust are attached hereto as Exhibits F, G, and H.

56.     DEP only recently learned and received documentation suggesting that ERP may have transferred its massive Hobet dragline equipment, putatively worth millions of dollars, to another Clarke-VCLF related entity which then granted the same law firm a security interest in the dragline apparently to secure the same debts.  A copy of the related UCC filing is attached hereto as Exhibit I.

57.     DEP also only recently learned that certain environmental groups received a judgment against ERP in 2019 and had registered that judgment in various West Virginia counties in the fall of 2019 to obtain judgment liens against ERP's real property in those counties, and that ERP entered into a forbearance agreement with those environmental groups in December 2019 agreeing, among other things, to pay the environmental groups 22.5% of the net proceeds realized by ERP from the sale of any real or personal property, even property to which the judgment lien did not extend.  A copy of the forbearance agreement, which contains recitals as to the entry and registration of the judgment, is attached hereto as Exhibit J.

58.     By late 2019 or early 2020, not only had ERP encumbered much of its valuable property but it had also completely run out of funds.

59.     As it had done at various points since its inception in the fall of 2015, ERP again requested access to the $12.5 million cash bond DEP had held since Patriot deposited those funds with the State Treasurer's Office in October 2015 pursuant to DEP's settlement agreement with Patriot and VCLF.

60.     DEP denied that request yet again, but initiated discussions with ERP's surety bond issuer, Indemnity National Insurance Company.

61.     Indemnity issued more than $115 million in surety bonds to back ERP's obligations under its West Virginia permits.

62.     If ERP remains in widespread default of its obligations under its permits as it is now, DEP would have to continue with its efforts to revoke all of ERP's remaining permits, forfeit, ultimately, the full $115-plus million in surety bonds backing those permits, and transfer all of ERP's permits to the State's Special Reclamation Fund, which would thereupon assume responsibility for reclaiming and remediating all of ERP's mining sites in accordance with the terms of its permits.

63.     DEP is concerned that forfeiting $115 million in surety bonds at more or less the same time could be problematic.

64.     In addition, transferring more than 100 permits to the Special Reclamation Fund would overwhelm the fund both financially and administratively, with the result that the actual reclamation and remediation of the ERP mining sites could be delayed.

65.     Faced with those prospects, DEP and Indemnity began exploring alternatives for securing the reclamation and remediation of the ERP mining sites.

66.     Indemnity has advised DEP that it is prepared to provide interim funding for approximately ninety days while exploring a longer-term fix.

67.     To that end, Indemnity has already provided $350,000 in funding to ERP within the past six weeks to allow ERP to meet certain basic environmental obligations in West Virginia and keep its staff employed. *See* Ex. A at § 4.

68.     But ERP has exhausted that limited funding on its limited operations in just four weeks, requiring Indemnity to provide additional emergency funding to ERP.

69.     Over the past two weeks, Indemnity has repeatedly advised ERP that it was unwilling to extend it further funding except on an extremely limited basis principally to address imminent threats to the public health and safety.

70.     At the same time, Indemnity advised DEP that it would fund a special receiver charged with overseeing ERP's operations, assets, and affairs so that the special receiver might maintain certain priority sites and determine whether it is possible to develop an effective strategic business plan for maintaining its permits, reclaiming and remediating ERP's mining sites and obtaining bond release all in accordance with the surface mining and clean water laws applicable to its operations.

71.     On March 17, 2020, I instructed DEP's lawyers to advise Mr. Cook that DEP would file this action and seek immediate injunctive relief against ERP and the appointment of a special receiver to ensure ERP's compliance therewith and, upon information and belief, they did so.

72.     Upon information and belief, on that call, Mr. Cook advised that ERP agreed in principal with the appointment of a receiver.

73.     In summary, DEP submits that

12

a.  The immediate entry of injunctive relief is necessary to compel ERP's

compliance with the surface mining and water pollution laws applicable to

its business operations;

b.  the appointment of a special receiver to assume control of ERP's assets,

operations, and affairs is essential to ensuring ERP's compliance with the

surface mining and water pollution laws applicable to its business

operations.



_Harold D. Ward_

HAROLD D. WARD, Director of the
Division of Mining and Reclamation and
Deputy Secretary of the West Virginia
Department of Environmental Protection

Subscribed and sworn to before me

this 25ᵗʰ day of March 2020

_Nancy Hudson_

Notary Public

13

Execution Version

# WVDEP-INIC-ERP Environmental Fund
## Short-Term Funding
## Binding Term Sheet

The following sets forth the terms of an agreement (the "**Term Sheet**") among the West Virginia Department of Environmental Protection ("**DEP**"), ERP Environmental Fund, Inc. ("**ERP**"), Virginia Conservation Legacy Fund, Inc. ("**VCLF**") and certain other persons or entities within the ownership and control of ERP that are signatories hereto (collectively, the "**Clarke Parties**"), and Indemnity National Insurance Company ("**INIC**"), with respect to short-term funding for ERP's ongoing reclamation and water treatment obligations on the West Virginia mining permits identified on **Exhibit A** (the "**Permits**") and the mining sites relating thereto.

1. **Existence of Material Defaults.** VCLF and ERP acknowledge and agree that they have been and continue to be in material default on their obligations under the Reclamation Agreement dated February 17, 2016 among ERP, VCLF, and DEP (as the same may have been amended in writing executed in accordance therewith prior hereto, the "**Reclamation Agreement**") and the Permits.

2. **Representations and Warranties.** VCLF and ERP represent and warrant that they have no sources of cash or other assets available to them for the continuing operation of their business and affairs and the reclamation and water treatment required under the Permits, the Reclamation Agreement, and applicable state and federal law, including any cash or other assets available for contribution to them from their members or their members' insiders or affiliates, including any of the Clarke Parties, other than the proceeds of the prospective sales of assets.

3. **Negotiations Toward a Resolution.** INIC and DEP have agreed to enter into good faith negotiations concerning the provision for ongoing reclamation and water treatment on the Permits and the mining sites relating thereto in light of ERP's inability to fund or provide for the same. ERP and the Clarke Parties agree to cooperate fully with those negotiations and acknowledge the possibility that a negotiated resolution may involve the transfer of ERP's assets and the Permits or the responsibility therefor to a new entity and/or the initiation of a receivership or other similar proceeding. INIC acknowledges the possibility that a negotiated resolution will involve the need for additional funding by INIC. DEP acknowledges the possibility that a negotiated resolution may require certain concessions with respect to certain outstanding surety bonds issued by INIC. Execution of this Term Sheet shall not obligate DEP and INIC to enter into any such resolution or a long-term agreement concerning provision for ongoing reclamation and water treatment on the Permits, and neither DEP or INIC shall be obligated to provide any further funding of same, except as expressly set forth in this Term Sheet.

4. **Provision of Funding.**

   a. Upon the execution of this Term Sheet by ERP, DEP, and INIC, INIC will fund to ERP $350,000 in cash (the "**Funding**"). Such Funding, net of the Initial Funding (as defined below), will be paid and deposited directly into the "**Collateralized Reclamation Account**" (as defined in the Reclamation Agreement) covered by the Collateral and Deposit Account Control Agreement, dated February 17, 2016, with



EXHIBIT

A

The Huntington National Bank, and will be disbursed therefrom only directly to the vendor or, with respect to approved payroll expenses, to ERP and only at the written instructions of DEP.

b. Pending the negotiation and implementation of a broader resolution, and as contemplated herein and in accordance with the conditions hereof, ERP may use the Funding on an as-needed basis on at least two Business Days' notice from ERP to DEP and INIC to pay for or fund (1) certain ongoing environmental obligations under the Permits in the State of West Virginia as set forth in lines 12 through 33 of the budget attached hereto as **Exhibit B**, specifically, the pumping and treatment of water from ERP's Martinka mine complex in Marion County, West Virginia, certain chemical treatment costs, certain water pumping costs, certain water sampling costs, and other actual costs and expenses incurred in administering the environmental obligations associated with Permits in West Virginia, including the provision of payroll associated with administering the environmental obligations (the "**Environmental Costs**") and (2) such other costs and expenses set forth in lines 35 through 50 of Exhibit B (the "**Other Expenses**"). ERP represents that Exhibit B hereto sets forth in detail its best estimate of the Environmental Costs it anticipates for the period covered in the budget on a weekly basis. INIC and ERP acknowledge and agree that DEP may release the Funding from theCollateralized Reclamation Account on an as-needed basis up to the amounts set forth in the budget in Exhibit B on a weekly basis, subject to (i) written verification from ERP to DEP and INIC of documented out-of-pocket, unaffiliated third-party costs and expenses for Environmental Costs and (ii) DEP's and INIC's prior written approval of such costs and expenses. DEP and INIC shall consult prior to approving the disbursement of any funds.

c. VCLF and ERP acknowledge and agree that (a) the Environmental Costs constitute part of their ongoing environmental obligations in the State of West Virginia and (b) the Funding may be utilized solely for its documented and approved out-of-pocket, unaffiliated third-party expenses for the Environmental Costs and the Other Expenses. For the avoidance of doubt, the Funding may not be used to pay any of ERP's administrative expenses, holding costs, overhead, or the salaries or wages of any of its employees, other than those directly employed in administering the environmental obligations associated with the Permits in West Virginia and other States.

The parties acknowledge and agree that INIC prepaid directly to ERP the sum of $132,000 of the Funding on February 5, 2020 (the "**Initial Funding**") to fund ERP's payroll on February 6, 2020 and the purchase of chemicals necessary for short-term water treatment, as set forth in Exhibit B hereto.

5. **Assets.** As a condition to the release of any funds (other than the Initial Funding), ERP shall

a. within ten days of the execution of this Term Sheet provide to DEP and INIC a complete inventory of, and make available title reports (including real property descriptions) to, all of its assets;

    b.  within ten days of the execution of this Term Sheet a complete statement of all liens, claims, and encumbrances against its assets, together with any and all documentation relating thereto;

    c.  within ten days of the execution of this Term Sheet provide to DEP and INIC documentation for all outstanding out-of-pocket, unaffiliated third-party expenses for pumping and treating water from ERP's Martinka mine complex and the other Permits since October 2015;

    d.  within ten days of execution of this Term Sheet provide to DEP and INIC a listing of all employees of ERP and VCLF and identify which of these employees are responsible for tasks related to water sampling and treatment in the State of West Virginia;

    e.  not sell, lease, or otherwise transfer any ownership interest of ERP or VCLF in any asset without the prior written consent of DEP and INIC such consent not to be unreasonably withheld; and

    f.  immediately grant and provide DEP and INIC access to all VCLF and ERP files and records, including, but not limited to, those files and records pertaining to the Permits and ERP's environmental obligations.

All such inventories and accountings shall be subject to the approval of DEP and INIC.

6. **Liens.** ERP hereby grants to the State of West Virginia and to INIC liens of equal priority upon all of its assets including, without limitation, accounts, deposit accounts, money, letter of credit rights, general intangibles, intellectual property, leases, real property, mineral rights, equipment, machinery, furniture, fixtures, inventory, as-extracted collateral, and proceeds of the same. Such liens shall secure all liabilities of ERP to DEP and INIC, respectively, related to the Permits. Immediately upon the execution of this Term Sheet, ERP shall provide DEP and INIC with detailed property descriptions of its real property interests and equipment to enable DEP and INIC to perfect liens previously granted and granted hereby. ERP shall cooperate with DEP and INIC in all respects in perfecting those liens as soon as is practicable after the execution of this Term Sheet. DEP and INIC shall grant releases of property from such liens to permit the sale of land and other assets, subject to their rights of consent with respect to any such sale under Section 5.e. above.

7. **Access to Documents and Information.** ERP shall (a) cooperate with and promptly respond to all requests of DEP and INIC for information and documents and (b) provide DEP and INIC or their representatives and agents full and complete access to its offices, books, and records upon reasonable notice therefor.

8. **Individual Signatories.** Thomas M. Clarke, Ana M. Clarke and Matthew Cook (the "**Individual Signatories**") are signatories to this agreement solely for the purpose of acknowledging the duties, rights and defaults of ERP and VCLF and to evidence the willingness of the Individual Signatories to cooperate in the resolution of material defaults identified herein. The execution of this agreement by the Individual Signatories does not impact their personal liability for such material defaults beyond that which may exist externally to this Agreement.

9. **No Release of Obligation.** Nothing set forth herein shall constitute or be deemed to (a) release, limit, alter, or otherwise affect any obligation or liability of VCLF or ERP (or any

Execution Version

other entity or person) under the Settlement Agreement dated October 27, 2015 among DEP and VCLF (the predecessor of ERP) and others (the "**Settlement Agreement**"), the Reclamation Agreement, the Permits, or any applicable state or federal law or rule, or any agreement with INIC, (b) release, limit, alter, or otherwise affect any obligation, liability, rights, or defenses of INIC under the surety bonds it issued relating to the Permits and applicable state and federal law, or (c) limit, impair, or affect (i) the rights or regulatory and enforcement authority of DEP with respect to the Reclamation Agreement, the Permits, or any applicable state or federal law or rule, including, without limitation, the right to revoke any or all of the Permits and forfeit any surety bonds or other collateral (including the "**Additional Cash Bond Account**" as defined in the Settlement Agreement) posted in connection therewith, or to pursue administrative, civil, or criminal actions to accomplish compliance with environmental laws, or (ii) any existing and outstanding enforcement actions or proceedings.  Notwithstanding the parties' entry into this Term Sheet, ERP and the Clarke Parties acknowledge and agree that its or their respective obligations and liabilities under the Settlement Agreement, the Reclamation Agreement, the Permits, and any applicable state or federal law or rule remain outstanding and in full force and effect.

10. **Breach of Agreement.**  ERP's or the Clarke Parties' breach of this Term Sheet shall constitute a Default under Section 8.a. of the Reclamation Agreement and entitle DEP to exercise all the rights set forth in Section 8.b. of the Reclamation Agreement.

11. **Conditions and Execution.**  This Term Sheet constitutes the entire understanding of the parties relating to the subject matter hereof and any changes to this understanding must be in writing signed by all parties.  Further, the heretofore referenced Settlement Agreement and Reclamation Agreement are hereby affirmed and are not in any way altered hereby. This Term Sheet is subject to the execution and delivery of this Term Sheet and any other documents contemplated hereby by each of the parties hereto.  This Term Sheet may be executed and delivered in counterparts and by facsimile or email communication and the communication thereof shall be deemed to constitute an original signature of this Term Sheet.

Dated: February 19, 2020                    ERP Environmental Fund, Inc.


                                            By: _____
                                            Name:  Mathew Cook
                                            Its:  President


                                            West Virginia Department of Environmental
                                            Protection


                                            By: _____
                                            Name:
                                            Its:

other entity or person) under the Settlement Agreement dated October 27, 2015 among DEP and VCLF (the predecessor of ERP) and others (the "**Settlement Agreement**"), the Reclamation Agreement, the Permits, or any applicable state or federal law or rule, or any agreement with INIC, (b) release, limit, alter, or otherwise affect any obligation, liability, rights, or defenses of INIC under the surety bonds it issued relating to the Permits and applicable state and federal law, or (c) limit, impair, or affect (i) the rights or regulatory and enforcement authority of DEP with respect to the Reclamation Agreement, the Permits, or any applicable state or federal law or rule, including, without limitation, the right to revoke any or all of the Permits and forfeit any surety bonds or other collateral (including the "**Additional Cash Bond Account**" as defined in the Settlement Agreement) posted in connection therewith, or to pursue administrative, civil, or criminal actions to accomplish compliance with environmental laws, or (ii) any existing and outstanding enforcement actions or proceedings. Notwithstanding the parties' entry into this Term Sheet, ERP and the Clarke Parties acknowledge and agree that its or their respective obligations and liabilities under the Settlement Agreement, the Reclamation Agreement, the Permits, and any applicable state or federal law or rule remain outstanding and in full force and effect.

10. **Breach of Agreement.**  ERP's or the Clarke Parties' breach of this Term Sheet shall constitute a Default under Section 8.a. of the Reclamation Agreement and entitle DEP to exercise all the rights set forth in Section 8.b. of the Reclamation Agreement.

11. **Conditions and Execution.**  This Term Sheet constitutes the entire understanding of the parties relating to the subject matter hereof and any changes to this understanding must be in writing signed by all parties. Further, the heretofore referenced Settlement Agreement and Reclamation Agreement are hereby affirmed and are not in any way altered hereby. This Term Sheet is subject to the execution and delivery of this Term Sheet and any other documents contemplated hereby by each of the parties hereto. This Term Sheet may be executed and delivered in counterparts and by facsimile or email communication and the communication thereof shall be deemed to constitute an original signature of this Term Sheet.

Dated: February 19, 2020                          ERP Environmental Fund, Inc.


By: _____
Name:
Its:

West Virginia Department of Environmental Protection


By: _Harold D. Ward_____
Name: _Harold D. Ward_
Its: _Dep. Sec. / Director DMR_

Execution Version

Indemnity National Insurance Company

By: _____
Name:  Thomas F. Elkins
Its:           President

ACKNOWLEDGED AND AGREED TO:

Virginia Conservation Legacy Fund, Inc.

By: _____
Name:
Its:

VCLF Holdings LLC.

By: _____
Name:
Its:

VCLF Land Trust, Inc.

By: _____
Name:
Its:

_____
Thomas M. Clarke

_____
Ana Clarke

_____
Matt Cook

Execution Version

Indemnity National Insurance Company

By: _____
Name:
Its:

ACKNOWLEDGED AND AGREED TO:

Virginia Conservation Legacy Fund, Inc.

By: _____
Name:  Thomas M. Clarke
Its:  Chief Executive Officer

VCLF Holdings LLC.

By: _____
Name: Thomas M. Clarke
Its:  Chief Executive Officer

VCLF Land Trust, Inc.

By: _____
Name:  Thomas M. Clarke
Its:  Chief Executive Officer

_____
Thomas M. Clarke


_____
~~Ana Clarke~~


_____
Matt Cook

Execution Version

Indemnity National Insurance Company


By: _____
Name:
Its:


ACKNOWLEDGED AND AGREED TO:

Virginia Conservation Legacy Fund, Inc.


By: _____
Name:
Its:

VCLF Holdings LLC.


By: _____
Name:
Its:

VCLF Land Trust, Inc.


By: _____
Name:
Its:


_____
Thomas M. Clarke


_____
Ana Clarke

_____
Matt Cook

# EXHIBIT A

Exhibit A
Permits

| NAME | DESCRIPTION | COMPANY | DEPARTMENT | ID CODE |
|---|---|---|---|---|
| **Remington** | | | | |
| General | | 410 | 2576 | P9999 |
| Stockburg 1 | Weatherby Plant and Refuse, U-60-83 | 410 | 2576 | P0001 |
| Stockburg 2 | Ruger, U-64-83 | 410 | 2576 | P0002 |
| Destiny | U-1011-01 | 410 | 2576 | P0003 |
| **Closed RE** | | | | |
| General | | 410 | 2960 | P9999 |
| Leme 1 | S-3001-99 | 410 | 2660 | P0004 |
| Misln | U-3019-01 | 410 | 2860 | P0005 |
| Essex | U-3009-03 | 410 | 2960 | P0006 |
| **Closed Catenary** | | | | |
| General | | 410 | 2424 | P9999 |
| Wither | O-26-85, H561 | 410 | 2424 | P0007 |
| Shrewsbury Refuse | R-96 | 410 | 2424 | P0008 |
| Kelly's Creek No 6 | S-47-75 | 410 | 2424 | P0009 |
| Kelly's Creek No 6 Surface | S-87-43 | 410 | 2424 | P0010 |
| Pond-Gap | PO-031 | 410 | 2424 | P0011 |
| Morris Fork Plant | O-54-82 | 410 | 2424 | P0012 |
| Belcher Refuse | O-60-82 | 410 | 2424 | P0013 |
| Morris Fork 44 | O-59-02 | 410 | 2424 | P0014 |
| No.7/7a Mine | U-87-83 | 410 | 2424 | P0015 |
| 8-Mile No.1 | S-12r-80 | 410 | 2424 | P0016 |
| 8-Mile No.2 | S-100-82 | 410 | 2424 | P0017 |
| Carver | S-72-81 | 410 | 2424 | P0018 |
| **Mountain View** | | | | |
| General | | 410 | 0658 | P9999 |
| Cut22 | S-108-76 | 410 | 0658 | P0019 |
| Cut21 | S-18-76 | 410 | 0658 | P0020 |
| Cut24 | S-103-80 | 410 | 0658 | P0021 |
| Robin6 | O-31-82 | 410 | 0658 | P0022 |
| Cut22 | S-718-75, S-19-82 | 410 | 0658 | P0023 |
| Cut90 | S-6015-00 | 410 | 0658 | P0024 |
| White Oak Refuse | R 753 | 410 | 0650 | P0025 |
| Cut26 | S-192-77, O-21-82 | 410 | 0658 | P0026 |
| White Oak RR | H370 | 410 | 0650 | P0027 |
| Morris Fork - Youngs Branch | S-141-75, H397 | 410 | 0658 | P0028 |
| **Tygart River** | | | | |
| General | | 410 | 0985 | P9999 |
| Treatment Plant | | 410 | 0985 | P0029 |
| Tygart River Mine | EM-125 | 410 | 0985 | P0030 |
| Sand Bank Refuse | R-756 | 410 | 0985 | P0031 |
| Powell Refuse | R-747 | 410 | 0985 | P0032 |
| Levels Road Refuse | O-1001-97 | 410 | 0985 | P0033 |
| Grassy Run Pump Site | | 410 | 0985 | P0034 |
| **Maryland Trail Point Lick** | | | | |
| General | | 410 | 2585 | P9999 |
| Preparation Plant | P-574 | 410 | 2585 | P0035 |
| Barlow Impoundment | O-3215-93 | 410 | 2585 | P0036 |
| Campbell Creek No 6 | U-3036-93 | 410 | 2585 | P0037 |
| Campbell Creek No.7 | U-3036-04 | 410 | 2585 | P0038 |
| Campbell Creek Haulroads | H-42 | 410 | 2585 | P0039 |
| **Catenary Point Creek** | | | | |
| General | | 410 | 2305 | P9999 |
| Samples Mine | S-3024-90 | 410 | 2305 | P0040 |
| Mine Extension | S-3004-99 | 410 | 2306 | P0041 |
| South Extension | S-3017-95 | 410 | 2305 | P0042 |
| White Oak Extension | S-3010-00 | 410 | 2305 | P0043 |
| T-Extension | S-3030-07 | 410 | 2305 | P0044 |
| N-Extension | S-3004-03 | 410 | 2305 | P0045 |
| Stanley Acreage | S-3035-93 | 410 | 2305 | P0046 |
| Kaylord South | S-3048-00 | 410 | 2305 | P0047 |
| Pinetree Flats | S-3215-01 | 410 | 2305 | P0048 |
| Samples Haulroad | O-3002-05 | 410 | 2305 | P0049 |
| Wildcat Surface | S-3000-00 | 410 | 2305 | P0050 |

| Pine Ridge | | | | |
|---|---|---|---|---|
| General | | 410 | 0833 | P3999 |
| Preparation Plant | O-17-83 | 410 | 0833 | P0051 |
| Refuse Impoundment | O-69-83 | 410 | 0833 | P0052 |
| Big Mountain 16 | U-5033-91 | 410 | 0830 | P0053 |
| Lower Dorothy | U-5001-06 | 410 | 0833 | P0054 |
| Board Camp | U-5023-08 | 410 | 0833 | P0055 |
| Booth Fork | U-5020-03 | 410 | 0833 | P0056 |
| White's Branch | U-5002-00 | 410 | 0833 | P0057 |
| Chestnut Hollow | S-5013-89 | 410 | 0833 | P0059 |
| William's Mountain | S-5029-85 | 410 | 0833 | P0069 |
| Robin Hood Plant and Refuse | O-76-82 | 410 | 0833 | P0060 |
| Big Mountain 8 | O-65-82 | 410 | 0833 | P0061 |
| Big Laurel HR | O-28-82 | 410 | 0833 | P0062 |
| Big Mountain HR | H-8 | 410 | 0833 | P0063 |

| Colony Bay | | | | |
|---|---|---|---|---|
| General | | 410 | 1580 | P3999 |
| Shop Knob | S-97-80 | 410 | 1580 | P0064 |
| Central | S-5022-94 | 410 | 1580 | P0065 |
| South | S-7-81 | 410 | 1580 | P0066 |
| Jasper Workman HR | H-234 | 410 | 1580 | P0067 |
| Colony Bay HR | H-534 | 410 | 1580 | P0068 |

| Eastern | | | | |
|---|---|---|---|---|
| General | | 410 | 1727 | P8999 |
| Kopperston Refine | O-19-83 | 410 | 1727 | P0069 |
| Hillside No.3 | U-5049-92 | 410 | 1727 | P0070 |
| No. A and AA | SM-120 | 410 | 1727 | P0071 |
| Peachtree Refuse | O-5-82 | 410 | 1727 | P0073 |
| Eagle No.1 and No.7 | U-4006-91 | 410 | 1727 | P0073 |
| Eagle No.3 | U-18-83 | 410 | 1727 | P0074 |
| Slick Wright No.3 | U-5016-05 | 410 | 1727 | P0075 |
| Beckley Complex | U-127-83 | 410 | 1727 | P0276 |

| Corridor G | | |
|---|---|---|
| Buck Fork Surface Mine | S-5096-41 | *S 500118* |
| Camp Creek South Deep Mine | U-5009-01 | |
| Hewitt Creek No.1 Surface Mine | S-5027-99 | |
| Horse Creek Haulroad | H-130 | |
| Little Coal River Haulroad | H-29-L | |
| Julian Tipple | P-732 | |
| Ancillary Area | O-5010-97 | |
| Slippery Gut Impoundment | O-6-81 | |
| Bath Station Preparation Plant | P-495 | |
| Coates Refuse Fill | R-405 | |
| Little Horse Creek Dry Refuse Fill | S-106-77 | |
| Bragg Fork Surface Mine/Impoundment | S-129-78 | |
| Big Horse Creek Surface Mine | S-12-85 | |
| Towers Surface Mine | S-18-82 | |
| Westridge No.3 Surface Mine | S-5002-03 | |
| Surface Mine No.45 | S-5002-07 | |
| Surface Mine No.44 | S-5003-06 | |
| Surface Mine No.43 | S-5003-07 | |
| Westridge Surface Mine | S-5003-96 | |
| Westridge South No.1 Surface Mine | S-5003-98 | |
| Surface Mine No.22 | S-5004-06 | |
| Westridge No.2 Surface Mine | S-5011-03 | |
| Sugartree Surface Mine | S-5016-92 | |
| Northridge Surface Mine | S-5020-96 | |
| Bismod/Ondeep Compart | S-5022-02 | |
| Buck Fork Surface Mine | S-5024-97 | |
| Stanley Fork Surface Mine | S-5026-89 | |
| Chestnut Oak Surface Mine | S-5033-98 | |
| Bullard Fork Surface Mine | S-5060-88 | |
| Sandlick Surface Mine | S-5011-12 | |
| Alma No.3 Deep Mine | S-5005-93 | |
| Camp Creek No.1 Deep Mine | U-5002-94 | |
| Chilton No.1 Mine | U-5036-68 | |

| Logan County | | |
|---|---|---|
| East Refiner | S-5079-86 | |
| Guyan Surface Mine | S-5007-01 | |
| North Aim | S-5006-05 | |
| Ruffner A Point | S-75-85 | |
| Ruffner-Southwest | S-5001-90 | |
| Northwest Ruffner | S-5001-91 | |
| Winifrede Mine | U-5026-92 | |
| Avoryation Point | P-410 | |
| White Oak Impoundment | O-110-83 | |

# EXHIBIT B

**ERP Environmental Fund, Inc.**

**Short-Term Funding Term Sheet**

**Exhibt B--Budget**

| | 7-Feb | 14-Feb | 21-Feb | 28-Feb | Total |
|---|---|---|---|---|---|
| Week ending | | | | | |
| Starting balance | $ 1,566 | $ 88,337 | $ 3,137 | $ 79,308 | |
| | | | | | |
| INIC Funding | $ 132,000 | $ - | $ 218,000 | $ - | $ 350,000 |
| Other income | $ 105,137 | $ 2,622 | $ - | $ - | $ 107,760 |
| | | | | | |
| Expenses--WV | | | | | |
|   Martinka | | | | | |
|     Power | | $ 13,820 | | | $ 13,820 |
|     PSD Fee | | | | | $ - |
|     Chemicals | $ 17,542 | | | $ 17,000 | $ 34,542 |
|     Service | | $ 2,518 | | | |
|     New Pump & install | | | | | |
|   Fuel for pumps | $ 12,822 | | | $ 7,000 | $ 19,822 |
| | | | | | |
|   Employees | | | | | |
|     Payroll | $ 102,341 | $ 4,732 | $ 98,000 | | $ 205,072 |
|     Workers Comp | | $ 42,000 | | | $ 42,000 |
|     Healthcare | | $ 8,141 | | | $ 8,141 |
|     Insurance Other | | | $ 10,584 | | $ 10,584 |
| | | | | | |
|   Security (Dragline) | $ 1,458 | $ 1,458 | $ 1,458 | $ 1,458 | $ 5,832 |
| | | | | | |
|   Operating Fees | | | | | |
|     Groundwater | | | $ 8,800 | | $ 8,800 |
|     OSM Payments | | | $ 3,200 | | $ 3,200 |
| | | | | | |
|   WV Total | $ 134,163 | $ 72,668 | $ 122,042 | $ 25,458 | $ 354,330 |
| | | | | | |
| Administrative | | | | | |
|   Internet | | $ 2,117 | | | $ 2,117 |
|   Network Serv | | $ 3,487 | | $ 570 | $ 4,057 |
|   Phones | $ 2,954 | | | $ 2,954 | $ 5,907 |
|   Misc | $ 1,250 | | | $ 1,250 | $ 2,500 |
| | | | | | |
| UMWA Contract | | | | | |
| | | | | | |
| Other States | | | | | |
|   Payroll | $ 12,000 | | $ 12,000 | | $ 24,000 |
|   Healthcare | | $ 1,551 | $ 2,600 | | $ 4,151 |
|   Workers Comp | | $ 8,000 | | | $ 8,000 |
|   Power (IL/TN) | | | $ 5,186 | | $ 5,186 |
|   Caustic (TN) | | | | $ 12,000 | $ 12,000 |
| | | | | | |
|   Other States Total | $ 12,000 | $ 9,551 | $ 19,786 | $ 12,000 | $ 53,337 |
| | | | | | |
| Ending Balance | $ 88,337 | $ 3,137 | $ 79,308 | $ 37,077 | $ 37,077 |

**Execution Version**

## SETTLEMENT AGREEMENT

THIS AGREEMENT (as may be amended or modified from time to time, this "Settlement Agreement")[1] is made and entered into as of October 27, 2015, by and among Patriot Coal Corporation, on behalf of itself and its debtor-affiliates (collectively, the "Patriot Debtors"), the West Virginia Department of Environmental Protection ("DEP"), Blackhawk Mining, LLC ("Blackhawk"), and Virginia Conservation Legacy Fund, Inc. (together with any direct or indirect subsidiary thereof created pursuant to the Plan, including without limitation ERP Federal and ERP Settlement (each as defined below) "VCLF" and, together with the Patriot Debtors, DEP, and Blackhawk, the "Parties").

**WHEREAS** on May 12, 2015 (the "Petition Date"), the Patriot Debtors each filed voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), which were jointly administered under case number 15-32450 (KLP) (collectively, the "Chapter 11 Cases");

**WHEREAS**, on October 5, 2015, the Patriot Debtors, Blackhawk, VCLF, and DEP entered into that certain Term Sheet, which was attached as Exhibit U to the Plan Supplement [Docket No. 1593]; (the "Term Sheet");

**WHEREAS**, the Term Sheet contemplated certain releases of and other terms applicable to the New Money Lender Entities;[2]

**WHEREAS**, on October 9, 2015, the Bankruptcy Court entered an order [Docket No. 1615] confirming the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of Bankruptcy Code* [Docket No. 1579] (the "Plan");

**WHEREAS**, the Patriot Debtors entered into that certain asset purchase agreement, dated as of June 22, 2015, with Blackhawk (as amended, supplemented, or modified from time to time, the "Blackhawk APA" and the transaction contemplated by the Blackhawk APA, the "Blackhawk Transaction") providing for the sale of certain of their assets;

**WHEREAS**, the Patriot Debtors entered into that certain asset purchase agreement, dated as of August 16, 2015, with VCLF pursuant to which VCLF would acquire the assets (excluding the Patriot Debtors' receivables) not proposed to be acquired in the Blackhawk Transaction and agree to assume certain liabilities excluded from the Blackhawk Transaction, all as specified, and subject to the terms and conditions, therein (as amended, supplemented, or modified from time to

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed them in the Plan (as defined herein).

[2] As used herein, "New Money Lender Entities" means, collectively, the following in any and all capacities, including, without limitation, as Holders of Claims and/or Interests: (a) the Combined Company 1.5 Lien Term Loan Agent; (b) the DIP Lenders; (c) the Combined Company 1.5 Lien Term Loan Lenders; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), all such Entities' respective current and former affiliates and all such Entities' and such affiliates' respective current and former attorneys, financial advisors, consultants, representatives, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, members (including ex officio members), officers, directors, employees, partners, subsidiaries, principals, agents, managers, administrators, trustees, managed funds, special purpose vehicles, accounts, investors, fund managers and representatives, and successors and assigns of each of the foregoing in any and all capacities.

**EXHIBIT B**

**Execution Version**

time, the "VCLF APA" and the transaction contemplated by the VCLF APA, the "VCLF Transaction");

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties hereto agree as follows:

1.　　**Funding of the Additional Cash Bond Account.**　On or before the Effective Date of the Plan, the Patriot Debtors will deposit $12.5 million with the West Virginia State Treasurer's Office, or in another acceptable collateralized deposit account for the benefit of DEP (the "Additional Cash Bond Account").　Such funds, together with any additional funds deposited into the Additional Cash Bond Account in accordance with this Settlement Agreement, shall be held as additional cash bond for the ongoing obligations of the Patriot Debtors, VCLF, and the Liquidating Trust (but not Blackhawk or its affiliates) solely to meet their environmental obligations in the State of West Virginia, including their obligations to reclaim mines and to treat water, and shall not be available to or for the use of the Patriot Debtors, VCLF, or the Liquidating Trust.

2.　　**Blackhawk Reclamation Services Agreement.**　Prior to the Effective Date, Blackhawk will enter into the Reclamation Services Agreement (the "Blackhawk Reclamation Services Agreement") attached hereto as Exhibit 1.

3.　　**VCLF Reclamation Agreement.**　VCLF and DEP will negotiate in good faith and use reasonable best efforts to enter into a reclamation agreement (the "VCLF Reclamation Agreement") pursuant to which, among other things, the parties thereto will establish a detailed reclamation schedule with respect to the West Virginia permits to be assigned to VCLF and provide for the creation and funding of a water trust fund on a permit by permit basis in accordance with applicable West Virginia laws and rules.　The VCLF Reclamation Agreement will provide that VCLF and its assignees may continue to mine coal incidental to reclamation as authorized in accordance with the VCLF Reclamation Agreement.

4.　　**Consent Order.**　As soon as reasonably possible after the execution of the VCLF Reclamation Agreement and the Blackhawk Reclamation Services Agreement, each of the Patriot Debtors, VCLF, and Blackhawk agree to enter into a consent order with DEP (the "Consent Order"), which shall embody the terms of this Settlement Agreement, the VCLF Reclamation Agreement and the Blackhawk Reclamation Services Agreement, which Consent Order shall be in a form acceptable to each of the Parties.　Notwithstanding anything foregoing to the contrary, neither (i) the omission of the New Money Lender Entities from the Consent Order nor (ii) the failure of the Parties to enter into the Consent Order, shall affect (a) either the release of the New Money Lender Entities set forth in Section 8(a) and 8(d) of this Settlement Agreement or any other provision of this Settlement Agreement intended to benefit the New Money Lender Entities or (b) any other provision of this Settlement Agreement.

5.　　**The Collateral Agreement and Other VCLF Matters.**

　　　(a)　　VCLF and DEP will negotiate in good faith and use reasonable best efforts to enter into an agreement (the "Collateral Agreement") within 30 days after the Effective Date, the materials terms of which shall be as described in Section 5(b) hereof.

　　　(b)　　The Collateral Agreement shall provide that:

2

(i)     VCLF shall establish, and pledge to DEP, a segregated deposit account (the "Collateralized Reclamation Account").

(ii)     All amounts distributed by ERP Federal Mining Complex, LLC ("ERP Federal") on account of the 22.5% of ERP Federal's Free Cash Flow (Implied) (as defined in the ERP Proposed Business Plan dated September 26, 2015 (the "Business Plan")) allocable to VCLF shall be pledged to DEP and deposited into the Collateralized Reclamation Account.

(iii)     All amounts distributed by ERP Settlement, LLC ("ERP Settlement") on account of the 10% of ERP Settlement's Claims Settlements (as defined in the Business Plan) allocable to VCLF shall be pledged to DEP and deposited into the Collateralized Reclamation Account.

(iv)     The full amount of any proceeds received by VCLF upon phased bond releases in accordance with Section 7 hereof shall be deposited into the Collateralized Reclamation Account.

(v)     Unless and until (x) VCLF, ERP Federal or ERP Settlement defaults under this Settlement Agreement, the VCLF Reclamation Agreement, or the Consent Order or (y) DEP shall issue a failure to abate cessation order with respect to any permit held by VCLF or any of its direct or indirect subsidiaries, DEP agrees that VCLF may use all amounts in the Collateralized Reclamation Account in the performance of its reclamation and water treatment obligations only within the State of West Virginia and only in accordance with the VCLF Reclamation Agreement.

(vi)     Upon (x) a default by VCLF, ERP Federal or ERP Settlement under this Settlement Agreement, the VCLF Reclamation Agreement, or the Consent Order or (y) DEP shall issue a failure to abate cessation order with respect to any permit held by VCLF or any of its direct or indirect subsidiaries, all amounts held in the Collateralized Reclamation Account shall be paid into the Additional Cash Bond Account and held in accordance with the terms and conditions set forth in Section 1 hereof, and DEP shall be entitled to execute upon its collateral pledge of the VCLF's 22.5% share of ERP Federal's Free Cash Flow (Implied) and 10% share of ERP Settlement's Claims Settlements and any other amounts held in or payable into the Collateralized Reclamation Account.

(c)     VCLF and ERP Federal agree that beginning in 2017, ERP Federal shall fund its asset retirement obligations at the Federal mine complex on a straight-line basis over the earlier of (x) six years and (y) the anticipated remaining life of the operations of the Federal mine complex, and the amounts necessary to fund such obligations shall be deducted from ERP Federal's Free Cash Flow (Implied).

6.     If the VCLF APA is not consummated and a transaction is instead consummated using the Liquidating Trust, then Patriot, the Liquidating Trust and DEP will enter into the agreements mutually acceptable to DEP, Patriot, and the Liquidating Trust, which shall be

3

substantially similar to the agreements contemplated in Sections 2, 3, and 5 hereof that would be entered into by VCLF, ERP Federal, and/or ERP Settlement.

7.     **Maintenance of Reclamation Bonds and Phased Bond Releases.**

(a)     At all times hereafter, VCLF (including specifically any VCLF direct or indirect subsidiary named on a permit held in the State of West Virginia) shall maintain reclamation bonds with respect to each of the permits held in the State of West Virginia in the full amount required by law and shall fully perform its reclamation and water treatment obligations in accordance with the terms of its permits, the VCLF Reclamation Agreement, any associated reclamation plans, and applicable law.

(b)     At all times from and after the date of this Settlement Agreement, DEP will provide for phased bond releases in accordance with all applicable law and rules, taking into account the terms of any water trust fund established with respect to the permits.

8.     **DEP Release.**

(a)     As of the Effective Date and subject to the timely deposit of the initial $12.5 million into the Additional Cash Bond Account in accordance with Section 1 hereof, DEP immediately, unconditionally and irrevocably releases the New Money Lender Entities from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or which could be asserted, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that DEP would have been legally entitled to assert or due to DEP or over which DEP has jurisdiction with respect to their investments in the Patriot Debtors or their conduct in connection with the Patriot Debtors, in each case arising prior to the Effective Date. For avoidance of doubt, such release will be and hereby is effective without regard to performance of the obligations in this Settlement Agreement other than the deposit of the initial $12.5 million into the Additional Cash Bond Account.

(b)     Subject to the performance of the obligations of the Patriot Debtors in this Settlement Agreement, DEP will unconditionally and irrevocably release the Patriot Debtors and each of the Patriot Debtors' officers, directors and advisors from any and all claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted or which could be asserted, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that DEP would have been legally entitled to assert or due to DEP or over which DEP has jurisdiction with respect to the Patriot Debtors, in each case arising prior to the Effective Date.

(c)     Subject to the performance of the obligations of the Patriot Debtors in this Settlement Agreement, DEP waives its rights pursuant to W.Va. Code § 22-3-18(c) and agrees not to Permit Block (as defined herein) any of the Patriot Debtors' current and former partners, members, officers, directors, principals, employees, agents, and investors ("Protected Patriot Parties") for any conduct or activities relating to the Patriot Debtors

4

prior to the Effective Date.  For purposes of this Section 8(c), "Permit Block" shall mean any action or inaction by DEP or any of its employees or agents to list or link any of the Protected Patriot Parties on the Applicant Violator System or to otherwise deny, block or prevent the processing or issuance of any application for a permit or any modification of an existing permit pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("SMCRA") on the grounds that any Protected Patriot Party is a violator or owner, operator, affiliate, controller or presumed controllers or other party having control over or responsibility for any violator with respect to any actual or alleged violations of SMCRA conditions attributable to mining or reclamation operations occurring at or in connection with any of the Patriot Debtors' facilities or operations at any time on or prior to the Effective Date.  DEP further agrees to unconditionally and irrevocably release the Protected Patriot Parties from all liability for unpaid fees, civil fines or penalties, or abatement obligations with respect to such violations or conditions, and fully and completely waives any rights it might have against the Protected Patriot Parties to seek a mandatory or prohibitory injunction under 30 U.S.C. § 1271(c) or W.Va. Code § 22-3-17(j) to make any member of the Protected Patriot Parties individually liable to abate a violation otherwise attributable to mining or reclamation operations occurring at or in connection with any of the Patriot Debtors' facilities or operations at any time on or prior to the Effective Date.

(d)     As of the Effective Date and subject to the timely deposit of the initial $12.5 million into the Additional Cash Bond Account in accordance with Section 1 hereof, DEP waives its rights pursuant to W.Va. Code § 22-3-18(c) and agrees not to Permit Block (as defined herein) any of the New Money Lender Entities for any conduct or activities relating to the Patriot Debtors prior to the Effective Date.  For purposes of this Section 8(d), "Permit Block" shall mean any action or inaction by DEP or any of its employees or agents to list or link any of the New Money Lender Entities  on the Applicant Violator System or to otherwise deny, block or prevent the processing or issuance of any application for a permit or any modification of an existing permit pursuant to the West Virginia SMCRA on the grounds that any New Money Lender Entities is a violator or owner, operator, affiliate, controller or presumed controllers or other party having control over or responsibility for any violator with respect to any actual or alleged violations of SMCRA conditions attributable to mining or reclamation operations occurring at or in connection with any of the Patriot Debtors' facilities or operations at any time on or prior to the Effective Date.  Without in any way limiting the release in Section 8(a), DEP further hereby unconditionally and irrevocably releases the New Money Lender Entities from all liability for unpaid fees, civil fines or penalties, or abatement obligations with respect to such violations or conditions, and fully and completely waives any rights it might have against the New Money Lender Entities  to seek a mandatory or prohibitory injunction under 30 U.S.C. § 1271(c) or W.Va. Code § 22-3-17(j) to make any member of the New Money Lender Entities  individually liable to abate a violation otherwise attributable to mining or reclamation operations occurring at or in connection with any of the Patriot Debtors' facilities or operations at any time on or prior to the Effective Date.

9.      **Blackhawk Price Match.**  To the extent VCLF seeks to use unaffiliated third-party contractors to perform any additional reclamation work under its reclamation plan or

permits over and above that contemplated by this Agreement, Blackhawk shall have a right to match the lowest bid from any third-party contractor for any construction, excavation, and grading work to be contracted by VCLF.

10.    **No Abandonment.** The Patriot Debtors will not abandon, pursuant to section 554 of the Bankruptcy Code, any of their West Virginia mining complexes or any related property or permit either prior to the Effective Date or in connection with the consummation of the Plan.

11.    **VCLF Acknowledgement.**    VCLF acknowledges that as of and after the Effective Date:

(a)    It shall be deemed as an operator or owner and controller under the West Virginia Surface Coal Mining and Reclamation Act with respect to all the West Virginia permits transferred or to be transferred to it; and

(b)    Each of its entities to which permits are to be transferred must comply with all applicable laws with respect to such permit transfers.

12.    **Obligations under the Modified Consent Decree.**

(a)    VCLF agrees to assume obligations under: (i) the Order in *Ohio Valley Environmental Coalition, Inc. et al. v. Hobet Mining, LLC*, Civil Action No. 3:09-cv-1167 (S.D.W. Va.) dated September 1, 2010, as amended on October 8, 2010; (ii) the Modified Consent Decree in *Ohio Valley Environmental Coalition, Inc. et al. v. Hobet Mining, LLC*, Civil Action No. 3:09-cv-1167; and the Modified Consent Decree in *Ohio Valley Environmental Coalition, et al. v. Patriot Coal Corp., et al.*, Civil Action No. 3:11-cv-00115 (S.D.W. Va.), entered on January 9, 2013, and as subsequently modified by addenda filed on September 5, 2014; (iii) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Hobet Mining, LLC and Catenary Coal Co., LLC*, Case Nos. 07-C-03 & 10-C-96 (W. Va. Cir. Ct. Boone County); and (iv) the settlement and consent order (including subsequent modifications) entered in *Mandirola v. Apogee Coal Co., LLC*, Case No. 10-C-144 (W. Va. Cir. Ct. Logan County) (collectively, the "Consent Decrees"); VCLF covenants to sign and become a party to the Consent Decrees through a Joint Motion to Substitute or similar pleading.

(b)    Subject to the substitution of VCLF for the Patriot Debtors under the Consent Decrees, DEP agrees to release the Patriot Debtors from their obligations under the state Consent Decrees and, to the extent allowed by law or rule, to reasonably cooperate in the Patriot Debtors' efforts to obtain a release from the federal Consent Decrees.

(c)    DEP agrees, to the extent allowed by law or rule, not to oppose the Patriot Debtors, Blackhawk, VCLF, or the Liquidating Trust in their efforts to modify the Consent Decrees with respect to the extension of the selenium compliance schedule by four years, and shall, to the extent allowed by law or rule, reasonably cooperate in all efforts to manage selenium discharges in a cost efficient manner.

6

KE 38104538

Execution Version

13.    **Conditions Precedent to Effectiveness of this Settlement Agreement.**  This Settlement Agreement and the compromises and settlements and other terms and provisions reflected herein will be null and void and of no further force and effect in the event that:

(a)    The Effective Date does not occur;

(b)    The $12.5 million is not deposited in the Additional Cash Bond Account in accordance with Section 1 hereof; or

(c)    The Blackhawk Reclamation Services Agreement is not entered into.

14.    **Third Party Beneficiaries.**  The Parties acknowledge and agree that the New Money Lender Entities are intended to be and hereby are acknowledged to be third party beneficiaries of this Settlement Agreement.  Without limiting the generality of the forgoing, the New Money Lender Entities are intended to be and are the beneficiaries of the release set forth in Section 8(a) and (d), Section 16, Section 17, this Section 14, and any other provision of this Settlement Agreement which would benefit the New Money Lender Entities.  All other Parties acknowledge and agree that the New Money Lender Entities have no duty of performance under this Settlement Agreement to any other Party.  Notwithstanding anything to the contrary herein, subject to the occurrence of the Effective Date and the timely deposit of the initial $12.5 million into the Additional Cash Bond Account in accordance with Section 1 hereof, all of the provisions of this Settlement Agreement expressly or impliedly inuring to the benefit of the New Money Lender Entities shall survive the expiration, termination or the superseding of this Settlement Agreement, in each case for any reason, and shall remain fully effective for the benefit of the New Money Lender Entities and fully enforceable by the New Money Lender Entities against each other Party notwithstanding such expiration, termination or superseding cause.

15.    **Successors and Assigns.**  The provisions of this Settlement Agreement shall be binding on the Parties and their successors and assigns, including any trustee appointed under chapter 11 of the Bankruptcy Code, and shall inure to the benefit of the Parties and their successors and assigns.

16.    **Entire Agreement.**  This Settlement Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof, and there are no representations, understandings, or agreements relative hereto which are not fully expressed herein.  This Settlement Agreement may not be modified, altered, or amended in whole or in part except by a written instrument executed by all Parties.  No modification, alteration or amendment of this Settlement Agreement, in whole or in part, shall impair, diminish or affect the release of the New Money Lender Entities set forth in Section 8(a) and 8(d) of this Settlement Agreement or any other provision of this Settlement Agreement expressly or impliedly intended to benefit the New Money Lender Entities.

17.    **Governing Law.**  This Settlement Agreement shall be governed by and construed under the laws of the State of West Virginia without regard for the conflicts of laws provisions thereof.

7

KE 38104538

18.     **In Personam Jurisdiction and Venue for Disputes Relating to the New Money Lender Entities.** Any dispute relating to the release of the New Money Lender Entities set forth in Section 8(a) and/or Section 8(d) shall be exclusively enforceable by, against and among the Parties and the New Money Lender Entities in the Bankruptcy Court or another federal court with competent jurisdiction within the Eastern District of Virginia, at the election of the New Money Lender Entities. Each Party to this Settlement Agreement hereby waives any right to file a motion, stipulate or consent, based on any grounds, to transfer jurisdiction of any action relating to such a dispute involving the New Money Lender Entities from such courts.

19.     **Authority and Validity**. Each Party represents, warrants, and acknowledges, as of the Effective Date, that (a) it has all the requisite authority to execute and deliver this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and perform its obligations under this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party, and to consummate the transactions contemplated herein and therein; (b) the execution, delivery and performance by it of this Settlement Agreement and the other documents and instruments contemplated hereby to which it is contemplated to be a party and the consummation of the transactions contemplated herein and therein have been duly authorized by all necessary action and no other action or proceeding is necessary to authorize and approve this Settlement Agreement or the other documents and instruments contemplated hereby to which it is contemplated to be a party or any of the transactions contemplated herein or therein; (c) this Settlement Agreement has been duly executed and delivered by it and constitutes a legal, valid and binding agreement by it, enforceable against it in accordance with the terms of this Settlement Agreement; and (d) the execution, delivery and performance by it (when such performance is due) of this Settlement Agreement does not and shall not (i) violate any provision of law, rule or regulation applicable to it, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

20.     **No Reliance.** Each Party represents and warrants that in entering into this Settlement Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter. In entering into this Settlement Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

21.     **Modification or Amendment.** This Settlement Agreement may be modified or amended only by written agreement executed by each of the Parties and, with regards to any provision impacting the New Money Lender Entities, the written consent of the New Money Lender Entities.

22.     **Further Assurances.** From and after the Effective Date, each of the Parties agrees to use their respective commercially reasonable efforts to execute or cause to be executed and deliver or cause to be delivered all such agreements, instruments and documents and take or cause to be taken all such further actions as may reasonably be necessary from time to time to carry out the intent and purpose of this Settlement Agreement, and to consummate the transactions contemplated hereby and thereby.

8

23.     **Third-Party Beneficiaries.**   Except as otherwise explicitly set forth herein, nothing in this Settlement Agreement is intended to benefit or create any right or cause of action in or on behalf of any person other than the New Money Lender Entities and the Parties hereto (and their affiliated persons and entities who are intended to be beneficiaries of the releases and settlements set forth herein).

24.     **Construction.**   This Settlement Agreement has been drafted through a cooperative effort of all Parties, and none of the Parties shall be considered the drafter of this Settlement Agreement so as to give rise to any presumption of convention regarding construction of this document. All terms of this Settlement Agreement were negotiated at arms-length, and this Settlement Agreement was prepared and executed without fraud, duress, undue influence or coercion of any kind exerted by any of the Parties upon the other.

25.     **Headings.**   Titles and headings in this Settlement Agreement are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Settlement Agreement.

26.     **Execution in Counterpart.**   This Settlement Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   All signatures of the Parties to this Settlement Agreement may be transmitted by facsimile or by electronic mail, and such transmission will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.

27.     **Severability.**   If any provision of this Settlement Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

*[Signature page follows]*

KE 38104538

Execution Version

        **IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

**PATRIOT COAL CORPORATION**

By: _____
Robert W. Bennett
Its President and Chief Executive Officer

**BLACKHAWK MINING LLC**

By: _____
Name: _____
Title: _____

**WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

By: _____
Randy Huffman
Its Secretary

**VIRGINIA CONSERVATION LEGACY FUND, INC.**

By: _____
Name: Thomas M. Clarke
Title:  President and CEO

**Blackhawk Mining, LLC**

By: _____

John M. Potter
Its Chief Executive Officer

*[Signature Page for Settlement Agreement]*

**Execution Version**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

**PATRIOT COAL CORPORATION**

By: _____
Robert W. Bennett
Its President and Chief Executive Officer

**BLACKHAWK MINING LLC**

By: _____
Name: _____
Title: _____

**WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

By: _____
Randy Huffman
Its Secretary

**VIRGINIA CONSERVATION LEGACY FUND, INC.**

By: _____
Name: Thomas M. Clarke
Title:  President and CEO

   **IN WITNESS WHEREOF**, the Parties hereto have executed this Settlement Agreement as of the date set forth above.

**PATRIOT COAL CORPORATION**

By: _____
Robert W. Bennett
Its President and Chief Executive Officer


**BLACKHAWK MINING LLC**

By: _____
Name: _____
Title: _____


**WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

By: _____
Randy Huffman
Its Secretary


**VIRGINIA CONSERVATION LEGACY FUND, INC.**

By: _____
Name: Thomas M. Clarke
Title:  President and CEO

## RECLAMATION SERVICES AGREEMENT

This **RECLAMATION SERVICES AGREEMENT** (the "Agreement") is entered into effective as of the _____ day of October, 2015 (the "Effective Date") by and between **BLACKHAWK MINING, LLC**, a Kentucky limited liability company ("Blackhawk"), and **ERP ENVIRONMENTAL FUND, INC.**, a West Virginia corporation ("ERP"). Blackhawk and ERP may sometimes be referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS,** Patriot Coal Corporation ("Patriot") and its subsidiaries conduct certain surface coal mining and reclamation operations in the State of West Virginia pursuant to surface disturbance permits issued under the West Virginia Surface Mining and Reclamation Act, W.Va. Code § 22-3-1 *et seq.* and its implementing regulations by the West Virginia Department for Environmental Protection ("WVDEP"); and

**WHEREAS,** on May 12, 2015, Patriot and its wholly-owned subsidiaries filed petitions under Chapter 11 of the United States Bankruptcy Code, initiating the jointly administered bankruptcy Case No. 15-32450 in the U.S. Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Case"); and

**WHEREAS,** pursuant to that certain Fourth Amended Joint Plan of Reorganization [Bankruptcy Case Docket No.1579] filed in the Bankruptcy Case on October 7, 2015 (the "Bankruptcy Plan") and that certain Asset Purchase Agreement by and among Blackhawk Mining LLC, Patriot Coal Corporation, the Subsidiaries of Patriot Coal Corporation listed on Schedule A thereto, dated June 22, 2015, as amended by First Amendment to Asset Purchase Agreement by and among Blackhawk Mining LLC, Patriot Coal Corporation, the Subsidiaries of Patriot Coal Corporation listed on Schedule A thereto dated August 31, 2015 (the "Blackhawk APA"), Patriot intends to transfer to Blackhawk certain Transferred Permits (as defined in the Blackhawk APA and further described in the Schedules to the APA, as amended) which authorize surface coal mining and reclamation operations on properties to be acquired by Blackhawk pursuant to the Blackhawk APA (the "Blackhawk Permits"); and

**WHEREAS,** the Plan contemplates that additional permits held by Patriot authorizing surface coal mining and reclamation operations which are not being assumed by Blackhawk under the APA or the Plan (the "Non-Blackhawk Permits") will be transferred by Patriot to ERP, which is a subsidiary of the Virginia Conservation Legacy Fund, Inc. ("VCLF"), and that ERP will perform reclamation on the premises subject to the Non-Blackhawk Permits; and

**WHEREAS,** VCLF and Blackhawk agreed to enter into this Agreement in connection with a compromise and settlement of WVDEP's objection to the Bankruptcy Plan (the "WVDEP Settlement Agreement"); and

Execution Copy

**WHEREAS,** Blackhawk and certain subcontractors it may retain have the necessary skill, ability, equipment, and labor force to perform reclamation services on the Non-Blackhawk Permits; and

**WHEREAS,** Blackhawk desires to perform reclamation services for ERP on the premises subject to the Non-Blackhawk Permits to the extent the same are located in the state of West Virginia, as further described in this Agreement and the documents ancillary hereto (the "Reclamation Services"); and

**WHEREAS,** in consideration of the Reclamation Services to be provided by Blackhawk, ERP desires to grant Blackhawk a license to enter upon the premises subject to the Non-Blackhawk Permits as necessary and convenient to conduct the Reclamation Services, together with such appurtenances, easements and rights of way reasonably necessary to access the premises subject to the Non-Blackhawk Permits; and

**WHEREAS,** in consideration of the Reclamation Services to be provided by Blackhawk, ERP desires to grant to Blackhawk the right to match certain offers to perform third-party contract reclamation services.

**NOW THEREFORE** in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt, sufficiency and mutuality of which are hereby acknowledged, Blackhawk and ERP agree as follows:

## Article I. Definitions

**"Business Day"** means any day on which the Federal Reserve member banks in New York, New York are open for business, and a Business Day shall run from 6 a.m. to 11 p.m. Eastern Standards Time or Eastern Daylight Time, whichever is applicable, for the then current period in time.

**"Reclamation Period"** means the period ending three (3) years after the Effective Date.

## Article II:  Reclamation Services

Commencing immediately upon the Effective Date, and continuing until the end of the Reclamation Period, Blackhawk shall provide, and ERP shall utilize, the Reclamation Services on the premises subject to the Non-Blackhawk Permits located in the state of West Virginia, as set forth below.

A.    Reclamation Plans.    The specific Reclamation Services to be provided by Blackhawk to ERP shall be: (i) directed by ERP, in accordance with detailed project specifications or scope of work documents developed by ERP in consultation with WVDEP and Blackhawk, and approved by WVDEP; or (ii) in the event of revocation of one or more Non-Blackhawk Permits and the forfeiture of any related bonds, as directed by WVDEP, in

2

Execution Copy

accordance with detailed project specifications or scope of work documents developed by WVDEP in consultation with Blackhawk and, to the extent applicable, ERP and VCLF (each a "Reclamation Plan"). The Parties agree that the Reclamation Services to be provided by Blackhawk under a Reclamation Plan will include excavation, grading, and similar earth-moving activities. Upon receipt from ERP or WVDEP of an approved Reclamation Plan, Blackhawk shall mobilize necessary labor and equipment and perform the Reclamation Services described in the Reclamation Plan in accordance with the Reclamation Plan. Blackhawk shall be deemed to have satisfied its obligations under a Reclamation Plan when (i) the specific work described in a Reclamation Plan is completed, or (ii) the Cost (as defined herein) to Blackhawk to complete the Reclamation Services meets (x) $7.5 million or (y) the total agreed upon Cost for a given year as set forth in Paragraph C of this Article II. The completion of the Reclamation Services described in a Reclamation Plan shall not be contingent upon the satisfaction of any regulatory performance standard or regulatory determination by a governmental authority with respect to the Non-Blackhawk Permits (such as the determination by WVDEP that a particular Non-Blackhawk Permit upon which Reclamation Services have been performed qualifies for bond release) unless (a) such performance standard or regulatory determination is specifically agreed to in advance by Blackhawk and specified in the Reclamation Plan or (b) completion is necessary to avoid show cause orders or correct or abate an imminent threat or endangerment to public health or safety as determined by WVDEP in which case the completion shall be governed by the provisions of this Agreement applicable during the Additional Services Period as defined in Article II(C).

B.   Costs. Blackhawk will provide the Reclamation Services hereunder at its actual costs, as set forth in the Rate Schedule attached as Exhibit A plus the reasonable additional costs of mobilization, with no markup or profit to Blackhawk (the "Cost" or "Costs"). Within sixty (60) days following the commencement of the Reclamation Services, and at the conclusion of each 60-day period thereafter, Blackhawk shall submit to ERP and WVDEP an accounting of its Costs for the Reclamation Services provided during the preceding 60-day period (a "Cost Report"). Unless ERP or WVDEP in good faith disputes the costs set forth in a Cost Report within ten (10) days of receipt of same, the actual costs described in the Cost Report shall be deemed conclusive and credited against the overall cost of Reclamation Services to be provided by Blackhawk under this Agreement. Blackhawk shall maintain accurate records of its actual costs and provide the same to ERP and WVDEP upon reasonable request. If ERP or WVDEP in good faith disputes the Costs set forth in a Cost Report, it shall provide Blackhawk written notice of its dispute, along with any information forming the basis of and allowing Blackhawk to evaluate the validity of, its dispute. The Parties shall thereafter attempt in good faith to resolve the dispute. If the Parties are unable to resolve the dispute within thirty (30) days following the receipt of written notice of the dispute, the dispute shall be submitted to a third party arbitrator, who shall be an expert in the field of mine reclamation or engineering. The arbitrator shall issue a final decision on the dispute within ten (10) days of receipt of the information forming the basis of ERP's or WVDEP's dispute, and such decision shall be final. The reasonable costs of

3

Execution Copy

the arbitrator's services, and any costs and legal or other fees incurred by the prevailing party, in connection with the submission of a dispute to arbitration as provided herein shall be paid by the losing party.

      C.     <u>Schedule and Amount of Reclamation Services.</u> Blackhawk shall perform the Reclamation Services during the Reclamation Period, at its Cost in the following amounts during the following 12-month time periods (each a "<u>Year</u>"):

      (i) For the twelve (12) months following the Effective Date ("<u>Year 1</u>"): not to exceed $3 Million in Cost;

      (ii) For the next twelve (12) months following Year 1 ("<u>Year 2</u>"): not to exceed $3 Million in Cost;

      (iii): For the next twelve (12) months following Year 2 ("<u>Year 3</u>"): not to exceed $1.5 Million in Cost.

In the event the Cost to Blackhawk of the Reclamation Services provided hereunder during an applicable Year meets or exceeds the Costs established for that Year in (i), (ii), or (iii) above and ERP or WVDEP requests the performance of additional Reclamation Services during that Year, Blackhawk may, at its option, either: (a) perform Reclamation Services beyond such amount in the Year and obtain a reduction in the amount of Reclamation Services to be performed in the following Year, or (b) refuse to perform any further Reclamation Services under this Agreement until the following Year; provided, however, Blackhawk shall perform any further Reclamation Services necessary to avoid show cause orders or correct or abate an imminent threat or endangerment to public health or safety as determined by WVDEP in which case the completion shall be governed by the provisions of this Agreement applicable to the Additional Services Period as defined in Article II(C). In the event Blackhawk has performed Reclamation Services hereunder at a total cost of $7.5 million, but has not completed the work described in a Reclamation Plan, and ERP or WVDEP desires for Blackhawk to continue in the performance of Reclamation Services, Blackhawk shall have the option, but not the obligation, to perform additional Reclamation Services at its standard rates for such services; provided, however, Blackhawk shall perform any further Reclamation Services necessary to correct or abate an imminent threat or endangerment to public health or safety as determined by WVDEP in which case the completion shall be governed by the provisions of this Agreement applicable during the Additional Services Period as defined in Article II(C). Upon notification that $7.5 million in Reclamation Services has been performed, ERP or WVDEP shall have ten (10) days (or such longer period as the Parties may extend by subsequent written agreement) to notify Blackhawk that it desires for Blackhawk to continue in the performance of the Reclamation Services, and if such request is accepted by Blackhawk, Blackhawk shall continue in the performance of the Reclamation Services until such time as it elects or the Parties mutually agree to terminate the same (the "Additional Services Period"). During the Additional Services Period, Blackhawk

shall be compensated for services performed at market rates, as agreed to by the Parties in writing, based on the costs in Exhibit A plus reasonable additional mobilization costs and a commercially reasonable profit to Blackhawk. Invoices during the Additional Services Period shall be submitted within sixty (60) days of performance of reclamation services and shall be paid within fifteen (15) days of the invoice date. All invoices during the Additional Services Period not paid within thirty (30) days of the invoice date shall be subject to an interest charge as stated on the invoice. If an invoice amount is disputed in good faith, notice of the dispute, along with appropriate supporting documentation, shall be submitted in writing within fifteen (15) days of the invoice date, along with payment in full of the invoice. If the Parties are unable to resolve the dispute within thirty (30) days of the date of written notice of the dispute, such dispute shall be submitted to a third party arbitrator for a binding final resolution. The fees of the arbitrator and the fees (including reasonable attorneys' fees) of the prevailing party shall be paid by the losing party to any dispute.

      D.    <u>Blackhawk Option to Pay Cash in Lieu of Performance of Reclamation Services</u>. At any time during the Reclamation Period, Blackhawk may, at its exclusive option and in its sole discretion, elect not to perform Reclamation Services and terminate this Agreement by making a cash payment to ERP or WVDEP in an amount equal to the difference between (x) $7.5 million in Costs of Reclamation Services and (y) the Cost of Reclamation Services actually performed pursuant to this Agreement through the date of such election by Blackhawk (the "Cash Election Amount"). If paid to ERP, the Cash Election Amount shall be paid into a segregated deposit account of ERPpledged to DEP (the "<u>Collateralized Reclamation Account</u>"), which Collateralized Reclamation Account shall be available to reimburse ERP with respect to water treatment expenditures at the Non-Blackhawk Permits in the state of West Virginia subject to and in accordance with the collateral agreement entered into by ERP, VCLF and WVDEP pursuant to the WVDEP Settlement Agreement. Neither the payment of the Cash Election Amount into the Collateralized Reclamation Account nor any other provision of this Agreement shall impose upon Blackhawk any responsibility, obligation, or liability with respect to the Collateralized Reclamation Account or funds deposited therein, it being expressly understood that the entire subject matter of the Collateralized Reclamation Account is subject to other agreement(s) between WVDEP and ERP or VCLF and that Blackhawk is not a party to or bound by any such agreement.

      E.    <u>Incidental Coal Removal.</u> The Parties agree that the Reclamation Services to be provided under this Agreement shall not involve any coal removal, whether or not incidental to reclamation. Should the performance of the Reclamation Services under a Reclamation Plan require or result in the incidental removal of any coal, whether or not such incidental coal removal is anticipated by the parties in the development of a Reclamation Plan, the Parties shall negotiate a separate agreement governing such incidental coal removal, addressing, among other things, the purchase or sale of such coal, the compliance with any lease or other document of ownership concerning such coal, or any regulatory approvals or environmental liability

Execution Copy

applicable to such incidental coal removal activities.  In the event that unanticipated conditions result in a need to perform incidental coal removal in order to complete a Reclamation Plan that did not anticipate incidental coal removal, Blackhawk may cease performance of Reclamation Services in such areas where incidental coal removal is necessary to perform the Reclamation Services for a reasonable time to allow the Parties to negotiate the agreement(s) contemplated by this paragraph.

F.      Operations and Compliance with Laws.   Blackhawk shall perform the Reclamation Services in a skillful, workmanlike, and prudent manner, in material compliance with federal, state, and local laws applicable to the Reclamation Services and the Non-Blackhawk Permits.

G.      Inspection of the Reclamation Services.  ERP and WVDEP retain the right and privilege at all times to, upon reasonable advance notice, inspect the Reclamation Services to be performed hereunder for the purpose of ascertaining the quality of the Reclamation Services and compliance with any Reclamation Plan.

H.      Access to ERP/Patriot Information.  ERP shall provide to Blackhawk any information such as maps, mine plans, reclamation plans (whether approved hereunder or previously existing), reports, permit applications, drawings or any other information reasonably necessary or convenient to aid in the performance of the Reclamation Services.

I.      Limitation of Liability.  Blackhawk shall have no liability to any federal, state, or local governmental authority or third party, whether under statute, rule, permit, regulation, common law, or otherwise, with respect to conditions existing or events occurring on the Premises (as herein defined) or the Non-Blackhawk Permits unless the actions giving rise to such liability result from the gross negligence or willful misconduct of Blackhawk in the performance of the Reclamation Services.

## Article III.  License

A.      License.  ERP hereby grants and provides unto Blackhawk a non-exclusive license to (i) conduct the Reclamation Services upon all property subject to the Non-Blackhawk Permits (the "Premises") and (ii) enter in and to the Premises with such men, tools, machinery, and equipment as may be necessary and convenient to conduct the Reclamation Services.

B.      Non-Exclusive Rights.  Blackhawk acknowledges that ERP may, during the Reclamation Period, carry on activities on the Premises as it deems necessary or desirable for its own purposes; provided, however, that ERP will not unreasonably interfere with Blackhawk's performance of the Reclamation Services.

6

Execution Copy

## Article IV.  Relationship of Parties

A.    <u>Independent Contractor / No Regulatory Relationship.</u>  It is expressly agreed that Blackhawk will perform the Reclamation Services under this Agreement as an independent contractor, and that no other relationship among the Parties is created by this Agreement. Blackhawk shall exercise exclusive control over its work force and labor relation policies and direct the manner, method and mode of performance of the Reclamation Services.  Blackhawk agrees not to hold itself out as a partner, joint venturer, employee, agent, representative or lessee of ERP; and nothing herein contained shall be construed as creating a single enterprise, joint venture, agency, partnership, joint employer, or lessor-lessee relationship.   Neither this Agreement nor the actions of Blackhawk hereunder shall result in Blackhawk being deemed a "permittee," "operator," "owner" or "controller" (as any of these terms may be defined under the federal Surface Mining Control and Reclamation Act or West Virginia Surface Mining and Reclamation Act, or any other federal or state statute or regulation, or common law) of ERP or any of its affiliates, or the Non-Blackhawk Permits.  Neither this Agreement nor the actions of Blackhawk hereunder shall cause Blackhawk or its officers, directors, shareholders, employees, agents, or subcontractors to, in any way or at any time, be "linked" to ERP or any of its affiliates in the U.S. Office of Surface Mining Applicant/Violator System or any of its state law equivalents (the "<u>AVS</u>").   Should Blackhawk, or any of its officers, directors, shareholders, employees, agents, or subcontractors, be deemed by any applicable governmental agency to be a "permittee," "operator," "owner," or "controller," or linked in the AVS in contravention of this paragraph, ERP agrees to undertake all reasonable efforts to remove such designation or link and shall indemnify and hold Blackhawk harmless from any and all claims, losses, or damages Blackhawk may incur as a result of the occurrence of such a designation or link and will reimburse Blackhawk for any fees or costs (including reasonable attorneys fees) incurred by Blackhawk in seeking to have such designation or link removed.  This indemnity obligation shall survive any termination or cancellation of this Agreement.

B.    <u>Regulatory Approvals/Violations.</u>   This Agreement shall not be construed as creating any obligation on the part of Blackhawk to obtain any federal, state, or local license, permit, authorization, bond, identification number or other approval from any governmental entity, and ERP shall retain exclusive responsibility and liability to any governmental agency for compliance with any laws, rules, or regulations for activities occurring on the Non-Blackhawk Permit and the Premises; provided, however, that Blackhawk shall be responsible and liable for any violations directly caused by Blackhawk's reclamation activities.  In the event Blackhawk receives any citation, violation, notice non-compliance, notice of violation, letter of warning, or other document attributing to it any legal responsibility for the environmental or health and safety conditions on the Premises or with respect to the Non-Blackhawk Permits, ERP shall indemnify and hold Blackhawk harmless from any and all claims, losses, or damages Blackhawk may incur as a result of such governmental action and will reimburse Blackhawk for any fees or costs (including reasonable attorneys fees) incurred by Blackhawk in seeking to resolve such

7

Execution Copy

claim, other than claims, losses, or damages incurred directly as a result of Blackhawk's reclamation activities. This indemnity obligation shall survive any termination or cancellation of this Agreement.

      C.    <u>Taxes.</u>  ERP shall be responsible for the payment of all: (i) reclamation taxes (known as the abandoned mine land fund tax) payable pursuant to Surface Mining Control and Reclamation Act, as amended; (ii) black lung excise taxes payable pursuant to the Black Lung Benefits Act of 1977, as amended and attributable to the Reclamation Services to be provided hereunder; and (iii) ad valorem property taxes payable with respect to ERP's ownership or interest in the Premises. Blackhawk shall be responsible for payment of taxes which may be imposed or assessed against the Reclamation Services, Blackhawk, Blackhawk's equipment, and improvements placed or installed by Blackhawk in or upon the Premises.

### Article V. Representations and Warranties

      A.    <u>Blackhawk Representations and Warranties.</u>  Blackhawk represents and warrants that: (i) it is a limited liability company duly organized, validly existing, and in good standing under the laws of the Commonwealth of Kentucky; (ii) it has full legal power, authority and capacity to effectuate and perform this Agreement; (iii) neither Blackhawk nor any of its assets is subject to any judgment, order, writ, decree, or injunction, nor is Blackhawk a party to any judicial, administrative or arbitration proceeding or investigation, now pending, or, to its knowledge, threatened, which could have a material adverse effect on the ability of Blackhawk to perform the Reclamation Services; and (iv) this Agreement constitutes the legal, valid and binding obligation of Blackhawk enforceable in accordance with its terms.

      B.    <u>ERP Representations and Warranties.</u>  ERP represents and warrants that: (i) it is a corporation duly organized, validly existing, and in good standing under the laws of West Virginia; (ii) it has full legal power, authority and capacity to effectuate and perform this Agreement; (iii) neither ERP nor any of its assets is subject to any judgment, order, writ, decree, or injunction, nor is ERP a party to any judicial, administrative or arbitration proceeding or investigation, now pending, or, to its knowledge, threatened, which could have a material adverse effect on the ability of ERP to perform its obligations under this Agreement; (iv) ERP, as of the date hereof and during the Reclamation Period shall remain, eligible to obtain surface disturbance permits and revisions and amendments thereto and is not listed in the AVS as holding or otherwise being linked to any permits upon which there exists any unremediated violation of environmental law; and (v) this Agreement constitutes the legal, valid and binding obligation of ERP enforceable in accordance with its terms.

### Article VI.  Insurance

      A.    <u>Coverage.</u>  Blackhawk shall, at its sole expense, procure and maintain in full force and effect during the Reclamation Period the following insurance coverage:

Execution Copy

(a)     Comprehensive general public liability insurance against claims for bodily injury, death or property damage, occurring in or about the Premises in an amount not less than one million dollars ($1,000,000.00) in respect of bodily injury or death of one or more persons ;

(b)     Worker's compensation, unemployment benefits, and employer's liability insurance adequate to fully satisfy Blackhawk's legal obligations under any state or federal workers' compensation statute, including, without limitation, obligations with respect to occupational disease and pneumoconiosis or "black lung"; provided, however, that Blackhawk may self-insure against liability for workers' compensation (including occupational disease) to the extent permitted by state and federal law.

(c)     Automobile liability and/or excess umbrella liability insurance (owned, hired and non-owned vehicles) with minimum bodily injury and property damage limits of One Million Dollars ($1,000,000.00) for each occurrence.

(d)     Property insurance in amounts equal to the full replacement cost (or highest insurable value if coverage for replacement cost is not available) covering all real and personal property and fixtures owned or leased by ERP or which Blackhawk places on such property during the term of this Agreement, against loss or damage by fire, lightening, explosion or other hazards covered under extended coverage insurance.  The proceeds of any loss payable under such policies as required above shall be used by Blackhawk in the restoration, repair, or replacement of the destroyed or damaged property to the extent required by Blackhawk for the performance of its obligations under this Agreement. Any proceeds so received and not used shall be divided between Blackhawk and ERP in proportion to their respective interests.

B.     Form of Insurance.  All insurance required under this Article VI shall be with a reputable insurer, shall name and insure ERP as an additional insured, shall be endorsed to provide waiver of subrogation rights in favor of ERP, and each of the required policies of insurance shall be written on an "occurrence" basis unless the policy is available only on a "claims made basis."

C.     Proof of Insurance.  Blackhawk agrees to furnish certificates of insurance and copies of all insurance policies with all forms, endorsements, and exceptions, before commencing work and each policy shall require the insurance carrier to notify ERP of any cancellation or change of insurance thirty (30) days prior to any such cancellation or change. Blackhawk agrees to furnish to ERP prior to commencing operations hereunder a certificate of good standing from the state workers' compensation agency, which provides coverage to Blackhawk's employees in the course of performance of this Agreement.

## Article VII.  Indemnification

A.     Blackhawk shall indemnify, save harmless and defend ERP, its parents, affiliates, subsidiaries and each of their respective officers, directors, employees, agents, advisors and

9

Execution Copy

representatives (collectively, the "ERP Indemnified Parties") from and against all claims, losses, liabilities, costs, settlements, awards and expenses (including without limitation reasonable attorneys' fees and expenses) arising out of any loss, personal injury, death or damage to property arising out of Blackhawk's performance of the Reclamation Services hereunder which is suffered or claimed to have been suffered by any person, corporation, or entity, except to the extent due to the negligence or willful misconduct of any ERP Indemnified Party.

B.    In addition to and not in limitation or contravention of the specific indemnification obligations set forth in Article IV of this Agreement, ERP shall indemnify, save harmless and defend Blackhawk, its parents, affiliates, subsidiaries and each of their respective officers, directors, employees, agents, advisors and representatives (collectively, the "Blackhawk Indemnified Parties") from and against all claims, losses, liabilities, costs, settlements, awards and expenses (including without limitation reasonable attorneys' fees and expenses) arising out of any loss, personal injury, death or damage to property arising out of ERP's performance under this Agreement which is suffered or claimed to have been suffered by any person, corporation, or entity, except to the extent due to the negligence or willful misconduct of any Blackhawk Indemnified Party.

## Article VIII.  Conditions

It is a condition to the effectiveness of this Agreement that: (a) The Bankruptcy Plan is confirmed and effective pursuant to a valid order of the Bankruptcy Court in the Bankruptcy Case, and (b) the transaction described in the Blackhawk APA in consummated.   Upon the failure of conditions (a) and (b) above, this agreement shall terminate, and neither Party shall have responsibility for performance hereunder.

## Article IX.  Force Majeure

Blackhawk and ERP shall each be released from performance under this Agreement to the extent that such performance is prevented by any cause or causes beyond their control including but not limited to the following events of force majeure: acts of God, war (whether declared or undeclared), terrorism, riots, revolution, insurrection, suspension of labor or measures adopted to counteract same, lockouts, fires, unforeseen geologic conditions, accidents, equipment breakdowns, explosions, epidemics, floods, actions of any government (or agency thereof), interruption or suspension of deliveries, diversion, embargo or confiscation of equipment or property by any governmental authority and/or any other causes whether of the kind and nature herein enumerated or otherwise which are beyond the control of the Parties.  In the event that such a force majeure condition occurs, the Party directly affected shall promptly provide notice to the other Party in writing. It is expressly agreed that any changes to the Non-Blackhawk Permits, the State of West Virginia's water quality standards,  or  any other legal requirement related in any way to Reclamation Services contemplated hereunder shall not be an event of Force Majeure, provided that ERP does not, either directly or indirectly, precipitate such

Execution Copy

changes to impose more stringent standards upon Blackhawk's performance of the Reclamation Services, as set forth in this Agreement.

## Article X.  Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of West Virginia.  The parties consent and submit to the jurisdiction of an appropriate state or federal court of general jurisdiction located in Kanawha County, West Virginia for litigation arising out of or relating to this Agreement and the transactions contemplated hereby, and further agree that service of process, summons, notice or document by U.S. registered mail to its respective address set forth herein shall be effective service of process for any litigation brought against it in any such court.

## Article XI.  Default

Each of the following shall constitute an event of default under this Agreement:

A.      Any representation made by a Party in this Agreement or in any document contemplated by this Agreement shall prove to be materially incorrect or to have omitted to state a material fact required to be stated therein or necessary to make it not misleading in light of the circumstances in which it was made;

B.      A Party shall fail to perform any material covenant or obligation hereunder;

C.      A Party shall file a petition in bankruptcy, have filed against it a petition in bankruptcy which is not dismissed or stayed within ninety (90) days, or otherwise have a trustee, receiver or custodian appointed with respect to its assets or the conduct of its affairs, or the Party shall admit in writing that it is insolvent;

D.      The performance by either of the Parties of its obligations hereunder shall fail to comply in any material respect with the terms of any permit, license, law, order, rule, regulation, judgment or decision applicable to that Party;

E.      The lawful issuance of any order, decree, judgment or directive by any governmental authority requiring Blackhawk to cease performance of the Reclamation Services hereunder for more than thirty (30) days;

F.      The creation of any condition, or discovery of any existing condition, on the Premises which constitutes an environmental hazard or common law nuisance and is likely to impose upon the Parties a duty to abate or mitigate such condition or to incur expenditures to maintain such condition so as to avoid damage to the environment or persons or property, but only if ERP fails to remedy such condition without cost to Blackhawk promptly upon notice of the existence of such condition;

11

Execution Copy

G.     If ERP or any person or entity owning of controlling ERP or owned or controlled by ERP is, or becomes, in violation of the federal or state surface mining control and reclamation laws or any other law, rule or regulation referred to in 30 CFR 773.15(b), or any such person is listed on the federal Applicant/Violator System or its state law equivalents;

H.     A strike or labor dispute (or any kind) involving employees of either party or is subcontractors that causes any picketing at or around the Premises; interferes with access into or out of the Premises, or otherwise prevents either Party from performing its obligations under this Agreement.

## Article XII.  Rights and Remedies Upon Default

Upon the occurrence of an event of default by a Party, the other Party may give written notice of such default to the defaulting Party, and if the defaulting Party does not cure such default within ten (10) Business Days of such notice in the case of a default in payment or thirty (30) Business Days after receipt of such notice in the case of a default other than a default in payment, then the other Party may:

A.     If the default is a default in payment, set off the amount due from the other Party against monies otherwise due to the other Party;

B.     Cure the same and either (i) offset the reasonable cost of such cure against amounts otherwise due to the defaulting Party, or (ii) be reimbursed in full by the defaulting Party for the same;

C.     Suspend its performance under this Agreement until the default is cured;

D.     Terminate this Agreement, or;

E.     Take any other action or pursue any other right available at law or equity.

The remedies provided herein are cumulative and the exercise of one shall not limit, waive or preclude the exercise of other remedies in this Article or otherwise in this Agreement or available at law or equity, at the same time or subsequently.  Each of the Parties must make commercially reasonable efforts to mitigate their damages.  Upon termination of this Agreement, Blackhawk shall have ninety (90) days to remove any and all equipment and materials from the Premises which Blackhawk owns and has placed on the Premises.

## Article XIII.  Non-Waiver

The failure of either Party to insist in any one or more instances upon strict performance of any obligation of the other Party under this Agreement shall not be deemed to be a waiver of the performance of any such obligation or a relinquishment of any rights hereunder for the future.  The respective rights and remedies of the Parties are cumulative and not exclusive of any rights or remedies which any Party would otherwise have.

12

Execution Copy

## Article XIV.  Health and Safety

A.      Both Parties shall take prudent steps to protect the safety and health of its own employees and those of its subcontractors under this Agreement, and shall comply in all material respects with all applicable provisions of federal, state, and local safety laws.  Both Parties are responsible and accountable to ensure their personnel work safely, and their respective management personnel shall enforce safe work practices.  Neither Party shall be responsible for supervising the other Party's personnel.

B.      ERP shall ensure that Blackhawk's employees or subcontractors are given any safety and health orientation ERP deems necessary or appropriate for conduct on the Premises (the "ERP Safety Rules") before any employee or subcontractor enters upon the Premises, and Blackhawk shall take prudent steps to cause its employees and its subcontractors under this Agreement to comply in all material respects with the same.  Any Blackhawk personnel found in material violation of any MSHA standard or ERP Safety Rule shall be subject to removal from the Premises, and any Blackhawk employee or subcontractor who willfully or repeatedly violates the ERP Safety Rules shall be subject to permanent exclusion from the Premises.  ERP shall promptly notify Blackhawk of any health or safety violations so that Blackhawk may take appropriate steps to correct the same.

C.      Blackhawk shall take prudent steps to (i) require its and its subcontractors' employees to adhere to all posted speed limits governing safe vehicle travel in and around the Premises, (ii) ensure that all of its or its subcontractors' vehicles that enter upon the Premises in performance of the Reclamation Services are driven and occupied by properly trained individuals and maintained in safe operating condition with all necessary safety equipment; and (iii) that its truck drivers maintain any Commercial Driver's License necessary to comply with DOT requirements.

D.      Personal safety equipment, e.g., hard hats, eye protection, and safety shoes, etc. necessary for the proper protection of Blackhawk's employees or subcontractors shall be the responsibility of Blackhawk.

E.      Each Party shall immediately notify the other of any reportable injury which occurs on the Premises.

F.      Each Party shall be solely responsible for its own employees' and those of its subcontractors regarding drug and alcohol use.  Controlled substances and alcohol are prohibited on the Premises, and any employee or subcontractor using, possessing, or selling controlled substances on the Premises will be immediately removed from the Premises, and may be turned over to law enforcement authorities.

Execution Copy

## Article XV.  Option to Match Offers for Other Reclamation Work

During the Reclamation Period, to the extent ERP seeks to use contractors to perform additional reclamation work under its reclamation plans or permits that is not the subject of a Reclamation Plan hereunder, Blackhawk shall have the right to match the lowest bid from any third-party contractor for any construction, excavation, and grading work to be contracted by ERP.  Following the receipt of bids for third-party reclamation work, ERP shall transmit the bid to Blackhawk, which shall have thirty (30) days thereafter in which to submit a lower bid or match the bids by providing written notice of same.  Upon receipt of any lower or matching bid from Blackhawk, ERP shall award the contract for additional reclamation services to Blackhawk. The performance of such additional work, and the terms and conditions thereof, shall be subject to a separate agreement and not governed by this Agreement.

## Article XVI.  Notice

All notices required to be given under this Agreement, unless otherwise specified, shall be made by recognized overnight delivery service or by certified mail, postage prepaid, addressed as follows:

If to Blackhawk:
Blackhawk Mining, LLC
3228 Summit Square Place
Suite 180
Lexington, KY 40509
Attn:  President

If to ERP:
ERP Environmental Fund, Inc.
PO Box 87
Natural Bridge, Virginia 24578
Attn: Tom Clarke

If to WVDEP:
West Virginia Department of Environmental Protection
601 57th Street, Southeast
Charleston, West Virginia 25304
Attn:  Harold D. Ward

or such other address as either Party from time to time may designate in writing to the other.  All notices shall be deemed delivered (i) if by personal delivery, on the date of delivery if delivered during normal business hours, and if not delivered during normal business hours, on the next Business Day following deliver; (ii) if by overnight delivery service, on the next Business Day following dispatch thereof; and (iii) if by certified mail, on the third Business Day after dispatch thereof.

14

Execution Copy

## Article XVII.  Subcontracting/Assignment/Successors and Assigns

A.     Blackhawk may freely subcontract the Reclamation Services or any portion thereof, or assign its rights and obligations hereunder: (i) to Hawkeye Contracting Company, LLC without notice to or receipt of consent from ERP, or (ii) to any prudent and reputable coal mining or reclamation services company with the financial ability, equipment, and labor force necessary to perform the Reclamation Services, provided Blackhawk gives notice of such subcontract or assignment to ERP and WVDEP and Blackhawk's subcontractor or assignee agrees to be bound by the terms of this Agreement.  Except as provided in the preceding sentence of this Agreement, Blackhawk shall not otherwise transfer its rights or interests created by this Agreement, either voluntarily or by operation of law, without having first obtained the written consent of ERP and WVDEP to such assignment or transfer, which consent shall not be unreasonably withheld, without first obtaining and presenting to ERP a covenant of assumption by the assignee/transferee, wherein such assignee/transferee expressly agrees to assume and be bound by all of the covenants, terms, conditions, and provisions of this Agreement.

B.     Upon notice to Blackhawk, ERP may assign freely its rights under this Agreement without Blackhawk's consent to VCLF or, in the event of a bond forfeiture at a Non-Blackhawk Permit, WVDEP.  ERP may not assign or otherwise transfer any of its rights or interests created by this Agreement, either voluntarily or by operation of law, without having first obtained the written consent of Blackhawk and WVDEP to such assignment or transfer, which consent shall not be unreasonably withheld, without first obtaining and presenting to Blackhawk a covenant of assumption by the assignee/transferee, wherein such assignee/transferee expressly agrees to assume and be bound by all of the covenants, terms, conditions and provisions of this Agreement.

## Article XVIII. Captions

The captions of the Articles and paragraphs of this Agreement are for convenience only, and shall not be considered in construing this Agreement.

## Article XIX.  Entire Agreement/Amendment

This instrument contains the entire Agreement between the Parties in relation to the matters contained herein and supersedes all prior negotiations, memoranda, and agreements, whether written or oral in relation to those matters.  This Agreement shall not be modified or amended except by written agreement executed by an authorized representative of both parties.

## Article XX. Counterparts

This Agreement may be executed in two or more counterparts, including by means of facsimile signatures, each of which shall be an original, but such counterparts together shall constitute but one and the same instrument.

15

**IN WITNESS WHEREOF,** the Parties have duly executed this Agreement with all necessary right and authority to bind them, effective as of the Effective Date.

**ERP Environmental Fund, Inc.**

By: _____
Thomas M. Clarke
Its President and CEO

*[Signature Page for Reclamation Services Agreement]*

**Blackhawk Mining LLC**

By: _____
John M. Potter
Its Chief Executive Officer

[*Signature Page for Reclamation Services Agreement*]

Acknowledged and Agreed:

**West Virginia Department of Environmental Protection**

By: _____
Randy Huffman
Its Secretary

9977334v5

*[Signature Page for Reclamation Services Agreement]*

**EXHIBIT A**

[See attached]

P.O. #
Customer
Invoice #
Job No:

**2015 Rate Sheet**

Job Location: Various     General Services

Contracting     Weekly Totals

*Rates are subject to Fuel price increases, Base = $3.30

Date 01/01/15 thru 12/31/15

| Operator | Equipment/Service | Equipment | | | Operator Time | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | Hours | Rate | Amount | Rate @ $32.80 | | Markup @ $3.50 | | |
| | | | | | Hours | Amount | Hours | Amount | |
| | Hitachi ZX 450 Excavator - 5026 | | $123.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 349E Excavator | | $116.25 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 350 Excavator | | $89.75 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo 330 Excavator | | $89.75 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 330 Excavator | | $89.75 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Komatsu 300 Excavator | | $85.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 225 Excavator | | $75.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 225 Excavator w/Hammer | | $122.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo 210 Excavator | | $75.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 200 Excavator w/grapple | | $75.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 160 Excavator | | $70.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 130 Excavator | | $60.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 120 Excavator | | $60.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Cat. 289 Skid Steer/Mini Excavator or equivalent | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 310 Backhoe | | $43.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 988 Loader | | $132.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 980 Loader | | $100.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 12H Grader/or equivalent | | $65.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 336 Long Boom Excavator | | $116.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere TC 54 Loader | | $45.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ingersoll Rand SD100 Compactor | | $40.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Tandem Dump Truck | | $40.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | GMC 6500 Dump Truck, (8 ton) | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Boom Truck | | $25.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo A30D Articulated Rock Truck | | $80.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo A40D Articulated Rock Truck | | $91.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Chevy Pickup, (additional to foremans) | | $4.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ford F550 Dump Truck w/1000 gal Hydroseeder | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ford F550 Dump Truck | | $17.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Chevy 3500 Flatbed Truck/or equivalent | | $17.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar DD10 Dozer | | $238.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |

| Description | | Rate | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Caterpillar D9 Dozer | | $150.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Caterpillar D8R Dozer | | $112.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Caterpillar Dozer D6R | | $83.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Caterpillar D5LGP | | $75.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| John Deere 700 Dozer | | $67.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| John Deere 850 C Dozer | | $75.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| John Deere 650H Dozer | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Kenworth Tractor & Lowboy | | $82.85 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Tandem Roll Back Truck | | $59.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Ford L8000 Water Truck | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Elgin Street Sweeper | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Mechanic's Truck | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| 3" - 4" Pump | | $10.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| 6" pump | | $15.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Service 6" Diesel Pump | | $96.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| Straw Blower | | $5.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| **Equipment/Operator Totals** | 0 | | $0.00 | 0 | $0.00 | 0 | $0.00 | $0.00 |
| Supervisor | | $45.00 | $0.00 | | | | | $0.00 |
| Supervisor Markup | | $3.50 | $0.00 | | | | | $0.00 |
| Laborer | | $32.00 | $0.00 | | | | | $0.00 |
| Laborer Markup | | $3.50 | $0.00 | | | | | $0.00 |
| Materials & Subs + 5%, see attached invoices | | | $0.00 | | | | | $0.00 |
| **Invoice Amount** | | | | | | | | **$0.00** |

| P.O. # | **2015 Rate Sheet** |
| Customer | |
| Invoice # | |
| Job No: | General Services | Fuel Supplied by Owner |
| Job Location | Varies | Date | 01/01/15 thru 12/31/15 |

| Contracting Weekly Totals | | Equipment | | | Operator Time | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Rate @ $32.00 | | Markup @ $3.50 | | |
| Operator | Equipment/Service | Hours | Rate | Amount | Hours | Amount | Hours | Amount | Total |
| | Hitachi ZX 450 Excavator- 5026 | | $76.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 349E Excavator | | $76.25 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 350 Excavator | | $60.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo 330 Excavator | | $60.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 330 Excavator | | $60.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Komatsu 300 Excavator | | $57.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 225 Excavator | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Hitachi 225 Excavator w/Hammer | | $80.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo 210 Excavator | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 200 Excavator w/grapple | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 160 Excavator | | $50.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 130 Excavator | | $43.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 120 Excavator | | $43.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Cat. 289 Skid Steer/Mini Excavator or equivalent | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 310 Backhoe | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 988 Loader | | $90.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 980 Loader | | $69.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 12H Grader/or equivalent | | $45.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar 336 Long Boom Excavator | | $76.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere TC 54 Loader | | $32.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ingersoll Rand SD100 Compactor | | $25.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Tandem Dump Truck | | $32.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | GMC 6500 Dump Truck, (8 ton) | | $25.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Boom Truck | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo A30D Articulated Rock Truck | | $57.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Volvo A40D Articulated Rock Truck | | $66.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Chevy Pickup, (additional to foremans) | | $4.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ford F550 Dump Truck w/1000 gal Hydroseeder | | $30.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ford F550 Dump Truck | | $17.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Chevy 3500 Flatbed Truck/or equivalent | | $17.50 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar DD10 Dozer | | $162.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar D9 Dozer | | $90.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar D8R Dozer | | $68.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar Dozer D6R | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Caterpillar D5LGP | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 700 Dozer | | $45.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 850 C Dozer | | $55.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | John Deere 650H Dozer | | $40.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Kenworth Tractor & Lowboy | | $82.85 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Tandem Roll Back Truck | | $40.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Ford L8000 Water Truck | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Elgin Street Sweeper | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Mechanic's Truck | | $20.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | 3" - 4" Pump | | $10.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | 6" pump | | $15.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Service 6" Diesel Pump,(fuel) | | $0.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Straw Blower | | $5.00 | $0.00 | | $0.00 | 0 | $0.00 | $0.00 |
| | Equipment/Operator Totals | 0 | | $0.00 | 0 | $0.00 | 0 | $0.00 | $0.00 |
| | Supervisor | | $45.00 | $0.00 | | | | | $0.00 |
| | Supervisor Markup | | $3.50 | $0.00 | | | | | $0.00 |
| | Laborer | | $32.00 | $0.00 | | | | | $0.00 |
| | Laborer Markup | | $3.50 | $0.00 | | | | | $0.00 |
| | Materials & Subs + 5%, see attached invoices | | | $0.00 | | | | | $0.00 |
| | | | | | | | Invoice Amount | | $0.00 |

Execution Copy

## RECLAMATION AGREEMENT

This Reclamation Agreement ("Reclamation Agreement") is entered into this 17th day of February 2016 by and among ERP Environmental Fund, Inc. ("ERP"), Virginia Conservation Legacy Fund, Inc. ("VCLF," and, together with ERP and its other affiliates, the VCLF Entities"), and the West Virginia Department of Environmental Protection ("DEP") (collectively the "Parties" and each individually a "Party").

### Recitals

Pursuant to the fourth amended joint chapter 11 plan (the "Plan") of Patriot Coal Corporation and its affiliates (collectively, "Patriot") and an Asset Purchase Agreement dated August 16, 2015 between VCLF, ERP, and Patriot (Exhibit K, Fourth Amended Disclosure Statement for Debtors' Fourth Amended Joint Plan of Reorganization, *In re Patriot Coal Corp.*, Case No. 15-32450-KLP (Bankr. E.D. Va., Sept. 18, 2015) [Doc. 1333])) entered into in connection with the Plan (the "Asset Purchase Agreement"), the VCLF Entities acquired certain mining and NPDES permits issued by DEP as set forth in Schedule 2.01(g) to the Asset Purchase Agreement.

In connection with confirmation of the Plan and approval of the VCLF transaction, the Parties entered into a comprehensive Settlement Agreement dated October 27, 2015 (the "Settlement Agreement") with Patriot and Blackhawk Mining LLC ("Blackhawk").

The Settlement Agreement contemplates that the VCLF Entities and DEP will enter into a reclamation agreement pursuant to which, among other things, they will establish a detailed reclamation schedule, including provisions for the mining of coal incidental to reclamation, with respect to certain West Virginia permits assigned to the VCLF Entities and provide for the creation and funding of a water trust fund on a permit by permit basis in accordance with applicable West Virginia laws and rules.

In furtherance of the implementation of the Settlement Agreement, the Parties hereby enter into the following Reclamation Agreement pursuant to Section 3 of the Settlement Agreement.

### Agreement

1.    Definitions. In addition to the terms defined above and elsewhere in this Reclamation Agreement, the following terms have the following meanings herein:

a.  "Blackhawk Services" means the reclamation services provided by Blackhawk under and pursuant to the Blackhawk Reclamation Services Agreement

b.  "Blackhawk Reclamation Services Agreement" means the Reclamation Services Agreement dated October [27], 2015 entered into between ERP and Blackhawk.

c.  "Collateral Agreement" means the agreement entered into by and among the Parties hereto and the relevant financial institution providing, among other things, for the establishment of the Collateralized Reclamation Account.

1



EXHIBIT

d. "Collateralized Reclamation Account" means the interest bearing deposit account established by VCLF and pledged to DEP in accordance with Section 5(b)(i) the Settlement Agreement pursuant to the Collateral Agreement.

e. "Default" has the meaning ascribed to it in Section 8 hereof.

f. "Director" means the Director of the Division of Mining and Reclamation of DEP.

g. "ERP Federal" means ERP Federal Mining Complex, LLC, an indirect subsidiary of VCLF and an affiliate of ERP.

h. "ERP Permits" means those former Patriot DEP-issued surface mining, underground mining, NPDES, and other environmental permits, as set forth in Schedule 2.01(g) of the Asset Purchase Agreement, that Patriot assigned to ERP pursuant to the Asset Purchase Agreement. The term "ERP Permits" does not refer to any permits associated with the Federal No. 2 Mine assigned to ERP Federal.

i. "Surety Bonds" means the bonds securing performance of the reclamation obligations associated with the ERP Permits.

2.   Permit Transfer Applications.

a. Within ten days from the date hereof, ERP shall file all remaining permit transfer applications with respect to each of the ERP Permits.

b. ERP shall take all necessary actions to diligently pursue approval of such permit transfer applications, including promptly responding to all requests by DEP for additional information and documents in connection with such permit transfer applications.

3.   Reclamation Plan.

a. Initial Site Reclamation Plan and Priority Schedule.

i. Exhibit 3.1 hereto sets forth, on a mining complex basis, the initial schedule for the conduct of reclamation and water treatment and management with respect to the ERP Permits (the "Initial Site Reclamation Plan and Priority Schedule"). As used herein, the term, "site," is synonymous with "complex." ERP operates twelve mining sites/complexes within the State of West Virginia. Progress maps associated with Exhibit 3.1 shall be submitted within three (3) business days of the Parties' execution of this Agreement.

ii. Pending the approval of the initial Permit Reclamation Plan(s) for any mining site, ERP may, subject to the approval of the Director, modify or amend Exhibit 3.1.

iii. The Initial Site Reclamation Plan and Priority Schedule will, as and to the extent necessary or appropriate, be incorporated into one or more consent orders.

b.  Long Term Reclamation and Water Treatment Plan.  Within thirty days from the date hereof (and irrespective of whether or not it has received final approval of the transfer of the ERP Permits), ERP shall deliver to the Director a long-term strategic reclamation and water treatment plan.  Such plan shall include the following:

i.  a detailed and specific strategic plan for completing the reclamation of the permitted sites under the ERP Permits;

ii.  a detailed water treatment inventory and specific strategic plan for the ongoing maintenance of water treatment and management activities required under the ERP Permits;

iii.  a detailed and specific strategic plan for complying with all applicable consent decrees relating to the ERP Permits;

iv.  a detailed and specific strategic plan for utilizing, establishing, and funding water trusts;

v.  a detailed and specific prioritization and detailed timeline for implementing each of the elements of the foregoing strategic plan, including a schedule for obtaining phased and final bond releases;

vi.  a detailed and specific strategic plan for funding the foregoing strategic plan, including a strategic plan for accessing and obtaining the collateral backing the existing Surety Bonds;

vii.  identification of resources available to implement the foregoing strategic plan;

viii.  a specific plan for utilizing the Blackhawk Services; and

ix.  the Reclamation Budget (as defined below).

c.  Detailed Permit Reclamation Plans.

i.  Within ten days from the date hereof, ERP shall submit a timeline for the submission of an amended reclamation plan for each of the ERP Permits.  The timeline for submission of the amended reclamation plans shall not exceed ninety days from the date hereof, by which time (and irrespective of whether or not it has received final approval of the transfer of the relevant permit), ERP shall submit and pursue until approval a detailed, and to the extent necessary or appropriate an amended reclamation plan for each of the ERP Permits (each a "Permit Reclamation Plan").

ii.  Upon DEP's approval of each such Permit Reclamation Plan, the approved amended reclamation plan shall be submitted to DEP as a revision, modification, or amendment to the relevant ERP Permit.

iii.  In the event that ERP determines that changes to the existing reclamation plan for an ERP Permit are not necessary or appropriate, ERP shall advise DEP of the same by letter on ERP letterhead addressed to the Director.  ERP may combine in a single letter notice that changes to multiple existing mine plans are not necessary or appropriate.

d.  Incidental Mining.

i.  Any detailed Permit Reclamation Plan may, subject to the approval of the Director, provide for mining incidental and necessary to facilitate a reclamation plan, including the extraction of coal that would not ordinarily be considered incidental to reclamation but as to which the parties agree such additional sale proceeds are necessary to fund reclamation.

ii.  All revenues generated from the sale or other disposition of all coal mined pursuant to the preceding subsection, net of unaffiliated third-party expenses incurred and required to be paid in connection with the sale of mined coal pursuant to the preceding subsection, including, but not limited to, transportation costs and taxes, shall be deposited into the Collateralized Reclamation Account and held in accordance with the Collateral Agreement.  It is understood that all expenses related to mining incidental to reclamation conducted pursuant to the preceding subsection, including expenses incurred by ERP Mineral, Inc. and any other ERP-related entity, will be included in the Reclamation Budget, with the effect that only the net proceeds from the sale of coal mined as incidental to reclamation will be deposited in the Collateralized Reclamation Account.

e.  Incremental Bonding and Inactive Status.

i.  In connection with the submission of a revised, modified, or amended reclamation plan or at any time thereafter, ERP may apply for

1.  incremental bonding for one or more of the ERP Permits in accordance with W.Va. Code St. R. § 38-2-11.4.a.3 & 4; and/or

2.  inactive status with respect to one or more of the ERP Permits in accordance with W.Va. Code St. R. § 38-2-14.11.

ii.  The approval or disapproval of any application for incremental bonding and inactive status shall be in the sole discretion of the Director.

4.  Performance of Reclamation and Water Treatment and Management.

a.  ERP shall perform all reclamation and water treatment and management in a manner designed to ensure that the reclamation and water treatment and management can be, to the extent practicable, timely and fully completed with the resources available to it.

b.  All reclamation and water treatment and management identified in the Initial Site Reclamation Plan and Priority Schedule and the detailed Permit Reclamation Plans

when and as approved by DEP shall be performed by ERP in accordance with a priority schedule proposed by ERP and approved in writing by DEP.

    c. The initial priority schedule is set forth in Exhibit 3.1.

    d. At any time and from time to time from and after the date hereof, ERP may propose subject to DEPs prior approval, and DEP may direct, changes to the priority schedule to take into consideration such factors as, but not limited to, site conditions, protection of the environment, efficient scheduling, cash flow, and operational concerns.

5.    Reclamation Budget and Reimbursement of Reclamation and Water Treatment and Management Costs.

    a. Within thirty days after the date hereof, ERP shall submit an annual budget for the maintenance, reclamation and water treatment and management with respect to all of the ERP Permits in accordance with this Reclamation Agreement ("Reclamation Budget"). The Reclamation Budget shall, at a minimum, provide for each of the following:

    i. a budget for the projected gross revenues from the sale of all mined coal from the ERP Permits;

    ii. A detailed budget for each mining site, detailing on separate lines the individual budgeted expenditures for maintenance, reclamation, and water treatment and management at each mining site;

    iii. To the extent applicable a separate line item(s) for water treatment and management funds at each applicable site;

    iv. Budgeted expenditures on a monthly and quarterly, as well as a calendar year (i.e. through December 31, 2016), basis;

    v. Total budgeted expenditures on a site-by-site basis;

    vi. Total budgeted expenditures on an aggregate basis by ERP (it being understood that the full budgeted amount of the Blackhawk Services shall reduce the amount of the total budgeted expenditures by ERP);

    vii. An estimate of the amount of the Blackhawk Services on a monthly, quarterly, and calendar year basis;

    viii. A monthly contingency amount not to exceed five percent (5%) of the total ERP budgeted amount for any given month.

    b. Not less than ninety days prior to the end of each calendar year hereafter, ERP shall deliver an annual budget on the same basis for the upcoming calendar year.

    c. Each Reclamation Budget shall be subject to the prior approval of DEP.

d. ERP may submit revised budgets from time to time, and, subject to the prior approval of DEP, each approved revised budget shall constitute the Reclamation Budget in accordance with this Reclamation Agreement.

e. Upon approval of the Reclamation Budget, ERP shall be authorized to incur expenses provided for in the Reclamation Budget without further approval of DEP; provided, however, that ERP shall have no authority to incur, without DEP's prior approval,

    i. Ordinary expenses in an aggregate amount in excess of the total ERP budgeted amount on a monthly basis; and

    ii. Ordinary expenses at a particular site in an aggregate amount greater than twenty-five percent (25%) in excess of the aggregate budgeted expenditures for such site.

    iii. "Ordinary expenses" do not include unforeseen, necessary expenses that may arise from time to time, such as equipment failure.

f. Within ten business days after the end of each calendar month covered by an approved Reclamation Budget, ERP shall deliver to DEP a report comparing actual expenditures against the budgeted expenditures on a line-by-line basis for the immediately preceding calendar month (each such report being a "Monthly Budget Report"). Each Monthly Budget Report shall include (i) a statement showing the aggregate amount of funds on deposit in the Collateralized Reclamation Account as of the end of such month together with an itemization of all funds deposited to the Collateralized Reclamation Account in the prior month, (ii) an accounting of the production and sale of any mined coal from the ERP Permits in such month, and (iii) a column showing the aggregate unused expenses for each line item and a calculation for each such line item of the percentage of aggregate unused expenses to the aggregate budgeted expenses to date.

g. Within five business days after delivery of a Monthly Budget Report, subject to the availability of sufficient funds in the Collateralized Reclamation Account, and in the absence of a Default as hereinafter defined, DEP will issue written instructions to the Financial Institution authorizing the transfer of an amount equal to the lesser of (1) the actual expenses incurred by or (2) the budgeted expenditures of ERP in accordance with this Reclamation Agreement as set forth in such Monthly Budget Report (the "Reimbursement Amount"). For any expenses that are not deemed "ordinary expenses," and which were not included in ERP's monthly budgeted expenditures, the Parties will meet and confer within five business days after deliver of the Monthly Budget Report for ERP to explain the necessity of the unbudgeted expenses. DEP will issue a decision on whether to reimburse ERP for the unbudgeted expenses within two business days of the meeting. If the Collateralized Reclamation Account does not contain sufficient funds to fully reimburse ERP for the full Reclamation Amount, DEP will instruct the Financial Institution to release all funds available and shall, promptly upon receiving notice of the availability of additional funds, instruct the Financial Institution to release such additional funds until ERP is reimbursed for the full Reimbursement Amount. For any expenses that

are not deemed "ordinary expenses" or which exceed the amount included in ERP's monthly budgeted expenditures, the Parties will meet and confer within five business days after delivery of the Monthly Budget Report for ERP to explain the necessity of the unbudgeted expenses. DEP will issue a decision on whether to reimburse ERP for the unbudgeted expenses within two business days of the meeting.

h. Any unused expenses, other than the monthly contingency amount, as shown in a Monthly Budget Report may be carried forward on a line-by-line basis to succeeding months, provided that (i) all accumulated unused expenses for a line item shall be used first before applying the monthly contingency amount to any expenses incurred for such line item and (ii) if the aggregate unused expenses for a line item exceeds ten percent of the aggregate budgeted expenses. VCLF shall provide a written explanation of such variance and a revised Reclamation Budget to account for the anticipated use of such variance in the next Monthly Budget Report. Any unused portion of the monthly contingency amount may not be carried forward.

i. ERP and the VCLF Entities acknowledge that their obligations to perform reclamation, water treatment and management, and other obligations required under the ERP permits and applicable law and rules are not limited by the availability of adequate funds in the Collateralized Reclamation Account for the reimbursement of expenses therefor or by the occurrence of a Default.

j. As soon as practicable, ERP will submit a report detailing expenditures made from October 27, 2015 to January 31, 2016 on a complex by complex basis and a summary of what those expenditures accomplished. DEP will review the report and will, within two business days of receipt and subject to the availability of sufficient funds in the Collateralized Reclamation Account, issue written instructions to the Financial Institution authorizing the transfer of an amount equal to the expenditures it agrees were properly incurred as a result of reclamation activities on the ERP Permits. If the Collateralized Reclamation Account does not contain sufficient funds to fully reimburse ERP for the funds DEP agrees are reimbursable for this time period, DEP will instruct the Financial Institution to release all funds available and shall, promptly upon receiving notice of the availability of additional funds, instruct the Financial Institution to release such additional funds until ERP is fully reimbursed for those expenses DEP agrees are reimbursable. For any portions DEP believes are not properly reimbursable, it may withhold reimbursement of that portion it disputes and will promptly meet with ERP to attempt to reach an agreement with respect to the disputed portion.

6.    Additional Reporting. Within ninety days after the end of each calendar year, VCLF will deliver financial statements prepared in accordance with GAAP for each of ERP, ERP Settlement, LLC ("ERP Settlement"), and ERP Federal. Such financial statements shall include a detailed calculation of ERP Federal's Free Cash Flow (Implied) (as defined in the ERP Proposed Business Plan dated September 26, 2015) and ERP Settlement's Claims Settlements (as defined in the Business Plan).

Execution Copy

7.   Meet and Confer.

a. Within fifteen days after each calendar quarter, ERP shall meet with the Director to provide a detailed report on the progress of reclamation and water treatment and management at each permitted site and the available financial and operating resources of ERP to perform reclamation and water treatment and management in accordance with the ERP Permits and this Reclamation Agreement.

b. ERP shall meet and confer with the Director or any of his designated representatives more frequently as requested by the Director.

c. DEP shall have the right to audit or otherwise verify the cost of all reclamation work either performed by or at the request of ERP or reclamation work for which ERP seeks payment from the Collateralized Reclamation Account.

8.   Default.

a. It shall constitute a default (each a "Default") under this Agreement if any of the foregoing events shall occur and be continuing:

i.   Any VCLF Entity defaults in the performance of its obligations under

1. this Reclamation Agreement;

2. the Settlement Agreement; or

3. any consent order or decree entered into after the effective date of this Reclamation Agreement to which it is a party; or

ii.  DEP shall issue a failure to abate cessation order with respect to any of the ERP Permits.

b. In the event of a Default, DEP may, in its sole discretion, immediately cease the reimbursement of expenses in accordance with this Reclamation Agreement and may, upon thirty days' prior written notice, terminate this Reclamation Agreement, seize and execute on the Collateralized Reclamation Account, and/or take any other legal or enforcement action against the VCLF Entities, any applicable operator, and/or their owners and controllers.

9.   DEP's Continuing Regulatory Authority and Enforcement.   Nothing in this Reclamation Agreement shall in any way limit or impair the rights of the Director to enforce all applicable environmental and reclamation laws and regulations.

10.  Water Treatment Trusts. ERP may at any time and from time to time hereafter propose to establish and fund one or more water treatment trusts pursuant to and in compliance with applicable law and rules, subject to the prior approval of DEP.  Each water treatment trust shall be governed by a separate agreement with DEP.

8

Execution Copy

11. <u>Amendment or Modification</u>.  This Reclamation Agreement cannot be modified, and its terms cannot be waived, except in writing signed by each of the Parties.

12. <u>Counterparts.</u>  This Reclamation Agreement may be executed by any of the Parties on separate counterpart signature pages (including by telecopy), and all such counterpart signature pages taken together with the body of the Reclamation Agreement shall be deemed to constitute one and the same instrument.

West Virginia Department of Environmental Protection

By _Harold D. Ward_____
Name:  Harold D. Ward
Title:  Director, Division of Mining and
　　　　Reclamation

ERP Environmental Fund, Inc.

By _____
Name:  Thomas Clark
Title:  President and Chief Executive Officer

VIRGINIA CONSERVATION LEGACY FUND

By _____
Name:  Thomas Clark
Title:  President and Chief Executive Officer

9

9.   <u>DEP's Continuing Regulatory Authority and Enforcement</u>.   Nothing in this Reclamation Agreement shall in any way limit or impair the rights of the Director to enforce all applicable environmental and reclamation laws and regulations.

10.   <u>Water Treatment Trusts</u>.   ERP may at any time and from time to time hereafter propose to establish and fund one or more water treatment trusts pursuant to and in compliance with applicable law and rules, subject to the prior approval of DEP.   Each water treatment trust shall be governed by a separate agreement with DEP.

11.   <u>Amendment or Modification</u>.   This Reclamation Agreement cannot be modified, and its terms cannot be waived, except in writing signed by each of the Parties.

12.   <u>Counterparts.</u>   This Reclamation Agreement may be executed by any of the Parties on separate counterpart signature pages (including by telecopy), and all such counterpart signature pages taken together with the body of the Reclamation Agreement shall be deemed to constitute one and the same instrument.

West Virginia Department of Environmental Protection

By _____
Name:  Harold D. Ward
Title:  Director, Division of Mining and
        Reclamation

ERP Environmental Fund, Inc.

By _____
Name:  Thomas Clark
Title:  President and Chief Executive Officer

VIRGINIA CONSERVATION LEGACY FUND

By _____
Name:  Thomas Clark
Title:  President and Chief Executive Officer

9

**EXHIBIT 3.1**

**Initial Site Reclamation Plan**

**Reclamation Priorities:**

ERP's first priority will be to minimize the possibility of any off-site disturbance on its permits. To achieve this objective, all permits will be inspected as necessary to ensure compliance. When issues are discovered that have the potential to create off-site disturbance, they will be immediately addressed. ERP has and will dedicate necessary personnel to the collection and monitoring of water samples and its permits.

For ease of tracking, ERP's permits are grouped into "complexes" which share geographical proximity or other features. Descriptions in the reclamation priority plan will reference complexes. A list at the end of this plan details which permits are part of which complex.

ERP will begin its active reclamation projects by concentrating on its large surface properties. These are located on the former Patriot operations at the Hobet surface mine, the Guyan surface mine, the Jupiter mine, the Hillfork Mine and portions of the Samples mine. By concentrating on these areas of greatest disturbance, ERP will be putting the limited resources at its current disposal to their most efficient use. ERP will place major emphasis on achieving Phase I reclamation on its permits, as this represents significant elimination of potential negative environmental effects. ERP Environmental funds itself through bond release. For this reason, amount of potential bond released will be one factor in determining which permits to work on.

**Corridor G Complex**

Work on the Corridor G Complex will be split between the former Hobet surface mine and the former Hillfork surface mine.

Hobet: Reclamation activities at the former Hobet properties will be concentrated in two distinct areas. The dragline will continue to work on Mine 45 (S-5002-07) until all highwall has been eliminated and other reclamation on this permit is finished. Dozers and support equipment will work with the dragline to maximize its effectiveness. Once the highwall on this permit has been eliminated, and other useful work completed, the dragline will be moved to a safe location and decommissioned. Due to the cost of maintaining a dragline, in the event of a failure of a major component, the dragline may be retired early. Under current plans, the highwall is planned to be eliminated by June 30, 2016. Operations take place four-five days per week, two shifts per day. Once earth-moving activities are completed, hydro-seeding and revegetation will take place on the permit.

In addition to the dragline, a spread of equipment will be dedicated to working among the permits on the south-western edge of the property, S-5012-12, S-5033-08, S-5011-01, and S-5003-96. Currently the highwall miner is finishing up wall on S-5033-08. Material from S-5012-12 will be used in reclamation on S-5011-01. Coal production and removal will take place on S-5012-12 and S-5033-08 as part of the process and will be used to defray some operating costs of ERP Environmental Fund. As part

of this process, trees will need to be cut on these permits. Area of tree removal is shown on attached map. Additionally this spread will work to place as many increments as possible of S-5003-96 in phase I as possible. Due to the large amount of bond on this permit, this will be an important process. Current plans are for work on this side to take place 4-5 days per week on day shift. Work on these permits is expected to continue through the end of 2016.

Hobet has a number of active water treatment sites. ERP will maintain and operate these sites. There are no plans to build new water treatment sites in 2016.

Hillfork: The former Hillfork site is also part of the Corridor G Complex. Reclamation work is being performed on S-5027-99. Work will focus on eliminating highwall and shaping the one remaining un-reclaimed valley fill. Coal production and removal will take place on this permit and trees will need to be cut. Area of trees to be cut is shown on the attached map. Active reclamation is anticipated to continue throughout the remainder of 2016.

ERP will continue to treat water at existing sites. There are no plans to construct new treatment in 2016.

**Logan County Complex:**

Guyan: ERP will also devote significant resources to reclamation on the former Guyan surface mine. ERP is currently reclaiming with 18 hourly UMWA-represented employees. Activity will focus on eliminating the last pit on S-5007-01 (pit 29). Due to the steep slope in this area, work in this area will consist of drilling and shooting one shot at a time, then working this material, then repeating the process. While work on this permit is ongoing, work will also be performed on permit S-5006-05. Activity on this permit will consist of eliminating highwall along the haulroad, finishing reclamation in the Stollings boxcut area and finishing grading on ridge 1. Coal removal incidental to reclamation will take place on permit S-5006-05. Reclamation activities are currently taking place seven days per week on day shift. Major reclamation activities at Logan County are expected to be completed by August 2016.

Logan County has numerous water treatment sites including the FBR plant. ERP will continue to operate these installations. At this time there are no plans to construct new treatment facilities at Logan County this year.

**Paint Creek Complex:**

Samples: ERP did not receive any equipment at the former Samples mine when it became responsible for several of the permits there. For this reason, ERP will employ Blackhawk under the terms of the Reclamation Services Agreement. Equipment mobilization has taken place and work has already begun. Work has begun on the southern permit S-3008-00. Initial work will consist of dozer and excavator work. The wall next to the overshot will be eliminated. Additionally slope work will be done with dozers and the southern valley fill will be finished. The current plan is to mobilize additional

equipment in the spring, finalizing work on S-3008-00 and commencing work on S-3035-93, S-3024-90, and S-3004-95. This work is expected to continue throughout 2016.

Water treatment at Samples will continue at active sites. New sites will be constructed as necessary to meet consent decrees and compliance schedules.

**Jupiter Complex:**

Jupiter: Work at Jupiter is taking place on permit S-5009-00 and P-0605-00 and U-5024-99. Material from the east end of the surface permit (S-5009-00) will be used to achieve final grade on the west end of the permit (crow's nest) and to eliminate highwall above the refuse disposal area. Coal production and removal will take place from the east side of S-5009-00. This will require cutting trees as shown on the attached map. The feasibility of capping the refuse area is being studied now. Reclamation work is taking place 4-5 days per week on day shift only. Reclamation work at Jupiter is expected to extend for three years.

A selenium treatment facility will be constructed on top of the western valley fill on S-5009-00.

**Closed Kanawha Eagle Complex:** ERP has three permits at Kanawha Eagle. Existing water treatment obligations will continue to be met. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP. There are no plans to construct new treatment facilities this year.

**Midland Trail/Point Lick Complex:** Five permits make up the Midland Trail/Point Lick Complex. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP. Existing water treatment obligations will continue to be met. There are no plans to construct new treatment facilities this year.

**Tygart River Complex:** The Tygart River complex consists of five permits. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP. These sites treat AMD discharges. Current treatment obligations will continue to be met. There are no plans to construct new treatment sites this year.

**Mountain View Complex:** The Mountain View Complex consists of thirteen permits. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP. Current treatment obligations will continue to be met. There are no plans to construct new treatment sites this year.

**Pine Ridge Complex:** The Pine Ridge Complex consists of thirteen permits. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP. Current treatment obligations will continue to be met. There are no plans to construct new treatment sites this year.

**Remington Complex:** The Remington Complex consists of three permits. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation

Agreement between ERP and the DEP.  Current treatment obligations will continue to be met.  There are no plans to construct new treatment sites this year.

**Colony Bay Complex:**  The Colony Bay Complex consists of 5 permits.  Active reclamation will take place on the Colony Bay permits (H-224, S-7-81, S-5022-94, H-534, S-87-80) to prepare them for phase I release.  Selenium treatment by underground injection on the Colony Bay permits will be put into place by March.  No other active reclamation or new treatment sites are planned for the Colony Bay permits in 2016.

**Eastern Complex:**  The Eastern Complex consists of eight permits. A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP.  Existing water treatment obligations will continue to be met.  There are no plans for new treatment sites at this time.

**Closed Catenary Complex:**  The Closed Catenary Complex consists of thirteen permits.  . A detailed plan for the reclamation of these permits will be submitted pursuant to the requirements of 3-C of the Reclamation Agreement between ERP and the DEP.  Existing water treatment obligations will continue to be met.  There are no plans for new treatment sites at this time.

| NAME | DESCRIPTION | COMPANY | DEPARTMENT | ID CODE | Allocation % | Enter Percentage of above allocation here and continue |
|---|---|---|---|---|---|---|
| **Remington** | | | | | | |
| General | | 410 | 2576 | P9999 | | All P9999 accounts should only be valid for Objective 75 |
| Stockburg 1 | Weatherby Plant and Refuse, U-80-83 | 410 | 2576 | P0001 | 60% | All other idcodes should be valid for all account combins |
| Stockburg 2 | Ruger, U-64-83 | 410 | 2576 | P0002 | 30% | |
| Deskins | U-3011-01 | 410 | 2576 | P0003 | 10% | |
| **Closed KE** | | | | | | |
| General | | 410 | 2960 | P9999 | | |
| Lease 1 | S-3001-95 | 410 | 2960 | P0004 | 100% | |
| Muira | U-3019-01 | 410 | 2960 | P0005 | 0% | |
| Essex | U-3009-03 | 410 | 2960 | P0006 | 0% | |
| **Closed Catenary** | | | | | | |
| General | | 410 | 2424 | P9999 | | |
| Witcher | O-28-85, HS41 | 410 | 2424 | P0007 | 5% | |
| Shrewsbury Refuse | R-56 | 410 | 2424 | P0008 | 5% | |
| Kelly's Creek No.6 | S-47-79 | 410 | 2424 | P0009 | 20% | |
| Kelly's Creek No.6 Surface | S-87-43 | 410 | 2424 | P0010 | 0% | |
| Pond Gap | UO-111 | 410 | 2424 | P0011 | 5% | |
| Morris Fork Plant | O-58-82 | 410 | 2424 | P0012 | 5% | |
| Belcher Refuse | O-80-82 | 410 | 2424 | P0013 | 25% | |
| Morris Fork HR | O-59-82 | 410 | 2424 | P0014 | 0% | |
| No.7/7a Mine | U-87-83 | 410 | 2424 | P0015 | 10% | |
| 8-Mile No.1 | S-124-80 | 410 | 2424 | P0016 | 5% | |
| 8-Mile No.2 | S-100-82 | 410 | 2424 | P0017 | 0% | |
| Carver | S-72-83 | 410 | 2424 | P0018 | 20% | |
| **Mountain View** | | | | | | |
| General | | 410 | 0658 | P9999 | | |
| Cut23 | S-268-76 | 410 | 0658 | P0019 | 10% | |
| Cut21 | S-38-76 | 410 | 0658 | P0020 | 10% | |
| Cut24 | S-103-80 | 410 | 0658 | P0021 | 15% | |
| Robin6 | D-31-82 | 410 | 0658 | P0022 | 0% | |
| Cut22 | S-218-75, S-38-80 | 410 | 0658 | P0023 | 15% | |
| Cut30 | S-6015-86 | 410 | 0658 | P0024 | 20% | |
| White Oak Refuse | R-753 | 410 | 0658 | P0025 | 10% | |
| Cut26 | S-193-77, D-21-82 | 410 | 0658 | P0026 | 5% | |
| White Oak HR | H370 | 410 | 0658 | P0027 | 0% | |
| Morris Fork - Youngs Branch | S-141-79, H397 | 410 | 0658 | P0028 | 15% | |
| **Tygart River** | | | | | | |
| General | | 410 | 0985 | P9999 | | |
| Treatment Plant | | 410 | 0985 | P0029 | 100% | |
| Tygart River Mine | EM-125 | 410 | 0985 | P0030 | | |
| Sand Bank Refuse | R-756 | 410 | 0985 | P0031 | | |
| Powell Refuse | R-747 | 410 | 0985 | P0032 | | |
| Levels Road Refuse | O-1001-87 | 410 | 0985 | P0033 | | |
| Grassy Run Pump Site | | 410 | 0985 | P0034 | | |
| **Midland Trail Point Lick** | | | | | | |
| General | | 410 | 2585 | P9999 | | |
| Preparation Plant | P-574 | 410 | 2585 | P0035 | 15% | |
| Refuse Impoundment | O-3015-93 | 410 | 2585 | P0036 | 25% | |
| Campbell Creek No.6 | U-3036-93 | 410 | 2585 | P0037 | 25% | |
| Campbell Creek No.7 | U-3036-04 | 410 | 2585 | P0038 | 25% | |
| Campbell Creek Haulroads | H-42 | 410 | 2585 | P0039 | 10% | |
| **Catenary Paint Creek** | | | | | | |
| General | | 410 | 2305 | P9999 | | |
| Samples Mine | S-3024-90 | 410 | 2305 | P0040 | 10% | |
| Mine Extension | S-3004-95 | 410 | 2305 | P0041 | 10% | |
| South Extension | S-3017-95 | 410 | 2305 | P0042 | 0% | |
| White Oak Extension | S-3010-00 | 410 | 2305 | P0043 | 10% | |
| T-Extension | S-3070-07 | 410 | 2305 | P0044 | 5% | |
| N-Extension | S-3004-08 | 410 | 2305 | P0045 | 5% | |
| Stanley Heritage | S-3035-93 | 410 | 2305 | P0046 | 25% | |
| Kayford South | S-3008-00 | 410 | 2305 | P0047 | 10% | |
| Pinetree Flats | S-3015-02 | 410 | 2305 | P0048 | 5% | |
| Samples Haulroad | O-3002-05 | 410 | 2305 | P0049 | 5% | |
| Wildcat Surface | S-3006-00 | 410 | 2305 | P0050 | 15% | |

| | | | | | |
|---|---|---|---|---|---|
| **Pine Ridge** | | | | | |
| General | | 410 | 0833 | P9999 | |
| Preparation Plant | O-14-83 | 410 | 0833 | P0051 | 5% |
| Refuse Impoundment | O-68-83 | 410 | 0833 | P0052 | 15% |
| Big Mountain 16 | U-5033-91 | 410 | 0833 | P0053 | 35% |
| Lower Dorothy | U-5005-00 | 410 | 0833 | P0054 | 5% |
| Board Camp | U-5023-08 | 410 | 0833 | P0055 | 10% |
| Lott's Fork | U-5020-09 | 410 | 0833 | P0056 | 0% |
| White's Branch | U-5002-00 | 410 | 0833 | P0057 | 20% |
| Chestnut Hollow | S-6013-89 | 410 | 0833 | P0058 | 5% |
| William's Mountain | S-5029-95 | 410 | 0833 | P0059 | 5% |
| Robin Hood Plant and Refuse | O-76-82 | 410 | 0833 | P0060 | 40% |
| Big Mountain 8 | O-65-82 | 410 | 0833 | P0061 | 25% |
| Big Jarrel HR | O-28-82 | | | P0062 | 5% |
| Big Mountain HR | H-6 | 410 | 0833 | P0063 | 0% |
| **Colony Bay** | | | | | |
| General | | 410 | 1580 | P9999 | |
| Shop Knob | S-87-80 | 410 | 1580 | P0064 | 15% |
| Central | S-5022-94 | 410 | 1580 | P0065 | 40% |
| South | S-7-81 | 410 | 1580 | P0066 | 15% |
| Jasper Workman HR | H-224 | 410 | 1580 | P0067 | 25% |
| Colony Bay HR | H-534 | 410 | 1580 | P0068 | 5% |
| **Eastern** | | | | | |
| General | | 410 | 1727 | P9999 | |
| Kopperston Refuse | O-19-83 | 410 | 1727 | P0069 | 10% |
| Hillside No.3 | U-5049-92 | 410 | 1727 | P0070 | 20% |
| No. A and AA | EM-120 | 410 | 1727 | P0071 | 10% |
| Peachtree Refuse | O-5-82 | 410 | 1727 | P0072 | 10% |
| Eagle No.1 and No.2 | U-4005-91 | 410 | 1727 | P0073 | 20% |
| Eagle No.3 | U-13-83 | 410 | 1727 | P0074 | 10% |
| Black Walnut No.3 | U-5016-05 | 410 | 1727 | P0075 | 0% |
| Beckley Complex | U-127-83 | 410 | 1727 | P0076 | 10% |
| **Corridor G** | | | | | |
| Buck Fork Surface Mine | S-5005-11 | | | | |
| Camp Creek South Deep Mine | U-5009-01 | | | | |
| Hewitt Creek No.1 Surface Mine | S-5027-99 | | | | |
| Horse Creek Haulroad | H-120 | | | | |
| Little Coal River Railroad | H-291 | | | | |
| Julian Tipple | J-732 | | | | |
| Ancillary Area | O-5010-97 | | | | |
| Slippery Gut Impoundment | O-6-81 | | | | |
| Beth Station Prepartion Plant | P-485 | | | | |
| Coarse Refuse Fill | R-405 | | | | |
| Little Horse Creek Dry Refuse Fill | S-106-77 | | | | |
| Bragg Fork Surface Mine/Impoundment | S-128-78 | | | | |
| Big Horse Creek Surface Mine | S-22-85 | | | | |
| Towers Surface Mine | S-38-82 | | | | |
| Westridge No. 3 Surface Mine | S-5002-03 | | | | |
| Surface Mine No. 45 | S-5002-07 | | | | |
| Surface Mine No. 44 | S-5003-06 | | | | |
| Surface Mine No. 42 | S-5003-07 | | | | |
| Westridge Surface Mine | S-5003-96 | | | | |
| Westridge South No. 1 Surface Mine | S-5004-04 | | | | |
| Surface Mine No. 22 | S-5008-06 | | | | |
| Westridge No. 2 Surface Mine | S-5011-01 | | | | |
| Sugartree Surface Mine | S-5016-92 | | | | |
| Northridge Surface Mine | S-5020-95 | | | | |
| Ballard/Chilton Contour | S-5022-02 | | | | |
| Boone Block Surface Mine | S-5024-97 | | | | |
| Stanley Fork surface Mine | S-5026-89 | | | | |
| Chestnut Oak Surface Mine | S-5013-08 | | | | |
| Ballard Fork Surface Mine | S-5080-88 | | | | |
| Sandlick Surface Mine | S-5012-12 | | | | |
| Alma No. 3 Deep Mine | U-5005-99 | | | | |
| Camp Creek No. 1 Deep Mine | U-5008-94 | | | | |
| Chilton No. 1 Mine | U-5016-98 | | | | |
| **Logan County** | | | | | |
| East Ruffner | S-5079-86 | | | | |
| Guyan Surface Mine | S-5007-01 | | | | |
| North Rum | S-5006-05 | | | | |
| Ruffner A Point | S-75-85 | | | | |
| Ruffner- Southwest | S-5001-90 | | | | |
| Northwest Ruffner | S-5005-93 | | | | |
| Winifrede Mine | U-5016-92 | | | | |
| Preparation Plant | P-610 | | | | |
| White Oak Impoundment | O-110-83 | | | | |





LEGEND

Priority Reclamation

ERP Environmental Fund, Inc.
PO BOX 305, MADISON WV 25130

Paint Creek Complex

Samples Surface Mine

Reclamation Priority Map

SCALE: 1" = 5000'   C.I.   DATE 15-Feb-16   BY:   APPROVED

FILE NAME AND PATH





LEGEND

Priority Reclamation

Tree Cutting Area

ERP Environmental Fund, Inc.
PO BOX 305, MADISON WV 25130

CORRIDOR G COMPLEX

Hobet 21 Surface Mine

Reclamation Priority Map















